**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**AT MEMPHIS**

| | | |
|---|---|---|
| **KIMBERLY DIEI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:21-cv-02071-JTF-cgc** |
| | ) | |
| **RANDY BOYD, ET AL.** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

**MEMORANDUM OF LAW IN SUPPORT OF THE INDIVIDUAL CAPACITY**
**DEFENDANTS' MOTION TO DISMISS THE FOURTH AND FIFTH**
**CAUSES OF ACTION**

---

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION AND SUMMARY ............................................................... 1

STATEMENT OF FACTS ................................................................................. 2

I. PROFESSIONAL STANDARDS FOR PHARMACISTS IN TENNESSEE AND
   PHARMACY STUDENTS AT UTHSC'S COLLEGE OF PHARMACY. ............... 2

    A. The State of Tennessee's Professional Standards for Pharmacists. ................. 2

    B. The University of Tennessee's Professional Standards for
   Pharmacy Students. ........................................................................................... 3

II. MS. DIEI'S APPEARANCES BEFORE THE UTHSC COLLEGE OF
    PHARMACY'S PROFESSIONALISM COMMITTEE. ........................................... 4

    A. The 2019 Event. .................................................................................................. 4

    B. The 2020 Event. .................................................................................................. 5

ARGUMENT ...................................................................................................... 5

I. THE COURT SHOULD DISMISS THE FOURTH AND FIFTH CAUSES OF
   ACTION ON THE MERITS. ..................................................................................... 5

    A. The University May Lawfully Require Professional Students To
   Abide by Professional Standards. ...................................................................... 5

    B. The University Has Taken No Adverse Action Against Ms. Diei. ............... 10

        1. The University Did Not Violate the First Amendment by
   Assigning Ms. Diei An Educational Activity in 2019. .......................... 10

            a. The Claims About the 2019 Event Are Time-Barred. ................. 10

            b. The Claims About the 2019 Event Are Without Merit. ................. 10

        2. The University Did Not Violate the First Amendment Because
   It Took No Adverse Action Against Ms. Diei in 2020. .......................... 13

        3. The University Did Not Violate the First Amendment by
   Investigating Complaints About Ms. Diei. ............................................. 16

        4. The Complaint Alleges No Valid Individual Capacity Claim Against
   President Boyd Because It Alleges No Wrongdoing On His Part. .......... 17

II.   THE COURT SHOULD DISMISS THE FOURTH AND FIFTH CAUSES OF
      ACTION BECAUSE THE INDIVIDUAL DEFENDANTS PRESIDENT BOYD
      AND DR. GEORGE ARE ENTITLED TO QUALIFIED IMMUNITY. ................. 18

          1.   Ms. Diei Has Not Alleged Any Actionable Constitutional Violation
               Against the Individual Capacity Defendants. ........................................ 18

          2.   Ms. Diei Has Not Alleged the Violation of Any Clearly Established
               Constitutional Right. ............................................................................... 18

CONCLUSION ............................................................................................................ 20

EXHIBIT LIST

## TABLE OF AUTHORITES

**Cases**

*Abbott v. Pastides*, 900 F.3d 160 (4th Cir. 2018) .............................................................16, 19, 20

*Al-Dabagh v. Case Western Reserve University*, 777 F.3d 355 (6th Cir. 2015) .................. 6-7, 14

*Arvest Bank v. Byrd*, 814 F. Supp. 2d 775 (W.D. Tenn. 2011)......................................Exhibit List

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ...................................................................................19

*Benison v. Ross*, 765 F.3d 649 (6th Cir. 2014) ....................................................................... 13-15

*Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986) ..................................................11

*Christian Legal Society v. Martinez*, 561 U.S. 661 (2010)..........................................................11

*Cobb v. University of Virginia*, 69 F. Supp. 2d 815 (E.D. Va. 1999)...........................................17

*District of Columbia v. Wesby*, 138 S. Ct. 577 (2018)..................................................................19

*Dobbs-Weinstein v. Vanderbilt Univ.*, 185 F.3d 542 (6th Cir. 1999) ...........................................14

*Doninger v. Niehoff*, 642 F.3d 334 (2d Cir. 2011).......................................................................20

*Erie County, Ohio v. Morton Salt, Inc.*, 702 F.3d 860 (6th Cir. 2012)...........................Exhibit List

*Garvie v. Jackson*, 845 F.2d 647 (6th Cir. 1988).........................................................................18

*Harris v. Blake*, 798 F.2d 419 (10th Cir. 1986)...........................................................................15

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) .................................................................................18

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988)..............................................................9

*Hosty v. Carter*, 412 F.3d 731 (7th Cir. 2005) (en banc)......................................................17, 19

*Howze v. Va. Polytechnic & State University*, 901 F. Supp. 1091 (W.D. Va. 1995) ....................14

*Hunt v. Board of Regents of the University of New Mexico*,
792 Fed. Appx. 595 (10th Cir. 2019).................................................................9-13 *passim*, 16, 20

*Iancu v. Brunetti*, 139 S. Ct. 2294 (2019).....................................................................................11

*Jacobs v. Alam*, 915 F.3d 1028 (6th Cir. 2019) ...........................................................................18

*Keefe v. Adams*, 840 F.3d 523 (8th Cir. 2016)...................................................................8-9

*Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2011).....................................6, 10, 12, 13, 16

*Ku v. Tenn.*, 322 F.3d 431 (6th Cir. 2003) .............................................................................7, 14

*Longoria v. San Benito Independent Consolidated School District*, 942 F.3d 258 (5th Cir. 2019) .......................................................................................20

*Machan v. Olney*, 958 F.3d 1212 (6th Cir. 2020) ..............................................................18-19

*Marshek v. Eichenlaub*, 266 Fed. Appx. 392 (6th Cir. 2008)..........................................Exhibit List

*McKinney v. Huntsville School Dist.*, 345 F. Supp. 3d 1071 (W.D. Ark. 2018) ..........................20

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) .............................................................................18

*Monell v. Dept. of Social Services*, 436 U.S. 658 (1978) ...........................................................17

*Morgan v. Swanson*, 755 F.3d 757 (5th Cir. 2014)..................................................................19

*National Institute of Family and Live Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ...................5

*New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495 (6th Cir. 2003) .......................................................................................Exhibit List

*Novak v. City of Parma*, 932 F.3d 421 (6th Cir. 2019)...............................................................19

*Okruhlik v. Univ. of Arkansas*, 395 F.3d 872 (8th Cir. 2005)......................................................14

*Oyama v. University of Hawaii*, 813 F.3d 850 (9th Cir. 2015)...................................................6, 9

*Regents of the University of Michigan v. Ewing*, 474 U.S. 214 (1985)........................................15

*Richmond v. Fowlkes*, 228 F.3d 854 (8th Cir. 2000) ...................................................................7

*Rieves v. Town of Smyrna, Tenn.*, 959 F.3d 678 (6th Cir. 2020)................................................19

*Rizzo v. Goode*, 423 U.S. 362 (1976)......................................................................................17

*Rumsfeld v. FAIR*, 547 U.S. 47 (2006) ...................................................................................10

*Salehpour v. University of Tennessee*, 159 F.3d 199 (6th Cir. 1998)............................................17

*Saucier v. Katy*, 533 U.S. 194 (2001) .....................................................................................18

*Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019) ......................................17

*Spence v. Washington*, 418 U.S. 405 (1974)....................................................................10

*Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748 (1976)..............6

*Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012) ............................................6, 11, 12, 17

*Widmar v. Vincent*, 454 U.S. 263 (1981)........................................................................11

*Yeasin v. Durham*, 719 Fed. Appx. 844 (10th Cir. 2018)..............................................20

*Yoder v. University of Louisville*, 526 Fed. Appx. 537 (6th Cir. 2013)........................9, 11, 16, 19

*Zimmerman v. Board of Trustees of Ball State University*,
940 F. Supp. 2d 875 (S.D. Ind. 2013) ..............................................................................20

## Statutes

Tenn. Code Ann. § 4-5-202 ................................................................................................2

Tenn. Code Ann. § 4-5-205 ................................................................................................2

Tenn. Code Ann. § 4-5-211 ................................................................................................2

Tenn. Code Ann. § 28-3-104(a)(1)(B) ............................................................................10

Tenn. Code Ann. § 49-9-101 ..............................................................................................3

Tenn. Code Ann. § 49-9-209(e)(1) .....................................................................................3

Tenn. Code Ann. § 63-10-202 ............................................................................................2

Tenn. Code Ann. § 63-10-301 ............................................................................................2

Tenn. Code Ann. § 63-10-304(c) ........................................................................................2

Tenn. Code Ann. § 63-10-305(6)........................................................................................2

## Administrative Procedure Act Rules

TENN. COMP. R. & REGS., Rule 1140-02-.01 ....................................................................2

TENN. COMP. R. & REGS., Rule 1720-3-5-.01 ...................................................................3

## **Court Rules**

Fed. R. Evid. 201(b)..........................................................................................Exhibit List

## INTRODUCTION AND SUMMARY

This is a case where the system worked. Alleging that she was "nearly expelled," the Plaintiff Kimberly Diei readily admits that she was "not expelled," because the University of Tennessee Health Science Center (UTHSC) College of Pharmacy "Dean Marie Chisholm-Burns . . . reverse[d] the [College's Professionalism] Committee's decision to expel Diei." Ms. Diei has not missed a single minute of school. (Complaint, ECF #1, ¶¶ 1, 9, 16, 92, 95, 100). Because the University took no adverse action against her, she has no basis for a claim.

This is also a case about professional responsibility. Just as lawyers in Tennessee must abide by the Rules of Professional Conduct, pharmacists in Tennessee must abide by the Rules of the Tennessee Board of Pharmacy on Professional Conduct and Responsibilities. And so must pharmacy students preparing to become pharmacists. By filing this lawsuit complaining that she is subject to "professionalism policies" (Compl., ¶ 95), Ms. Diei challenges that proposition.

As explained below, the College of Pharmacy imposes standards upon its students that are set forth in Tennessee statutes, in Tennessee administrative rules, and in UTHSC's student handbook called *CenterScope*. They are the same professional standards that practicing Tennessee pharmacists live and work under 365 days a year. Case law makes clear that the imposition of such professional standards on students is lawful. The pleadings show that the Individual Capacity Defendants have taken no adverse action against Ms. Diei that could give rise to a lawsuit, and that a part of her claim is time-barred. In any event, the Individual Capacity Defendants should be dismissed on qualified immunity grounds. The damages claims against them should be dismissed with prejudice. And as shown by the separate motion being filed by the Official Capacity Defendants, there is no basis for injunctive relief because UTHSC's professional standards are facially valid – meaning that this entire lawsuit should be dismissed.

1

## STATEMENT OF FACTS

I.  **PROFESSIONAL STANDARDS FOR PHARMACISTS IN TENNESSEE AND PHARMACY STUDENTS AT UTHSC'S COLLEGE OF PHARMACY.**

    A.  **The State of Tennessee's Professional Standards for Pharmacists.**

The Tennessee General Assembly has declared that "[t]he practice of pharmacy within the state is . . . a professional practice affecting public health, safety and welfare and is subject to regulation and control in the public interest." Tenn. Code Ann. § 63-10-202. To this end, the General Assembly created a Board of Pharmacy. Tenn. Code Ann. § 63-10-301 *et seq*. By statute the Board is authorized to deny or revoke licensure on a number of specifically defined bases, including that the person has been guilty of "unethical or unprofessional conduct." Tenn. Code Ann. § 63-10-305(6). Additionally, the Board "has the power and authority to adopt, amend and repeal rules of professional conduct appropriate to the establishment and maintenance of a high standard of integrity and dignity in the profession of pharmacy." Tenn. Code Ann. § 63-10-304(c). Exercising its statutory authority, the Tennessee Board of Pharmacy has adopted "Professional Conduct and Responsibilities" rules governing pharmacists and pharmacy interns. TENN. COMP. R. & REGS., Rule 1140-02-.01 (Exhibit 1, available on the Tennessee Secretary of State's website at https://publications.tnsosfiles.com/rules/1140/1140-02.20170220.pdf). These rules were enacted pursuant to the Tennessee Uniform Administrative Procedure Act, meaning they went through an extensive process of public input and review for lawfulness by the Tennessee Attorney General. *See* Tenn. Code Ann. §§ 4-5-202, -205, -211. One provision of the Board of Pharmacy's professionalism standards is:

> A pharmacist shall observe the law, uphold the dignity and honor of the profession, and accept its ethical principles.  A pharmacist shall not engage in any activity that will bring discredit to the profession, and shall expose, without fear or favor, illegal or unethical conduct in the profession.  [TENN. COMP. R. & REGS., Rule 1140-02-.01(4).]

2

### B.     The University of Tennessee's Professional Standards for Pharmacy Students.

The University of Tennessee is a public institution created by Tennessee statutes.  *See* Tenn. Code Ann. § 49-9-101 *et seq*. The University is governed by a Board of Trustees which has "full power and authority to make bylaws, rules and regulations for the government of the university and the promotion of education in the university that in their opinion may be expedient or necessary." Tenn. Code Ann. § 49-9-209(e)(1). Pursuant to its statutory authority, the University's Board of Trustees has enacted, through the APA rulemaking process, a rule for UTHSC entitled "Maintenance of Ethical and Professional Standards." TENN. COMP. R. & REGS., Rule 1720-3-5-.01 (Exhibit 2, available on the Tennessee Secretary of State's website at https://publications.tnsosfiles.com/rules/1720/1720-03/1720-03-05.pdf). UTHSC also maintains a student handbook, *CenterScope*, that is readily available online at http://catalog.uthsc.edu/index.php?catoid=33. A "Student Rights and Responsibilities" link leads to a page with an index entry for "Maintenance of Ethical and Professional Standards of the Health Professions" in the lower left column. It links to a page which sets out UTHSC's APA Professionalism Rule contained in TENN. COMP. R. & REGS., Rule 1720-3-5-.01 (*see* Exhibit 3):

## Standards of the Health Professions

Failure to maintain the high ethical and professional standards of the various disciplines of the health professions may subject a student to suspension or other appropriate remedial action by the University.

A. A student enrolled at The University of Tennessee Health Science Center is subject to disciplinary action up to, and including, suspension and dismissal for engaging in the following acts of misconduct, regardless of whether such misconduct is engaged in, on, or off, University- owned or controlled property;

   1. Commission of an offense classified as a felony by Tennessee's criminal statutes or by Federal criminal statutes.
   2. Unlawful use, possession, or sale of drugs or narcotics, whether or not felonious.
   3. Plagiarism, falsification of records, or other act which substantially impugns the integrity of the student.
   4. Other unprofessional and unethical conduct which would bring disrepute and disgrace upon both student and profession and which would tend to substantially reduce or eliminate the student's ability to effectively practice the profession in which discipline he or she is enrolled.

B. A student applying for admission to The University of Tennessee Health Science Center shall also be subject to the above provisions and may be denied admission on the basis of his or her failure to maintain the aforementioned ethical and professional standards.

3

In her Complaint, Ms. Diei alleges ignorance of these rules, but she was directly informed of University policies when she began her student career at UTHSC. On August 7, 2019, she signed a document entitled "Standards for Student Professional Conduct." (Exhibit 4). It identified the relevant sources, including *CenterScope*.  By signing it she affirmed:

> I have read carefully the College of Pharmacy's Standards for Student Professional Conduct and the Student Policies and Guidelines of The University of Tennessee Health Science Center.  I fully understand their meaning and significance.  While a student at this institution, I agree to abide by the Standards for Student Professional Conduct and Student Policies and Guidelines and agree to accept all of its implications without reservation.

## II.   MS. DIEI'S APPEARANCES BEFORE THE UTHSC COLLEGE OF PHARMACY'S PROFESSIONALISM COMMITTEE.

Ms. Diei alleges that the University is "policing her personal social media activity" (Compl., ¶ 1), but what her Complaint shows the University has done, rather than surveilling her, is to respond on two occasions to complaints about her social media activity. (*Id.*, ¶ 34, 55).

### A.   The 2019 Event.

Ms. Diei's interactions with the Professionalism Committee began in 2019 after a complaint was made about her social media postings. (Compl., ¶ 34). The complaint was submitted in the form of a video, screen shots of which are attached as Exhibit 5.[1] The video shows that Ms. Diei displayed UTHSC College of Pharmacy trademarks and logos on the same account where she posted a video of herself removing her breast from her shirt. As a result of this 2019 event, Ms. Diei was requested to "write a 3-page paper reflecting on [her] behavior and describing what [she has] learned from this incident and what [she] will do differently in the future." (Exhibit 6, p. 8). By her own admission, she "agreed to write" it (Compl., ¶ 50), but she does not allege that she actually did write and submit the paper.

---

[1] A copy of the video will be emailed to chambers, ECF_Judge_Fowlkes@tnwd.uscourts.gov.

## B.   The 2020 Event.

In August 2020, Ms. Diei was again contacted by the Professionalism Committee after another complaint about her social media activity, and was provided a link to screenshots of posts to her Twitter and Instagram accounts. (Compl., ¶¶ 55-56). Those screenshots are collected in Exhibit 7. When Ms. Diei inquired about the professionalism standards that would be applied, Dr. George referred her to, among other things, *CenterScope* and "the professionalism standard as established by the College, and as reflected by the State Board of Pharmacy." (Exhibit 6, p. 13). The Professionalism Committee voted unanimously to academically dismiss Ms. Diei from the College of Pharmacy. (Compl., ¶ 82). She appealed, and "Dean Chisholm-Burns . . . decided to reverse the Committee's decision to expel Diei." (*Id.*, ¶¶ 82, 92). That is, Ms. Diei "successfully appealed her expulsion." (*Id.*, ¶ 3). Ms. Diei did not miss any class time – as she alleges, "[s]he is, and was at all times relevant to the Complaint, a student at the College of Pharmacy," which she "currently attends," and no mere student, but a student "in good academic standing." (*Id.*, ¶¶ 9, 16, 95). As she frankly admits, she "was not expelled." (*Id.*, ¶100).

## ARGUMENT

## I.   THE COURT SHOULD DISMISS THE FOURTH AND FIFTH CAUSES OF ACTION ON THE MERITS.

### A.   The University May Lawfully Require Professional Students To Abide by Professional Standards.

"States may regulate professional conduct, even though that conduct incidentally involves speech." *National Institute of Family and Live Advocates v. Becerra*, 138 S. Ct. 2361, 2372 (2018). And institutions of professional higher education may impose professionalism standards upon their students, requiring their students to adhere to the professional standards of the profession they are preparing to enter. Indeed, it has long been standard for pharmacy

students in particular to be "trained in the ethics of the profession." *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 751 (1976). A university's teaching and requiring adherence to such professional standards serves a "legitimate pedagogical concern in teaching its students to comply with" the code of ethics in their field. *Keeton v. Anderson-Wiley*, 664 F.3d 865, 876 (11th Cir. 2011). In addition, assessment of a student's professionalism involves an institutional discharge of a responsibility toward society, for professional "certification programs are designed to ensure that . . . students meet the professional standards in their chosen fields," such that when a university "communicates to the world that, in its view, that student is fit to practice the profession . . . , the [u]niversity places its 'imprimatur' on each student it approves." *Oyama v. University of Hawaii*, 813 F.3d 850, 862, 870 (9th Cir. 2015). And students "are not forced to be there," *Ward v. Polite*, 667 F.3d 727, 734 (6th Cir. 2012) – that is, by deciding to enter a profession and attend a school to prepare them for licensure in that profession, a student is choosing to voluntarily submit to the regulation of that profession. Court decisions from around the country confirm this.

In *Al-Dabagh v. Case Western Reserve University*, 777 F.3d 355 (6th Cir. 2015), a medical student was dismissed and denied graduation due to professionalism issues such as tardiness to class, propositioning a classmate for sex at a dance, and driving while intoxicated. As part of its curriculum, Case Western imposed a professionalism requirement on its medical students. Among those standards was that students "[c]onsistently demonstrate[ ] ethical, honest, responsible and reliable behavior." *Id*. at 357. To graduate, medical students had to receive the endorsement of a "Committee on Students," a group of faculty and administrators which assessed each "student's exam scores, clinical performance, and 'professional attitudes and behavior.'" *Id*. "A student [could not] receive a degree without the Committee's approval, good

grades notwithstanding." *Id*. That was Al-Dabagh's fate – "the only thing standing between [him] and a diploma [was] the Committee on Students' finding that he lack[ed] professionalism." *Id*. at 359. Despite his good grades and his completion of all the necessary coursework, he was not awarded an M.D. The Sixth Circuit held that assessment of a student's professionalism is an "academic judgment" to which courts should defer. The court did defer to Case Western's judgment about Al-Dabagh's professionalism and ordered dismissal of the lawsuit. *Id*. at 359-61. In doing so, the Sixth Circuit emphasized the importance of assessing the professionalism of future professionals while they are still students:

> It is entirely reasonable to assess the presence of professionalism early. For once a medical student graduates, we must wait for a violation before we may punish the absence of it.

*Id*. at 360. *See also Ku v. Tenn.*, 322 F.3d 431 (6th Cir. 2003) (upholding removal of medical student from rotations for reasons including "'unprofessional conduct,'" "his inability to interact with others in a basic professional manner;" characterizing the "decision [as] an academic one").

A case similar to *Al-Dabagh* involving a pharmacy student is *Richmond v. Fowlkes*, 228 F.3d 854 (8th Cir. 2000), in which a student nearing graduation was dismissed in his very last semester. While on a rotation, he exhibited "unprofessional conduct" – "unexplained absenteeism, [a] failure to look up the appropriate medication dosage for a 21-month-old patient, and . . . [a] belligerent and argumentative response to" his supervisor – that resulted in his receiving a negative "non-cognitive evaluation." *Id*. at 856. Earlier in his student career he had received other negative evaluations for such things as tardiness to class and lack of preparation for class. *Id*. at 856, 858. The Eighth Circuit held that "attributes of professionalism" (*id*. at 855) are properly considered to be "academic" and "scholastic in nature" (*id*. at 858), and affirmed the summary judgment dismissal of all the plaintiff's constitutional claims.

In *Keefe v. Adams*, 840 F.3d 523 (8th Cir. 2016), the court confronted the exact question raised by Ms. Diei here: May a graduate school's professionalism standards be applied to speech? The court's answer was "yes." In *Keefe*, a nursing student was removed from the program for "behavior unbecoming of the profession and transgression of professional boundaries." *Id*. at 525. He had posted material on his Facebook page that "raised concerns about his professionalism and boundary issues." *Id*. at 526. These included posts about giving those who used an electric pencil sharpener during class "a hemopneumothorax," about "using whiskey for anger management," and also "swearing, and calling a fellow student a 'stupid bitch,'" all of which Keefe considered to be jokes. *Id*. at 527. Invoking the Nurse's Association Code of Ethics, the school dismissed Keefe from the program. He sued, alleging a First Amendment violation. He made the same argument Ms. Diei is making here. She argues that "public institutions cannot investigate or discipline – much less expel – students for speech protected by the First Amendment." (Compl., ¶ 4). The court rejected this argument:

> Keefe[ ] . . . frames [his] contention categorically – a college student may not be punished for off-campus speech, he contends, unless it is speech that is unprotected by the First Amendment, such as obscenity.  To our knowledge, no court has adopted this extreme position, and we decline to do so.

*Id*. at 529. The court, citing six federal court of appeals decisions, noted that "[m]any courts have upheld enforcement of academic requirements of professionalism and fitness, particularly for a program training licensed medical professionals." *Id*. at 530. The fact that such professionalism requirements may regulate a student's speech is both acceptable and inevitable, for "determinations of non-compliance will almost always be based at least in part on a student's speech." *Id*. The fact that the speech regulated by such professionalism requirements may be a student's "on-line, off-campus" speech is also acceptable.  As the *Keefe* court explained:

8

> A student may demonstrate an unacceptable risk of professionalism off campus, as well as in the classroom, and by speech as well as conduct.   [citations, including to the Sixth Circuit's *Yoder* case, *infra*.]   Therefore, college administrators and educators in a professional school have discretion to require compliance with recognized standards of the profession, both on and off campus, 'so long as their actions are reasonably related to legitimate pedagogical concerns.'  *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 . . . (1988)."

*Id*. at 531. *See also Oyama v. University of Hawaii*, 813 F.3d 850, 869 (9th Cir. 2015) ("The First Amendment does not prevent the University from denying Oyama's student teaching application after determining that his statements reflected a failure to absorb . . . defined and established professional standards.").

The Sixth Circuit addressed professionalism standards in the context of social media in *Yoder v. University of Louisville*, 526 Fed. Appx. 537 (6th Cir. 2013). The court affirmed the dismissal, on qualified immunity grounds, of claims against university administrators who dismissed a nursing student because of the content of her MySpace blog post, a satirical essay which revealed information about a birth she had witnessed as part of her education.

The intersection of professional standards and social media is also illustrated by *Hunt v. Board of Regents of the University of New Mexico*, 792 Fed. Appx. 595 (10th Cir. 2019), *cert. denied*, 2020 WL 6829148 (2020), in which the Tenth Circuit confronted a case where a university required a medical student, based on his core political speech (a social media post about the 2012 Presidential election), to engage in ethics and professionalism activities such as assigned readings, supervised reflective writings, and meetings with a faculty mentor. *Id*. at 598-99.  He did so – but also sued, claiming a First Amendment violation. Noting that "[o]ff-campus, online speech by university students, particularly those engaged in professional schools, involves an emerging area of constitutional law," *id*. at 601, the court affirmed the dismissal of claims against individual university administrators on the grounds that there had been no violation of a

clearly established constitutional right. *See also Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2011) (discussed *infra*; upholding remediation plan imposed on professional student).

In all eight of these cases, the university won. These cases teach that (1) institutions of higher education may require their professional students to adhere to the professional standards of the profession they are preparing to enter; (2) those professional standards may regulate conduct that involves speech; and (3) the speech that may be permissibly regulated includes off-campus, on-line speech such as social media posts. While this professional regulation may well cause professionals and students preparing for a profession to think carefully about the choices they make in how they conduct themselves, that is an inherent part of living under the standards of the profession they have chosen to pursue.

### B.     The University Has Taken No Adverse Action Against Ms. Diei.

#### 1.     The University Did Not Violate the First Amendment by Assigning Ms. Diei An Educational Activity in 2019.

##### a.     The Claims About the 2019 Event Are Time-Barred.

The statute of limitations for Ms. Diei's claim is one year. Tenn. Code Ann. 28-3-104(a)(1)(B). The Complaint shows that the 2019 event was complete in October 2019 (¶ 47), over a year before this suit was filed. Any claims based on the 2019 event should be dismissed.

##### b.     The Claims About the 2019 Event Are Without Merit.

Ms. Diei's first problem is that there was no First Amendment protected speech. She has not identified any idea or viewpoint she was communicating by the act of removing her breast from her shirt. Doing so is not "inherently expressive," and without an "intent to convey a particularized message" her action did not constitute speech at all. *Rumsfeld v. FAIR*, 547 U.S. 47, 66 (2006) ("we have extended First Amendment protection only to conduct that is inherently expressive"); *Spence v. Washington*, 418 U.S. 405 (1974).

Second, the University acted lawfully in providing Ms. Diei with an educational outcome to address the complaint about her social media posting. "A university's mission is education." *Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981). Schools have "broad discretion" in making choices about "selection and implementation of a curriculum – the lessons students need to understand and the best way to impart those lessons." *Ward v. Polite*, 667 F.3d 727, 732 (6th Cir. 2012). Educating students can include "teaching students the boundaries of socially appropriate behavior." *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 683 (1986).[2] Further, this teaching and "license to choose among pedagogical approaches . . . is not confined to the classroom." *Christian Legal Society v. Martinez*, 561 U.S. 661, 686 (2010). A college of pharmacy may lawfully teach its students the tenets of professionalism in the pharmacy profession, including the boundaries of socially appropriate behavior for pharmacists. And while it is true that offensive statements may be protected "because of the ideas they convey," there is less constitutional protection for statements that "offend because of their ***mode*** of expression," particularly statements that are "obscene, vulgar, or profane." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2303 (2019) (Roberts, C.J., concurring in part and dissenting in part) (emphasis added).

For example, in *Hunt*, *supra*, the Tenth Circuit held that the university violated no clearly established constitutional right when it required a medical student who had posted a profanity-laced social media message about the 2012 Presidential election to undergo:

> A professionalism enhancement prescription consisting of an ethics component and a professionalism component, each with different faculty mentors. For the ethics component, the mentor would assign readings and supervise a reflective writing assignment on patient autonomy and tolerance. The professionalism

---

[2] *Fraser* involved a public high school student, but its principles are applicable here. *See Ward v. Polite*, 667 F.3d at 733-34 (declining to create a distinction "between student speech at the high school level and university levels"); *Yoder*, 526 Fed. Appx. at 545 n.3 ("school speech standards may be applicable to university students").

> component entailed: (1) a writing assignment on the public expression of political beliefs by physicians; (2) an apology letter that Mr. Hunt could present to his classmates, select individuals or no one; (3) rewriting the Facebook post in a passionate yet professional manner; and (4) regular meetings with the faculty member over the course of a one-year period.

*Id*. at 599 (internal quotation marks and citations omitted).

*Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2011), cited with approval by the Sixth Circuit in *Ward v. Polite*, 667 F.3d 727, 741-42 (6th Cir. 2012), is similar. A graduate student seeking a master's degree in school counseling expressed to students and faculty – including during "out of class" (*id*. at 868) conversations – that she strongly opposed homosexuality and would tell a homosexual client that "his behavior is morally wrong and then try to change the client's behavior," including by referring the client "to someone practicing conversion therapy." *Id*. at 869. This was contrary to the American Counseling Association's Code of Ethics. *Id*. Before allowing her to see clients, the university required her to go through an extensive "remediation plan" which required her to, among other things, "submit a two-page reflection to her advisor every month," along with having to attend at least three workshops and read at least ten peer-reviewed articles "that pertain to improving counseling effectiveness with the GLBTQ population." *Id*. at 870. She refused and sued. The court rejected her First Amendment challenge to these requirements, explaining:

> In requiring Keeton to learn about and interact with the GLBTQ population, to read articles in counseling or psychological journals about counseling the GLBTQ population, and to become familiar with the ALGBTIC Competencies for Counseling Gay and Transgender clients, [the university's] officials sought to teach her how to effectively counsel GLBTQ clients in accordance with the ACA Code of Ethics.

*Id*. at 874 (affirming denial of plaintiff's motion for preliminary injunction).

Here, what Ms. Diei did was post a video of her taking her breast out of her shirt, and also posted UTHSC College of Pharmacy logos and trademarks to the same account. If this was

speech, then this mode of expression is outside the boundaries of socially and professionally appropriate behavior for a pharmacist. Ms. Diei herself seems to concede the impropriety of tying the College to her post by alleging in her Complaint (¶ 25) that she "has never identified herself in her social media posts as a College of Pharmacy student nor has she indicated any affiliation with the University of Tennessee" – although, as shown by Exhibit 5, this is not true.

By assigning Ms. Diei to write a three-page paper reflecting on this incident, the College of Pharmacy imposed an educational activity far less burdensome or intrusive than what was imposed on the students in *Hunt* and *Keeton*, and acted lawfully.

### 2. The University Did Not Violate the First Amendment Because It Took No Adverse Action Against Ms. Diei in 2020.

Ms. Diei "was not expelled" (Compl., ¶100) from the UTHSC College of Pharmacy because she "successfully appealed her expulsion." (*Id.*, ¶ 3). The University's final action was to ***not*** expel her, and while awaiting that final action she did not miss a single minute of class. (*Id.*, ¶¶ 9, 16, 95). Just as the winner of a basketball game is determined by the final score, not the half-time score, common sense says that Ms. Diei did not suffer any adverse action she may sue about after winning her appeal.  So does case law.

In *Benison v. Ross*, 765 F.3d 649 (6th Cir. 2014), Dr. Kathleen Benison, a tenured professor at Central Michigan University, requested a promotional pay supplement. *Id*. at 653. Her "department recommended denying her application for a salary supplement, and the reviewing dean agreed.  [She] appealed their recommendations to the provost, but she resigned before he could render a final decision." *Id*. She sued, alleging among other things that the denial of the pay supplement was retaliation against her in violation of the First Amendment because her husband, a CMU student, had sponsored a no-confidence resolution against CMU's provost

and president. *Id*. The Sixth Circuit affirmed the dismissal of this claim by summary judgment

based on Dr. Benison's failure to complete the internal appeals process, explaining:

> The negative recommendations of the . . . Department and Dean Davison
> regarding Kathleen's application for a promotional pay supplement are ***not
> adverse actions*** because Kathleen resigned before CMU made a final decision to
> deny her request for a salary increase. Tenure decisions and other promotional
> "decisions in an academic setting involve a combination of factors which tend to
> set them apart from employment decisions generally." *Dobbs-Weinstein v.
> Vanderbilt Univ.*, 185 F.3d 542, 545 (6th Cir. 1999) (internal quotation marks
> omitted). In *Dobbs-Weinstein*, we held that a dean's decision to deny tenure to a
> professor was not an adverse action because it was not an "ultimate employment
> decision":
>
> > Because tenure decisions are so complex and potentially contentious,
> > universities are well-served to have a grievance procedure for individuals
> > wishing to appeal any of the many intermediate decisions or evaluations
> > made during the tenure review process.  [When a university] employs such
> > a process, [it] allow[s] [a professor] to prevent [a negative] interim
> > decision from becoming final.
>
> *Id*. at 545; *see also Okruhlik v. Univ. of Ark.*, 395 F.3d 872, 879 (8th Cir. 2005)
> ("*[A] university should have the opportunity to correct errors through its
> complete internal appeals process that precedes its final decision*."); *Howze v.
> Va. Polytechnic & State Univ.*, 901 F. Supp. 1091, 1097 (W.D. Va. 1995)
> ("[W]here the tenure decision was following the chain of appeal, each decision
> along the way is not actionable. ***Only the final decision is the ultimate act***."). The
> same principle is applicable to "[i]ntermediate decisions in a promotion process
> [which] do not constitute independent adverse employment actions unless they
> directly influence the decisionmaker's choice [to deny promotion.]" *Okruhlik*, 395
> F.3d at 879-80.

*Id*. at 659-60 (emphases added).

*Benison* involved a claim by a faculty member, but its policy rationale applies equally to

students. Just as evaluating a faculty member's performance involves making judgments about

academic matters, so does evaluating a student's professionalism, for the Sixth Circuit has held

that a determination about professionalism is an "academic judgment."  *Al-Dabagh*, *supra*, 777

F.3d at 360; *Ku*, *supra*, 322 F.3d at 436. Further, the Sixth Circuit recognized that a "'university

should have the opportunity to correct errors through its complete internal appeals process that

precedes its final decision,'" 765 F.3d at 659, and that can happen only if courts dismiss claims about alleged errors that are corrected in a final decision.

A student case demonstrating this is *Harris v. Blake*, 798 F.2d 419 (10th Cir. 1986). There, a psychology graduate student's teacher put a letter in his file that assessed him as incompetent and unethical based on things he had done while taking her course, and this letter was seen by some of his later teachers and may have affected the grades they gave him – grades that went below the required minimum GPA and compelled him to withdraw from the program. He did not initially know about the letter, but after he found out, which was after he had already received the later low grades, the university allowed him to appeal everything. The outcome of the appeal confirmed the assessments. He sued, claiming constitutional due process violations. The Tenth Circuit acknowledged he presented triable factual issues about the legality of the original letter and its effect on his grades, but still affirmed summary judgment dismissal of the lawsuit because the later process cured the initial wrongdoing. The Tenth Circuit explained:

> Harris was given the opportunity to challenge the letter and the grades before the Academic Appeal Board. It is the Board's decision that ultimately resulted in Harris' forced withdrawal, and Harris has failed to show that this decision was not made with conscientious deliberation through the exercise of professional judgment [the due process standard from *Regents of the University of Michigan v. Ewing*, 474 U.S. 214 (1985)]. It is undisputed that unbiased faculty members have considered Harris' case and have exercised their own judgment concerning the propriety of the grades that compelled his withdrawal. Accordingly, Harris has failed to support the alleged denial of substantive due process.

*Id*. at 425.

Thus, the lawfulness of the "final decision" and "ultimate act" (*Benison*) is what matters. *Benison* shows that when a person does not appeal, her lawsuit is dismissed because she failed to receive the university's final decision. *Harris* shows that when an improper action is taken at a lower level, there is no valid lawsuit if, on appeal, the final decision is lawful in a way that cures

the prior wrongdoing even if the person loses the appeal.  If a lawsuit is to be dismissed when the person **does not appeal**, or **appeals and loses** the appeal, then of course a lawsuit is to be dismissed when the person **appeals and wins** and receives the exact outcome – the "final decision" and "ultimate act" – she wanted.  That is this lawsuit.

### 3.    The University Did Not Violate the First Amendment by Investigating Complaints About Ms. Diei.

Ms. Diei asserts that "public institutions cannot investigate . . . students for speech protected by the First Amendment." (Compl. ¶ 1). This is legally incorrect.  In addition to imposing professionalism standards, a university may lawfully investigate complaints that the standards have been violated.  Indeed, the cases cited above are inexplicable if a university is not allowed to investigate anything about a student's speech – the schools could not have reached the point of dismissing a student from a nursing program (*Yoder*), or imposing a professionalism enhancement program (*Hunt*) or remediation plan (*Keeton*), without first having investigated the matter, because otherwise how would they have known about it?

*Abbott v. Pastides*, 900 F.3d 160 (4th Cir. 2018) shows Ms. Diei's legal theory is wrong. In that case, a complaint was made to the University of South Carolina about two student groups' "Free Speech Event," which had included visual displays of such items as a swastika, and at which the students sponsoring the event allegedly made sexist and racist statements. *Id*. at 163. In response to student complaints, the university investigated the matter, but took no disciplinary action. The plaintiffs nonetheless alleged that "University officials violated their First Amendment rights when they required Abbott to attend a meeting to discuss complaints about their event." *Id*. The Fourth Circuit rejected the claim and upheld the university's actions in "seeking relevant information." *Id*. at 173.

16

*Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019), relied upon by Ms. Diei (Compl., ¶ 4), is inapposite and is not to the contrary. That case dealt only with the question of a plaintiff's standing to make a facial challenge to a University policy. The University does not challenge Ms. Diei's standing here, and *Speech First* issued no holding at all about what does and does not violate the First Amendment on the merits.

### 4.   The Complaint Alleges No Valid Individual Capacity Claim Against President Boyd Because It Alleges No Wrongdoing On His Part.

Section 1983 does not impose vicarious liability, *Monell v. Dept. of Social Svcs.*, 436 U.S. 658 (1978), nor does it create liability based on an allegation that a defendant merely failed to act to prevent a constitutional violation. *Rizzo v. Goode*, 423 U.S. 362 (1976). Individual defendants are due to be dismissed from a lawsuit when they have "not done anything wrong (or, indeed, anything at all . . .)." *Hosty v. Carter*, 412 F.3d 731, 733 (7th Cir. 2005) (en banc). Thus, in *Ward v. Polite*, *supra*, the Sixth Circuit affirmed the dismissal of claims against a university president "who did not play a meaningful role in [the student's] dismissal." 667 F.3d at 742. Absent such a showing, there was no basis to sue the president over "the potentially improper implementation of [University] policy by some members of the university." *Id. See also Salehpour v. Univ. of Tennessee*, 159 F.3d 199, 206-07 (6th Cir. 1998) (dismissing university president); *Cobb v. Univ. of Virginia*, 69 F. Supp. 2d 815, 834 (E.D. Va. 1999) (same). President Boyd cannot be sued for damages in his individual capacity based on the contention that other University officials allegedly applied University policies to Ms. Diei in an unlawful way absent some allegation that President Boyd had something to do with it. There is no such allegation. The Fourth Cause of Action against President Boyd should be dismissed.

II.   **THE COURT SHOULD DISMISS THE FOURTH AND FIFTH CAUSES OF ACTION BECAUSE THE INDIVIDUAL DEFENDANTS PRESIDENT BOYD AND DR. GEORGE ARE ENTITLED TO QUALIFIED IMMUNITY.**

Qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This principle applies to University of Tennessee officials. *Garvie v. Jackson*, 845 F.2d 647 (6th Cir. 1988). Qualified immunity is both a defense to liability and an entitlement not to stand trial or face other burdens of litigation. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Once a defendant raises qualified immunity, "[a] plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity." *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019). Here, Ms. Diei cannot satisfy her burden.

1.   **Ms. Diei Has Not Alleged Any Actionable Constitutional Violation Against the Individual Capacity Defendants.**

The threshold question is whether, taken in the light most favorable to the plaintiff, the facts alleged show that an official's conduct violated a constitutional right. *Saucier v. Katy*, 533 U.S. 194, 201 (2001). If no constitutional right would have been violated even if the allegations were established, no further inquiry is necessary. *Id.*  Here, as explained in Argument Section I, Ms. Diei has failed to allege any actionable constitutional violation.

2.   **Ms. Diei Has Not Alleged the Violation of Any Clearly Established Constitutional Right.**

On the question of whether the right Ms. Diei is asserting here "was clearly established in light of the specific context of the case," the burden she must carry "[t]o overcome qualified immunity" is to "identify a case whose facts and holding would make 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Machan v. Olney*, 958

F.3d 1212, 1214-15 (6th Cir. 2020) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)). "If reasonable officials could disagree as to whether the conduct at issue was lawful, then qualified immunity applies*." Rieves v. Town of Smyrna, Tenn.*, 959 F.3d 678, 695 (6th Cir. 2020).  To be "clearly established," a right must be "'beyond debate.'" *Novak v. City of Parma*, 932 F.3d 421, 434 (6th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Because "First Amendment parameters may be especially difficult to discern in the school context[,] . . . 'educators are rarely denied immunity from liability arising out of First-Amendment disputes.'" *Abbott v. Pastides*, *supra*, 900 F.3d at 174 (quoting *Morgan v. Swanson*, 755 F.3d 757, 769 (5th Cir. 2014)). *See also Hosty v. Carter*, *supra*, 412 F.3d at 733 (qualified immunity for college dean in First Amendment case; "[m]any aspects of the law with respect to students' speech . . . are difficult to understand and apply").

Far from being able to satisfy her burden, the law is the exact opposite of what Ms. Diei must show exists here. If Ms. Diei is claiming that a university may not subject its professional students to the professional standards of the profession they are studying to enter, that claim has been squarely rejected by many courts, as explained in Section I.A above.  If she is claiming that those professional standards may not regulate speech in any manner, that claim has also been rejected in those cases.  If she is taking the position that such professional standards may regulate speech, but not social media postings, binding precedent shows there is qualified immunity in this case. "[N]either the Supreme Court nor a panel of our circuit has considered whether schools can regulate off-campus, online speech by students." *Yoder v. University of Louisville*, 526 Fed. Appx. 537, 545 (6th Cir. 2013) (affirming dismissal of claims against university administrators who dismissed nursing student because of the content of her MySpace blog post). And if she is claiming that complaints about her social media postings could not even be investigated, that

argument was rejected in *Abbot v. Pastides*, *supra*. The truth is that "[a]t the intersection of university speech and social media, First Amendment doctrine is unsettled." *Yeasin v. Durham*, 719 Fed. Appx. 844, 852 (10th Cir. 2018) (affirming qualified immunity regarding punishment for university student's Twitter posts).[3] The Individual Capacity Defendants are entitled to qualified immunity.

## CONCLUSION

The Individual Capacity Defendants request the Court to dismiss the Fourth and Fifth Causes of Action with prejudice and enter final judgment under Rule 54(b).

Respectfully submitted this 1st day of March, 2021.

<div style="margin-left:40%">

*/s/ Frank H. Lancaster*
Frank H. Lancaster, BPR # 030650
Associate General Counsel, University of Tennessee
719 Andy Holt Tower
Knoxville, TN 37996-0170
(865) 974-3245
flancast@tennessee.edu

Attorney for Defendants

</div>

---

[3] *See also Hunt, supra*, 792 Fed. Appx. 595 (noting that "[o]ff-campus, online speech by university students, particularly those engaged in professional schools, involves an emerging area of constitutional law," *id*. at 601, the court affirmed the dismissal of claims against individual university administrators on qualified immunity grounds); *Longoria v. San Benito Independent Consolidated School District*, 942 F.3d 258 (5th Cir. 2019) (high school cheerleader was dismissed from the team for her social media activity, which was "not threatening or directed towards the school community," *id*. at 264, but some of which the school felt contained sexual innuendo – qualified immunity because "the right at issue was not clearly established," *id*. at 265); *Doninger v. Niehoff*, 642 F.3d 334 (2d Cir. 2011) (granting school officials qualified immunity when they prohibited high school student from running for class secretary based on off-campus internet speech); *McKinney v. Huntsville School Dist*., 345 F. Supp. 3d 1071, 1075-76 (W.D. Ark. 2018) (qualified immunity on First Amendment claim for school officials who expelled student who posted to social media image of himself in a trenchcoat holding an assault rifle); *Zimmerman v. Board of Trustees of Ball State University*, 940 F. Supp. 2d 875, 895-97 (S.D. Ind. 2013) (university officials entitled to qualified immunity on First Amendment claim when they disciplined students for completely off-campus behavior that involved using a false Facebook account to lure another student to a purported date with an under-aged female, videoed him, and posted it online with the caption that he "is a pedophile.").

## EXHIBIT LIST

**Exhibit 1**:      TENN. COMP. R. & REGS., Rule 1140-02-.01

**Exhibit 2**:      TENN. COMP. R. & REGS., Rule 1720-3-5-.01

**Exhibit 3**:      Excerpts from UTHSC *CenterScope*[1]

**Exhibit 4**:      Document entitled "Standards for Student Professional Conduct" signed by Ms. Diei (Ms. Diei's student number and phone number redacted)[2]

**Exhibit 5**:      Screenshots of video submitted in 2019 as complaint about Ms. Diei's social media posts[3]

**Exhibit 6**:      September 4, 2020 letter from Ms. Diei's counsel to Dean Chisholm-Burns (Ms. Diei's e-mail address and phone number redacted)[4]

**Exhibit 7**:      Screenshots of Diei's Twitter and Instagram accounts submitted in 2020 as complaint about Ms. Diei's social media posts[5]

**Exhibit 8**:      Declaration of Dr. Christa M. George, Authenticating Exhibits 4, 5, and 7

––––––––––––––––––

[1] Available at http://catalog.uthsc.edu/index.php?catoid=33, http://catalog.uthsc.edu/content.php?catoid=33&navoid=3383, and http://catalog.uthsc.edu/content.php?catoid=33&navoid=3383#Maintenance_of_Ethical%20and_Professional_Standards_of_the_Health_Professions. "A court that is ruling on a 12(b)(6) motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice" without converting the motion to one under Rule 56. *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003). The Court may take judicial notice of information not subject to reasonable dispute that is contained on the website of a public institution. *See, e.g., Marshek v. Eichenlaub*, 266 Fed. Appx. 392 (6th Cir. 2008); *Arvest Bank v. Byrd*, 814 F. Supp. 2d 775, 787 n.4 (W.D. Tenn. 2011); Fed. R. Evid. 201(b).

[2] This document is referred to throughout the Complaint (e.g., ¶ 38). On a Rule 12(b)(6) motion, the Court may consider matters that are referred to in a plaintiff's complaint but not attached. *See, e.g., Erie County, Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 863 (6th Cir. 2012).

[3] This document is referred to in ¶ 34 of the Complaint, and is part of the pleadings. *Erie*, *supra*.

[4] This document is referred to in ¶90 of the Complaint, and is part of the pleadings. *Erie*, *supra*.

[5] In addition to this document being referred to in Paragraph 56 of the Complaint, excerpts are included in Paragraphs 60, 62, and 63 of the Complaint; the document is therefore part of the pleadings for purposes of a Rule 12(b)(6) motion to dismiss. *Erie*, *supra*. Note that additional images were shared with Ms. Diei at the hearing, but the attached screenshots were what were made available to her on August 27, the date she references in her Complaint.

**CERTIFICATE OF SERVICE**

I hereby certify that on March 1, 2021, a copy of the foregoing memorandum was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt, and parties may access this filing through the Court's electronic filing system.


*/s/ Frank H. Lancaster*