THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| KIMBERLY DIEI, | |
| *Plaintiff*, | **CIVIL ACTION NO. 2:21-cv-02071-JTF-cgc** |
| v. | **JURY DEMAND** |
| RANDY BOYD, ET AL., | |
| *Defendants*. | |

---

**PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT**

---

GREG HAROLD GREUBEL
PA Bar No. 321130; NJ Bar No. 171622015
(admitted *pro hac vice*)
KATLYN A. PATTON
PA Bar No. 328353; OH Bar No. 097911
(*pro hac vice* forthcoming)
FOUNDATION FOR INDIVIDUAL RIGHTS IN
EDUCATION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (215) 717-3440
greg.greubel@thefire.org

EDD PEYTON
TN Bar No. 25635
SPICER RUDSTROM, PLLC
119 South Main, Suite 700
Memphis, Tennessee 38103
Tel: (901) 522-2318
Fax: (901) 526-0213
epeyton@spicerfirm.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 2

    I.   Diei Alleges That Defendants Twice Punished Her for Viewpoints Expressed in Off-Campus, Personal Social Media Posts. ........................................................................... 2

    II.  Defendants Move to Dismiss the Complaint, Relying Primarily on Materials Outside the Complaint. .................................................................................................................... 6

ARGUMENT ..................................................................................................................... 8

    I.   This Court Should Reject Defendants' Invitation to Consider Material Outside the Complaint. .................................................................................................................... 8

    II.  Diei's Third and Fourth Causes of Action Sufficiently Allege That Defendants' Policies Were Unconstitutionally Applied to Diei's Off-Campus, Personal Speech. ........................... 11

        A.   Diei Has Alleged That Defendants Punished Her Because of Her "Offensive" Viewpoints. ................................................................................................................. 12

        B.   Defendants Have No Basis for Disciplining Diei's Off-Campus, Personal Speech. 16

        C.   Defendants' Unconstitutional Punishment Was Not an "Academic Determination" and Does Not Further Any Legitimate Pedagogical Concern. ........................................... 20

        D.   Diei Has Sufficiently Alleged Personal Involvement by Boyd. ............................... 23

    III.  Diei's Fifth Cause of Action Sufficiently States Claims Against Chairperson George in Her Individual Capacity for First Amendment Retaliation. .................................................... 24

        A.   Diei's Social Media Posts Are Clearly Protected Expression. ................................. 25

        B.   Defendants' Punishment of Diei Would Deter a Student of Ordinary Firmness from Continuing to Engage in Protected Expression. ............................................................. 26

        C.   As Alleged in Diei's Complaint, Defendants Voted to Expel Diei Because of Her Protected Speech. ........................................................................................................ 29

    IV.  Defendants Are Not Entitled to Qualified Immunity on Diei's Fourth and Fifth Causes of Action Because They Violated Clearly Established Law. ...................................................... 29

        A.   Defendants Violated Clearly Established Law by Disciplining Diei Because of Her Viewpoint. ................................................................................................................... 30

B.   Defendants Violated Clearly Established Law by Retaliating Against Diei for Her Protected Speech. .............................................................................................32

V.   Defendants' "Various Professionalism Policies" Are Unconstitutionally Overbroad and Vague. ...............................................................................................................33

A.   Diei's First and Second Causes of Action Sufficiently State Facial Claims for Overbreadth and Vagueness. ............................................................33

B.   Defendants' "Standards of the Health Professions" Are Unconstitutionally Overbroad. ...................................................................................................35

1.   Defendants' "Standards of the Health Professions" Restrict Protected Speech and Expressive Conduct. ...............................................................36

2.   Defendants Have no Pedagogical Interest in Punishing Students' Personal Expression or Expressive Conduct on Social Media. ...................................37

3.   Defendants' Professionalism Policies Burden More Speech Than Necessary to Further Their Interests. ...............................................................38

C.   Defendants' Standards of the Health Professions Are Unconstitutionally Vague. ...41

1.   Defendants Failed to Provide Their Students with Proper Notice of Proscribed Activities. ...............................................................................................42

2.   Defendants' Policies Provide College of Pharmacy Administrators Unbridled Discretion to Punish Speech They Dislike. ...................................................44

D.   Defendants' Policies Are Not Immune from Judicial Review. ................................45

CONCLUSION ...............................................................................................47

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Al-Dabagh v. Case Western Reserve Univ.*, 777 F.3d 355 (6th Cir. 2015) ................................... 20

*Am. Freedom Def. Initiative v. Suburban Mobile Auth.*, 978 F.3d 481 (6th Cir. 2020) ............... 43

*Anders v. Cuevas*, 984 F.3d 1166 (6th Cir. 2021) ................................................... passim

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................. 9

*Ass'n of Cleveland Fire Fighters v. Cleveland*, 502 F.3d 545 (6th Cir. 2007) ........................... 42

*B.L. v. Mahanoy Area Sch. Dist.,* 964 F.3d 170 (3d Cir. 2020), *cert. granted*, 141 S. Ct. 976
    (2021) ............................................................................. 31, 32

*Barr v. Lafon*, 538 F.3d 554 (6th Cir. 2008) ........................................................ 16, 40

*Barron v. Univ. of Notre Dame du Lac*, 93 F. Supp. 3d 906 (N.D. Ind. 2015) ........................... 29

*Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78 (1978) ...................................... 21

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................... 9

*Bell v. Johnson*, 308 F.3d 594 (6th Cir. 2002) ....................................................... 26

*Benison v. Ross*, 765 F.3d 649 (6th Cir. 2014) ....................................................... 28

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986) ........................................ 12, 18

*Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381 (6th Cir. 2005) ................................ passim

*Brown v. Jones Cty. Junior Coll.*, 463 F. Supp. 3d 742 (S.D. Miss. 2020) ............................. 24

*Cahoo v. SAS Analytics Inc.*, 912 F.3d 887 (6th Cir. 2019) ........................................... 30

*Casas v. Laquinta Holdings, Inc.*, Case Nos. 16-cv-2951; 17-cv-2236; 17-cv-2273; 17-cv-2427;
    17-cv-2504; 17-cv-2505; 17-cv-2515; 17-cv-2558; 17-cv-2664; 17-cv-2680, 2018 U.S. Dist.
    LEXIS 222089 (W.D. Tenn. Sep. 26, 2018) .................................... 9, 34, 42

*Christian Legal Soc'y of the Univ. of Cal. v. Martinez*, 561 U.S. 661 (2010) ............................. 45

*Citizens in Charge, Inc. v. Husted*, 810 F.3d 437 (6th Cir. 2016) ..................................... 45

*Colson v. City of Alcoa*, No. 3:16-CV-377, 2017 U.S. Dist. LEXIS 66339 (E.D. Tenn. May 2,
    2017) ............................................................................... 23

*Connection Distribution Co. v. Holder*, 557 F.3d 321 (6th Cir. 2009) ...........................................8

*Dobbs-Weinstein v. Vanderbilt Univ.*, 185 F.3d 542 (6th Cir. 1999)...........................................28

*Endres v. Northeast Ohio Med. Univ.*, 938 F.3d 281 (6th Cir. 2019) ...............................21, 22, 23

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ........................................34, 35, 42

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) .................................12, 18, 19

*Healy v. James*, 408 U.S. 169 (1972) .........................................................................11

*Heller v. Doe*, 509 U.S. 312 (1993) ...........................................................................45

*Hill v. Lapin*, 630 F.3d 468 (6th Cir. 2010)..................................................................32

*Iancu v. Brunetti*, 139 S. Ct. 2294 (2019) ..................................................................12

*Izen v. Catalina*, 398 F.3d 363 (5th Cir. 2005)...........................................................32

*Jenkins v. Jefferson Cty. Bd. of Educ.*, No. 3:19-CV-315-RGJ, 2020 U.S. Dist. LEXIS 57145
(W.D. Ky. Apr. 1, 2020)................................................................................................30

*Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580 (6th Cir. 2008) ...........................32

*Kesterson v. Kent State Univ.*, 967 F.3d 519 (6th Cir. 2020) ......................................32

*Lac Vieux Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.*, 172 F.3d 397
(6th Cir. 1999)…………………………………………………………………………………45

*Matal v. Tam*, 137 S. Ct. 1744 (2017) .................................................................12, 40

*McGlone v. Cheek*, 534 F. App'x 293 (6th Cir. 2013) .................................................41

*Miller v. City of Cincinnati*, 622 F.3d 524 (6th Cir. 2010).....................................42, 44

*Minessota Voters All. v. Mansky*, 138 S. Ct. 1876 (2018)......................................43, 46

*Morse v. Frederick*, 551 U.S. 393 (2007).............................................................18, 19

*Nat'l Inst. of Family and Live Advocates v. Becerra*, 138 S. Ct. 2361 (2018) .................22, 25, 37

*Nixon v. Hardin Cty. Bd. of Educ.*, 988 F. Supp. 2d 826 (W.D. Tenn. 2013)................17, 18, 19

*OSU Student All. v. Ray*, 699 F.3d 1053 (9th Cir. 2012)..............................................23

*Paige v. Coyner*, 614 F.3d 273 (6th Cir. 2010) ..........................................................29

*Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972) ........................................42

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992).............................................................37

*Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418 (6th Cir. 2014).....................29

S*peech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019).....................27, 28, 29, 32

*Street* v. *New York*, 394 U.S. 576 (1969) .............................................................12, 31

*Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478 (6th Cir. 2009)............................9

*Texas v. Johnson*, 491 U.S. 397 (1989)................................................................37, 40

*Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999)..................................................32

*Thompson v. Ohio State Univ.*, 990 F. Supp. 2d 801 (S.D. Ohio 2014)...........26, 27, 33

*Tigrett v. Cooper*, 855 F. Supp. 2d 733 (W.D. Tenn. 2012) .......................................10

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) ....................12, 17

*Trs. of Detroit Carpenters Fringe Benefit Funds v. Patrie Constr. Co.*, 618 F. App'x 246 (6th Cir. 2015)...................................................................................................................10

*United States v. Playboy Entm't Grp.*, 529 U.S. 803 (2000)……………………………..45

*United States v. Stevens*, 559 U.S. 460 (2010) ..........................................................25

*Univ. of Cincinnati Chapter of Young Am. for Liberty v. Williams*, No. 1:12-cv-155, 2012 U.S. Dist. LEXIS 80967 (S.D. Ohio June 12, 2020) ........................................................45

*Virginia v. Hicks*, 539 U.S. 113 (2003) .......................................................................36

*Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012)......................................................passim

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)...................................................46

*Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565 (6th Cir. 2008) ........................9

*Wurzelbacher v. Jones-Kelley*, 675 F.3d 580 (6th Cir. 2012) .....................................28

*Yeasin v. Durham*, 719 F. App'x 844 (10th Cir. 2018) ...............................................31

*Yoder v. Univ. of Louisville*, 526 F. App'x 537 (6th Cir. 2013).......................17, 36, 39

**Statutes**

Tenn. Code Ann. § 63-10-202 .....................................................................................36

Tenn. Code. Ann. § 63-10-304(c) ...............................................................................38

**Other Authorities**

*Help Center — Using Instagram, Stories*, INSTAGRAM ...................................................................6

**Rules**

Fed. R. Civ. Pro 12(d) ........................................................................................................9

Fed. R. Civ. Pro. 12(b)(6) ...............................................................................................27

Under this Court's Orders dated March 8, 2021 (Order Granting Plf.'s Unopposed Mot. for Extension of Time to Respond to Defs.' Mots. to Dismiss, ECF No. 29) and April 7, 2021 (Order Granting Parties' Joint Mot. for Leave to File a Single Br. in Resp. To Defs.' Mots. to Dismiss and to Exceed Page Limitation, ECF No. 31), Plaintiff Kimberly Diei respectfully submits this Consolidated Opposition to Defendants' Motions to Dismiss the Complaint and requests that this Court deny Defendants' motions in their entirety.

## INTRODUCTION

In this First Amendment lawsuit, Plaintiff Kimberly Diei alleges the University of Tennessee Health Science Center College of Pharmacy violated the First and Fourteenth Amendments when it punished her for the viewpoints she expressed in off-campus, personal speech on social media. In their motions to dismiss, Defendants fail to address the legal standard at this stage and improperly submit material outside the Complaint, including Diei's social media posts from 2019 and other "professionalism" policies purportedly used to justify Diei's punishment. Moreover, Defendants seek to dismiss the Complaint by improperly contesting Diei's factual allegations. Diei has unambiguously alleged both that Defendants did not provide her with the text of *any policy* she allegedly violated and that Defendants' webpage, ostensibly housing these policies, did not work. At the pleading stage, Defendants may not attempt to justify their unconstitutional actions based upon a policy Diei has never seen or other material outside the Complaint. Instead, Diei is entitled to discovery to prove her allegations that Defendants unconstitutionally punished her because of viewpoints expressed in her social media posts. This Court should reject Defendants' invitation to review documents outside the Complaint.

Even if this Court considers the "professionalism" policies Defendants submit to the Court, these policies are unconstitutional both as-applied to Diei and on their face. As Diei's punishment demonstrates, Defendants engaged in viewpoint discrimination by punishing Diei and applied their policies to punish Diei's off-campus, personal speech even though her speech had no connection to the University or disruptive effect on campus. Defendants also retaliated against Diei for engaging in clearly protected First Amendment expression. Moreover, Defendants' policies are overly broad on their face because those policies are directly related to suppressing student expression and serve no pedagogical interest. Finally, Defendants' policies are vague on their face because they fail to give students any notice of prohibited activities and give administrators unbridled discretion to punish speech they dislike. Accordingly, this Court should deny Defendants' motions to dismiss in their entirety.

## STATEMENT OF FACTS

Diei alleges that Defendants never provided her with any of the policies under which she was disciplined in 2019 and 2020.  Diei further alleges that Defendants informed her she was punished for the "crude," "vulgar," and "sexual" viewpoints expressed on her off-campus, personal social media accounts.

### I.    Diei Alleges That Defendants Twice Punished Her for Viewpoints Expressed in Off-Campus, Personal Social Media Posts.

Diei began posting on her personal "KimmyKasi" social media accounts in 2016. (Compl., ¶ 21.) Before Diei began her studies at the University of Tennessee Health Science Center in August 2019, she regularly posted on her social media accounts. (*Id.*,¶¶ 14, 27.) Since Diei became a student at the College of Pharmacy, the College of Pharmacy Professionalism Committee (the "Committee"), led by Chairperson George, has twice investigated her for her protected, personal expression. (*Id.*, ¶ 82.) Diei alleges that she never actually received or had

access to Defendants' "various professionalism policies" upon her matriculation as a student. (*Id.*, ¶¶ 36–40.) While Diei was informed that the College of Pharmacy maintains a policy entitled "Standards for Student Professionalism Conduct," the link to that policy was not functioning. (*Id.*, ¶¶ 37–39.)

Defendants' first investigation into Diei's social media activity was in September 2019. (*Id.*, ¶ 34.) While Diei has not based her claims on that investigation, it is evidence of Defendants' hostility towards her protected speech. During its 2019 investigation, the Committee indicated that Diei's posts violated the College of Pharmacy's professionalism policies because they were "crude," "vulgar," and "sexual." (*Id.*, ¶ 43.) Chairperson George did not provide Diei with the "various professionalism policies" under which she was allegedly investigated in 2019. (*Id.*, ¶ 36.)

Defendants again investigated Diei's social media activity in 2020 based on an anonymous complaint. (*Id.*, ¶ 55.) After reviewing the anonymous complaint, the Committee voted to expel her because of the "crude," "vulgar," and "sexual" viewpoints expressed in her personal social media. (*Id.*, ¶¶ 43–44.) Chairperson George explained that the Committee objected to Diei's posts because they "again included material of a sexual nature, as well as crude and vulgar statements." (*Id.*, ¶ 80.)

In 2020 Chairperson George and the Committee identified a handful of examples of Diei's allegedly "unprofessional social media posts." (*Id.*, ¶ 55.) For example, in one tweet Diei proposed lyrics for a possible remix to the popular song "WAP" by Cardi B and Megan Thee Stallion. (*Id.*, ¶ 60.) In another tweet, she defended the overtly sexual nature of the lyrics to "WAP," pointing out that human beings are inherently sexual. (*Id.,* ¶ 62.) As Diei alleges in her Complaint, these are examples of Diei using her personal social media accounts to express her

viewpoints on issues regarding permissible conduct by women in popular culture, occasionally employing profanity and other sexual commentary. (*Id.*, ¶ 59.)

Neither Chairperson George nor any other University of Tennessee administrator cited the Standards of the Health Professions or any other specific policy as the basis for punishment of Diei in 2020. (*Id.*, ¶¶ 66–67, 76.) After she received the complaint in the 2020 investigation, Diei twice asked Chairperson George via email to identify the "specific policy/guidelines [she] ha[d] allegedly violated," for a "direct link" to where such a policy or guideline resides, and to explain how exactly she had violated "the standard, code, policy, guideline." (*Id.*, ¶¶ 66, 68). Chairperson George stonewalled Diei's questions; instead, she responded by referencing "various professionalism codes" and declining to comment further until their in-person meeting. (*Id.*, ¶¶ 67, 69.)

Diei also asked Chairperson George and the Committee to identify the policy she had allegedly violated during their meeting on September 1, 2020. (*Id.*, ¶ 74). Chairperson George again identified the "sexual" and "crude" nature of Diei's posts as the reason for the Committee's investigation. (*Id.*, ¶ 75.) Neither Chairperson George nor any other Committee member provided Diei with a specific policy she allegedly violated or quoted the language of any specific policy. (*Id.*, ¶¶ 74–76). Chairperson George's letter informing Diei that she had been expelled from her graduate program cited "Technical Standards," not the Standards of the Health Professions policy or any other specific professionalism policy. (*Id.*, ¶ 82). Diei appealed the Committee's decision to College of Pharmacy Dean Marie Chisholm-Burns, who ultimately overturned Diei's expulsion. (*Id.*, ¶¶ 89, 92). To this day, Diei is unaware of not only the policy terms she allegedly violated, but also what, if any, criteria Dean Marie Chisholm-Burns used in deciding to overturn Chairperson George's decision to expel her for her protected expression.

Diei has also alleged that Defendant Randy Boyd, as President of the University, was personally responsible for the approval and implementation of the "various professionalism policies" that Defendants cited to justify punish Diei for her expressive conduct. Specifically, Diei has alleged that "President Boyd is responsible for the promulgation, implementation, and enforcement of the College of Pharmacy's policies, procedures, and practices, including those that were applied to deprive Diei of her constitutional rights." (*Id.*, ¶¶ 10, 137.)

As a result of Defendants' unconstitutional punishment of Diei's expressive activity, Diei has self-censored her social media activity. (*Id.*, ¶ 96.) At least once a day, Diei chooses not to post something to her social media accounts because she is afraid that the Committee will deem her post too "sexual," "crude," or "vulgar" and punish her. (*Id.*, ¶ 98.) Despite her attempts to self-censor, Diei is currently living with a reasonable fear that the Committee will open another investigation into her social media accounts and attempt to expel her or otherwise discipline her once again. (*Id.*, ¶ 97.) Defendants' unconstitutional censorship has also caused Diei emotional harm because she believed that her future career as a pharmacist had been destroyed, and she continues to worry that the Committee will punish her in the future. (*Id.*, ¶ 100.)

On February 3, 2021, Diei sued President Boyd, Chairperson George, and members of the Board of Trustees of the University for violating her rights under the First and Fourteenth Amendments, seeking declaratory and injunctive relief and damages. Diei's First and Second Causes of Action, brought against all Defendants in their official capacities, are facial challenges to the "various professionalism policies" on overbreadth and vagueness grounds. Diei's Third Cause of Action, brought against all Defendants in their official capacities, is an as-applied challenge to Defendants' punishment of Diei under the "various professionalism policies." Diei's Fourth Cause of Action, brought against Defendants Boyd and Chairperson George in their

individual capacities, is an as-applied challenge for Defendants' punishment of Diei under the "various professionalism policies." Diei's Fifth Cause of Action, brought against Chairperson George in her individual and official capacities, is an as-applied claim for First Amendment retaliation.

**II.      Defendants Move to Dismiss the Complaint, Relying Primarily on Materials Outside the Complaint.**

On March 1, 2021, Defendants filed two motions to dismiss, styled as the: (1) Official Capacity Defendants' Motion to Dismiss the First, Second, and Third Causes of Action (Individual Capacity Defs.' Mot. to Dismiss the Fourth and Fifth Causes of Action ("Defs.' Ind. Mot."); and (2) Individual Capacity Defendants' Motion to Dismiss the Fourth and Fifth Causes of Action (Official Capacity Defs.' Mot. to Dismiss the First, Second, and Third Causes of Action ("Defs.' Off. Mot."), ECF No. 25). Defendants did not move to dismiss Diei's Fifth Cause of Action against Defendant Chairperson George in her official capacity.

In their motions, Defendants attach and ask the Court to consider material outside the Complaint. First, Defendants attach six screenshots from Diei's Instagram stories from 2019. Instagram's "story" function allows a user to post an image or video that other Instagram users can only view for twenty-four hours. After the twenty-four hours has elapsed, the image or video disappears.[1] When Diei learned that she was accepted to the College of Pharmacy, she created several Instagram stories celebrating the news. (Defs.' Ind. Mot., Ex. 5, ECF No. 24-6 ("Diei's Story Posts"), 3–6 of 7.) Diei intended these stories to be temporary, and anyone who opened Instagram and navigated to Diei's page today would not be able to view them. Defendants,

---

[1] For more on Instagram "stories" function, see *Help Center — Using Instagram, Stories*, INSTAGRAM, https://help.instagram.com/1660923094227526/?helpref=hc_fnav&bc[0]=Instagram%20Help&bc[1]=Using%20Instagram (last visited Mar. 30, 2021) (attached as Exhibit A).

apparently, retained screenshots of Diei's posts and now claim that those posts were the basis for Diei's 2019 punishment. (Defs.' Ind. Mot., 11 of 29.)

Second, Defendants attach "professionalism" regulations and policies—none of which were provided to Diei or appear in her Complaint—to justify their unconstitutional punishment of Diei. Specifically, Defendants attach an excerpt from the College of Pharmacy's *CenterScope* Student Handbook entitled "Standards of the Health Professions." (Defs.' Ind. Mot., Ex. 3, ECF No. 24-4 ("Defs.' Prof. Policy").) Diei alleged that she was only informed about one policy governing professionalism, which was entitled "Standards for Student Professionalism Conduct." (Compl., ¶ 37.) Defendants have produced a document that purports to show Diei agreeing to abide by the "Standards for Student Professionalism Conduct," which notably does not reference the "Standards of the Health Professions" policy. (Defs.' Ind. Mot., Ex. 4, ECF No. 24-5 ("Defs.' Pledges").) The "Standards of the Health Professions" policy states:

> A student enrolled at the University of Tennessee Health Science Center is subject to disciplinary action up to and including suspension and dismissal for engaging in the following acts of misconduct, regardless of whether such misconduct is engaged in on or off University-owned or -controlled property:
>
> . . . [U]nprofessional and unethical conduct which would bring disrepute and disgrace upon both student and profession and which would tend to substantially reduce or eliminate the student's ability to effectively practice the profession in which discipline he or she is enrolled.

(*Id.*) However, Diei has alleged that the link to the "Standards for Student Professionalism Conduct" policy on Defendants' website did not work, and, as a result, she has alleged that she has never seen that policy. (Compl., ¶¶ 39—40.) Defendants do not attempt to explain how Diei could have been aware of the "Standards for Student Professionalism Conduct" when it was not available online. Instead, Defendants have attempted to evade this issue by relying upon the

regulations and "Standards of the Health Professions" policy, neither of which are referenced in the Complaint. Moreover, Diei has specifically alleged that "[t]o this day, the College of Pharmacy has not provided any specific 'professionalism' policies to [her]," and Defendants must accept this allegation as true. (*Id.*, ¶ 116.)

As argued below, this Court should reject Defendants' invitation to consider these materials outside the Complaint and deny Defendants' motions to dismiss in their entirety.

## ARGUMENT

After addressing the proper standard of review and Defendants' improper attempts to contest the well-pleaded facts in the Complaint in Section I, this brief discusses Diei's as-applied claims before her facial challenges. *See Connection Distribution Co. v. Holder*, 557 F.3d 321, 327 (6th Cir. 2009) ("[T]he 'usual judicial practice' is to address an as-applied challenge before a facial challenge.") (citation omitted). Accordingly, Section II demonstrates that Diei's Third and Fourth Causes of Action sufficiently state a claim that Defendants unconstitutionally applied "various professionalism policies" to Diei's off-campus speech in 2020. Section III explains why Diei's Fifth Cause of Action sufficiently states a claim against Chairperson George in her individual and official capacities for retaliating against Diei by investigating and punishing her because of her viewpoints expressed in off-campus, online speech. Section IV refutes Defendants' claims of qualified immunity. Finally, Section V demonstrates that Diei sufficiently alleges facial challenges to Defendants' "various professionalism policies" as unconstitutionally overbroad and vague.

### I.    This Court Should Reject Defendants' Invitation to Consider Material Outside the Complaint.

Defendants ignore the standard for motions to dismiss. To prevent dismissal under Fed. R. Civ. P. 12(b)(6), a complaint must set out sufficient factual matter to show that the claim is

8

facially plausible. *Casas v. Laquinta Holdings, Inc.*, Case Nos. 16-cv-2951; 17-cv-2236; 17-cv-2273; 17-cv-2427; 17-cv-2504; 17-cv-2505; 17-cv-2515; 17-cv-2558; 17-cv-2664; 17-cv-2680, 2018 U.S. Dist. LEXIS 222089, at *20 (W.D. Tenn. Sep. 26, 2018) (Fowlkes, J.) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (denying motions to dismiss, in part, because defendants failed to accept all factual allegations as true)). Even when defendants move to dismiss on the basis of qualified immunity, "[a]s with any other motion to dismiss, we perform this analysis while accepting the plaintiff's factual allegations as true and drawing all reasonable inferences in his favor." *Anders v. Cuevas*, 984 F.3d 1166, 1175 (6th Cir. 2021). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citation omitted). As this Court has recognized, "a complaint does not need detailed factual allegations to survive dismissal." *Casas*, 2018 U.S. Dist. LEXIS 222089, at *21.

"When reviewing a motion to dismiss, a district court may not consider matters beyond the complaint." *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 576 (6th Cir. 2008). "If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). The Sixth Circuit has warned that district courts must exercise "'great caution and attention to the parties' procedural rights'" before converting a motion to dismiss to a motion for summary judgment. *Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 487 (6th Cir. 2009) (citation omitted). Moreover, the Sixth Circuit "has recognized that it may consider items appearing in the record of the case, including exhibits, without converting a Rule 12(b)(6) motion into a motion for summary judgment, but only "'so long as they are *referred to*

*in the complaint* and are central to the claims contained therein.'" *Trs. of Detroit Carpenters Fringe Benefit Funds v. Patrie Constr. Co.*, 618 F. App'x 246, 255 (6th Cir. 2015) (emphasis in original) (citation omitted); *see also Tigrett v. Cooper*, 855 F. Supp. 2d 733, 757 (W.D. Tenn. 2012) ("the Court is merely testing the sufficiency of Plaintiffs' pleading, and any consideration of evidence outside the Complaint would be inappropriate.").

First, Defendants inappropriately rely on six screenshots and a video allegedly used by Defendants to punish Diei in 2019. (Defs.' Ind. Mot., 11 of 29.) These posts, however, do not appear and are not referenced in the Complaint. Instead, Diei alleged that "Chairperson George also did not identify the specific content from Diei's social media accounts that were objectionable, including the specific content that prompted the investigation." (Compl., ¶ 41.) Despite this clear allegation that Defendants did not provide the posts to Diei in 2019, Defendants now ask the Court to use screenshots of her social media activity it apparently retained when ruling on this motion. Because those screenshots do not appear and are not referenced in the Complaint, this Court cannot consider them at this stage. *Tigrett*, 855 F. Supp. 2d at 757 (refusing to review legislative history of challenged statutes in denying motion to dismiss).

Second, Defendants improperly rely on the "Standards of the Health Professions," contained within their *CenterScope* Student Handbook, and two Tennessee regulations governing pharmacists to justify their punishment of Diei. (Defs.' Ind. Mot., 10–11 of 29.) As alleged in the Complaint, Diei twice asked Chairperson George during the 2020 investigation to identify the "specific policy/guidelines [she] ha[d] allegedly violated," for a "direct link" to where such a policy or guideline resides, and to explain how exactly she had violated "the standard, code, policy, guideline." (Compl., ¶ 66, 68.) Chairperson George stonewalled Diei's questions; instead,

she responded by referencing "various professionalism codes" and declining to comment further until their in-person meeting. (*Id.*, ¶¶ 67, 69.) As a result, Diei did not know what policy was used to discipline her. The only policy that appears in Diei's Complaint is the "Standards for Student Professionalism Conduct" policy—which Diei alleges that she has never seen. (*Id.*, ¶ 38.) Indeed, Diei affirmatively pleads that Defendants have "not provided any specific 'professionalism' policies to Diei." (*Id.*, ¶ 116.) In short, it took Diei filing a lawsuit against the Defendants to finally receive a response to her question about what policy was being used to punish her viewpoints. It would be implausible to find that Diei's Complaint references the "Standards of the Health Professions" policy itself or the Tennessee regulations it purports to enforce because she clearly alleges that she never received those policies or knew of their existence. Because the "Standards of the Health Professions" policy and the Tennessee regulations it purports to enforce do not appear and are not referenced in the Complaint, this Court cannot consider them at this stage. Nevertheless, this Court may also deny Defendants' motions to dismiss because Diei has sufficiently alleged a plausible claim for relief on her as-applied and facial challenges.

## II. Diei's Third and Fourth Causes of Action Sufficiently Allege That Defendants' Policies Were Unconstitutionally Applied to Diei's Off-Campus, Personal Speech.

For decades, it has been settled law that the First Amendment rights of college students are coextensive with the public at large. *Healy v. James*, 408 U.S. 169, 180 (1972) ("[T]he precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, 'the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'") (citations omitted). Despite

this precedent, the Sixth Circuit has incorrectly held that restrictions on the First Amendment rights of students from high school to college are analyzed under the same paradigm. *Ward v. Polite*, 667 F.3d 727, 733–34 (6th Cir. 2012) (holding that there is no "stop-go distinction between student speech at the high school and university levels . . . .").[2] Nevertheless, Diei has sufficiently stated claims under Sixth Circuit precedent based upon Defendants' punishment of her off-campus, personal speech.

The Sixth Circuit has derived its student speech jurisprudence from the Supreme Court's opinions in *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503 (1969), *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986), and *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988). *See Ward*, 667 F.3d at 733–34. The Sixth Circuit has made clear school administrators may not "invoke curriculum as a pretext for punishing" a student because of her viewpoint, even if those viewpoints are offensive. *Id*. at 734 (citation omitted). "Viewpoint discrimination is poison to a free society." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019) (Alito, J., concurring). "We have said time and again that 'the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) (quoting *Street* v. *New York*, 394 U.S. 576, 592 (1969)). As the Supreme Court recently reaffirmed, "[g]iving offense is a viewpoint." *Id.* at 1749.

### A. Diei Has Alleged That Defendants Punished Her Because of Her "Offensive" Viewpoints.

In the Sixth Circuit, it is clearly established that administrators may not invoke curriculum as pretext for punishing a student for her viewpoints. In *Ward*, the Sixth Circuit

---

[2] Diei preserves the ability to argue in future stages that the Sixth Circuit's decision in *Ward* should be overruled with regard to its application of K-12 student speech cases to college student speech.

reviewed a graduate school's expulsion of a student in a counseling program for allegedly violating the American Counseling Association's (ACA) code of ethics, which were incorporated into the student handbook. *Ward*, 667 F.3d at 731. The graduate program administrators determined that the plaintiff's request to refer homosexual clients to other therapists instead of affirming their sexual orientation based upon her religious beliefs violated the code of ethics. *Id.* at 735. The plaintiff, however, alleged that the administrators invoked the code of ethics as pretext for disciplining her based upon her religious viewpoints. *Id.*

The Sixth Circuit denied summary judgment to the defendants, explaining that it was not clear that the plaintiff's actions violated the code of ethics because "[t]he university cannot point to any policy articulated in its course materials, the student handbook or anything else forbidding practicum students from making referrals." *Id.* at 736. Although the plaintiff's actions did not violate the text of the code of ethics, the defendants attempted to justify expelling the student under "a 'blanket rule' that [students] could not refer any clients." *Id.* The Sixth Circuit rejected these arguments, finding that "[a]lthough the university submits it dismissed Ward from the program because her request for a referral violated the ACA code of ethics, a reasonable jury could find otherwise—that the code of ethics contains no such bar and that the university deployed it as a pretext for punishing Ward's religious views and speech." *Id.* at 735.

In her Complaint, Diei alleges that Defendants punished her for expressing viewpoints off-campus that they considered "sexual," "crude," and "vulgar." Defendants seek to justify that punishment — both then and now in their motion to dismiss — by referencing "various professionalism policies." But as the Sixth Circuit made clear in *Ward*, professionalism policies maintained by a public university must meet First Amendment standards and cannot justify viewpoint discrimination. In the 2019 incident, Chairperson George told Diei that the "sexual,"

"crude," and "vulgar" viewpoints expressed on her social media accounts violated the College of Pharmacy's professionalism policies. (Compl., ¶ 43.) However, Chairperson George neither provided these "professionalism" policies to Diei nor explained how her allegedly "sexual" and "crude" viewpoints expressed off-campus on her own time violated the professionalism policies. (*Id*. ¶ 44.) Similarly, in 2020, Chairperson George explained that the Committee objected to Diei's "posts again [because they] included material of a sexual nature, as well as crude and vulgar statements." (*Id*. ¶ 80.) Chairperson George then justified the Committee's viewpoint discriminatory punishment under the guise of an unidentified professionalism policy, stating that "the committee has determined that [Diei's] conduct is a serious breach of the norms and expectations of the profession, that [Diei] doe[es] not meet the minimum thresholds of professional behavior or the requirements of the Technical Standards for students in the UTHSC College of Pharmacy." (*Id*. ¶ 82.) Despite Chairperson George's references to the various professionalism policies in the UTHSC Handbook, Catalog, and "Technical Standards for students in the UTHSC College of Pharmacy[,]" Chairperson George never provided Diei the text of these policies or explained how the allegedly "sexual," "crude," or "vulgar" nature of her personal social media content violated those policies. (*Id*. ¶ 85.) As in *Ward*, Defendants attempt to cloak impermissible viewpoint discrimination by reference to an impermissibly broad and vague catch-all "professionalism" policy. As in *Ward*, this court should reject the effort.

Indeed, in their motions, Defendants ignore that Diei has alleged viewpoint discrimination. Instead, Defendants assume that Chairperson George applied a policy entitled "Standards of the Health Professions" to Diei. (Defs.' Ind. Mot., 10–11 of 29.) As explained above, Diei has never seen this policy, and there is no allegation in the Complaint that Defendants used this policy to punish Diei. Defendants also assert that Diei agreed to abide by

14

this policy by signing a document entitled "Standards for Student Professional Conduct." (*Id.*) However, like Diei's Complaint, the "Standards for Student Professional Conduct" does not mention the "Standards of the Health Professions" or "UTHSC's APA Professionalism Rule." (*Id.*) At this stage of litigation, Defendants may not contradict the allegations of the Complaint. This Court, however, can find that Defendants' reliance on the "Standards of the Health Professions" in this lawsuit shows that Defendants' decision to expel Diei was improperly motivated by her viewpoints, not her alleged violation of the "various professionalism policies."

Like in *Ward* where the Sixth Circuit precluded summary judgment based upon defendants' punishment of a student's in-class speech, in part, because "[t]he university cannot point to any policy articulated in its course materials, the student handbook or anything else forbidding practicum students from making referrals," neither the "Standards of the Health Professions" nor any of the policies identified in the Complaint prohibit "sexual," "crude," or "vulgar" social media posts that occur entirely off-campus, are non-disruptive, and are unrelated to any legitimate pedagogical concern. Specifically, as Defendants note in their motion, a student may only be expelled under the "Standards for Student Professional Conduct" if the Defendants determine that the student's behavior "would tend to substantially reduce or eliminate the student's ability to effectively practice the profession [of pharmacy]." (Defs.' Off. Mot., 18 of 21.) However, Defendants did not determine that Diei's social media posts would interfere with her ability to practice pharmacy; instead, Chairperson George wrote that Diei's social media posts were "a serious breach of the norms and expectations of the profession . . . ." (Compl., ¶ 82.) Chairperson George's failure to engage in the analysis outlined in the "Standards for Student Professional Conduct" supports Diei's allegation that it was the viewpoints she

expressed off-campus, not a violation of any identifiable policy, that caused Defendants to vote to expel her.

Because *Ward* would preclude summary judgment based upon the factual dispute about the basis for Diei's punishment, this Court should deny Defendants' motion to dismiss.

## B. Defendants Have No Basis for Disciplining Diei's Off-Campus, Personal Speech.

As noted above, the Sixth Circuit instructs lower courts to apply the *Tinker, Fraser,* and *Hazelwood* line of cases when analyzing the First Amendment rights of students. *Ward*, 667 F.3d at 733–34. As the Sixth Circuit summarized in *Barr v. Lafon*, *Tinker, Fraser*, and *Hazelwood* establish three principles. 538 F.3d 554 (6th Cir. 2008). First, "under *Fraser*, a school may categorically prohibit vulgar, lewd, indecent, or plainly offensive student speech [on campus]." *Id.* at 563–64. Second, "under *Hazelwood*, a school has limited authority to censor school-sponsored speech in a manner consistent with pedagogical concerns." *Id.* at 564. And third, as to student speech not addressed in *Fraser* and *Hazelwood*, "the *Tinker* standard applies . . . and allows regulation only when the school reasonably believes that the speech will substantially and materially interfere with schoolwork or discipline." *Id.* The Sixth Circuit has cautioned that "the less the speech has to do with the curriculum and school-sponsored activities, the less likely any suppression will further a legitimate pedagogical concern . . . ." *Ward*, 667 F.3d at 734.

As described in more detail below, *Tinker, Fraser, Hazelwood*, and *Ward* each concern either in-school or school-sponsored speech, unlike Diei's off-campus, personal social media posts. In *Yoder v. University of Louisville*, the Sixth Circuit observed that "neither the Supreme Court nor a panel of our circuit has considered whether schools can regulate off-campus, online speech by students . . . ." 526 F. App'x 537, 545 (6th Cir. 2013). Since *Yoder*, however, one court in this district considered whether a school can regulate the off-campus, online speech of

students and held that such regulation is unconstitutional. *Nixon v. Hardin Cty. Bd. of Educ.*, 988 F. Supp. 2d 826, 830 (W.D. Tenn. 2013). Before examining *Nixon*, a short summary of *Tinker, Fraser,* and *Hazelwood* is necessary.

In *Tinker*, the Court reviewed a school's policy that prohibited students from wearing an armband on campus, which the school established after learning that a group of students planned to wear black armbands to protest the Vietnam War. 393 U.S. at 504. The school suspended the students when they wore the armbands, even though there was no actual disturbance on campus. *Id.* at 504, 514. "The District Court concluded that the action of the school authorities was reasonable because it was based upon their fear of a disturbance from the wearing of the armbands." *Id.* at 508. The Supreme Court disagreed, explaining a "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" was not sufficient to warrant a prohibition of student speech on school grounds. *Id.* at 509. Instead, the Court held that, in light of the "special characteristics of the school environment," schools could not restrict student expression unless the expression "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Id.* at 506, 513. Importantly, the expression at issue in *Tinker* occurred on school grounds, and in limiting its holding to on-campus speech, the *Tinker* Court recognized both that "[s]chool officials do not possess absolute authority over their students" and that students "out of school are 'persons' under our Constitution," when they are off-campus, students' expression is their own and punishable only under the First Amendment's narrow exceptions. *Id*. at 511.

In *Fraser*, the Court reviewed a school's punishment of a student for delivering a speech for student government office at an assembly in which the student "referred to his candidate in terms of an elaborate, graphic, and explicit sexual metaphor." 478 U.S. at 677–78. The Court

17

upheld the school's punishment of the student, explaining that it is appropriate for the school to police "lewd, indecent, or offensive speech and conduct" that occurs *in school* because "school authorities [are] acting *in loco parentis*, to protect children — especially in a captive audience . . . ." *Fraser*, 478 U.S. at 683–684. In a later case involving student speech, the Court emphasized the limits of schools' jurisdiction over student speech, explicitly noting that "[h]ad Fraser delivered the same speech in a public forum outside the school context, it would have been protected." *Morse v. Frederick*, 551 U.S. 393, 405 (2007).

In *Hazelwood*, the Court reviewed a school's censorship of two student newspaper articles about pregnant students and the impact of divorce on students. 484 U.S. at 263. The Court upheld the censorship of these articles because the school's newspaper "bear[s] the imprimatur of the school" and the censorship was "reasonably related to legitimate pedagogical concerns." *Id.* at 271, 273. As the Court explained in its holding, "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech *in school-sponsored* expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273 (emphasis added).

The Sixth Circuit's student speech jurisprudence does not permit punishment of students for their off-campus, personal social media. In *Nixon*, a school disciplined a sixth-grade student for jokingly tweeting that she was going to physically harm a classmate. 988 F. Supp. 2d at 830. The court acknowledged that the Sixth Circuit did not provide any guidance on whether schools may regulate off-campus, online student speech, but it concluded that *Tinker, Fraser,* and *Hazelwood* provided the analysis needed for the case. *Id.* at 833–39. On a full record, the court denied summary judgment to the defendants because the school's punishment was not permissible under the Sixth Circuit's student speech jurisprudence. *Id.* at 839. *Tinker* did not

justify punishment because "[n]o disruption of school activities or impact on the school environment has been shown." *Id. Fraser* did not justify punishment because "[t]he speech was not made at school, directed at the school, or involved the use of school time or equipment." *Id.* Finally, *Hazelwood* did not justify punishment because "the speech had no connection to [the school] whatever other than the fact that both the speaker and the target of the speech studied there." *Id.*

Those rulings compel the same result here. Like the school in *Nixon* that exceeded their constitutional authority to punish student speech, Defendants have no basis to punish Diei's off-campus posts as KimmyKasi under *Tinker, Fraser,* and *Hazelwood. Tinker* does not permit punishing Diei because her posts have never caused a disruption on campus or interfered with the rights of other students. (Compl., ¶ 28.) *Fraser* does not permit punishing Diei because she does not post in class or use school time or equipment to create her posts. (*Id.*, ¶¶ 32–33, 145.) *Fraser* states that "vulgar" student speech may be restricted in certain contexts, but only when it occurs on school grounds; the Supreme Court explicitly noted in *Morse* that off-campus "vulgar" speech is entitled to full First Amendment protection. *Morse*, 551 U.S. at 405 (clarifying that "[h]ad Fraser delivered the same speech in a public forum outside the school context, it would have been protected."). Finally, *Hazelwood* does not permit punishing Diei because her posts did not "bear the imprimatur of the school" and the censorship was not "reasonably related to legitimate pedagogical concerns." 484 U.S. at 271, 273; Compl., ¶¶ 145–146.

Because Diei has alleged that Defendants' punishment against her for her off-campus, online speech is unconstitutional as-applied under the Sixth Circuit's student speech jurisprudence and its application in *Nixon*, this Court should deny Defendants' motions to dismiss.

### C. Defendants' Unconstitutional Punishment Was Not an "Academic Determination" and Does Not Further Any Legitimate Pedagogical Concern.

As argued above, *Ward* is controlling authority that Defendants may not avoid. Nevertheless, Defendants attempt to evade *Ward* by building an argument based upon *dicta* in Sixth Circuit cases that do not involve First Amendment claims and out-of-circuit cases concerning "professionalism." In short, Defendants take the position that a university is free to punish *any* student speech so long as the university states that it is enforcing a "professionalism" policy. The only precedential Sixth Circuit opinion that Defendants have identified to support their position is *Al-Dabagh v. Case Western Reserve University*, 777 F.3d 355 (6th Cir. 2015). As argued below, *Al-Dabagh* does not support Defendants' conclusion, and the Sixth Circuit's subsequent analysis of the issues in *Al-Dabagh* undermines Defendants' arguments.

In *Al-Dabagh*, a medical student was dismissed from his program after the university determined that he "lack[ed] professionalism" based upon a number of conduct issues. 777 F.3d at 359. The *Al-Dabagh* plaintiff brought a single claim for breach of contract—a crucial fact omitted from Defendants' analysis. *Id*. The Sixth Circuit explained that Ohio law and "Federal Due Process law" require courts to give deference to a university's "academic judgment." *Id*. The Sixth Circuit then found that the defendants' "professionalism determination is an academic judgment" entitled to deference. *Id.* at 360. Based upon this holding, Defendants argue that this Court must defer to its "academic judgment" concerning Diei's professionalism. (Defs.' Ind. Mot., 13–14 of 29.) The Sixth Circuit, however, has recently clarified its holding in *Al-Dabagh*.

In *Endres v. Northeast Ohio Medical University*, a student brought several causes of action, including a Due Process claim, against a medical school that dismissed him for cheating on an exam. 938 F.3d 281, 299 (6th Cir. 2019). Concerning the Due Process claim, the parties disputed whether the student was dismissed for an "academic" reason as opposed to a

"disciplinary" reason. *Id.* at 297. Under Due Process jurisprudence, the distinction between "academic" and "disciplinary" is crucial because students dismissed for "academic" reasons are entitled to less procedural protections. *Id.* at 297–98; *see also Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 85–90 (1978). The defendants argued that the decision to dismiss the student for cheating was an "academic" determination akin to the "professionalism" determination in *Al-Dabagh*. *Endres*, 938 F.3d at 297–98. The Sixth Circuit, however, rejected the defendants' broad interpretation of *Al-Dabagh* and a universities' ability to limit the process due to students by construing all discipline as an "academic" determination. *Id.* at 299.

The Sixth Circuit observed that "it cannot be the case that because [a student's] alleged misconduct somehow relates to a professional trait, the medical school need only treat the matter as academic and provide the student with minimal process." *Id.* The Sixth Circuit was correctly concerned that universities would be incentivized to construe all disciplinary matters as relating to a "professional" trait, and, therefore, an "academic" determination with limited procedural protections. *Id.* As the Sixth Circuit warned, a "school could reasonably construe all types of misconduct as a sign of the student's lack-of-professionalism and thus avoid providing the student with the heighted procedures that the Due Process Clause may demand." *Id.* The Sixth Circuit also rejected the defendants' argument that courts must defer to a university's determination concerning when discipline is "academic," explaining that "[w]hether the university describes conduct as academic or disciplinary does not dictate what process the Constitution demands. As a default, it is the Constitution, not a university handbook, that establishes what process is due: the Constitution sets 'the floor or lowest level of procedures acceptable.'" *Id.* at 300 (citation omitted).

Like the defendants in *Endres* who argued that the court was required to defer to its "academic" judgment to determine the level of process due under the Constitution, Defendants have argued universities may evade well-established First Amendment jurisprudence because they punished Diei under a "professionalism" policy. (Defs.' Ind. Mot., 13–14 of 29.) Like the plaintiff in *Endres* who argued that his dismissal for cheating was not an "academic" determination, Diei has alleged that Defendants punished her for her viewpoints, not because she violated a professionalism policy. Although Diei has not alleged a procedural due process claim, the Sixth Circuit's concern that a university would attempt to avoid well-established constitutional constraints on its ability to punish students by invoking a "student's lack-of-professionalism" applies equally in the First Amendment context.

Importantly, Defendants argue that universities may evade normal First Amendment constraints and punish students for violating "professionalism" policies because "[a] university's teaching and requiring adherence to such professional standards serves a 'legitimate pedagogical concern in teaching its students to comply with' the code of ethics in their field." (*Id.*, 13 of 29.) However, the Supreme Court has recently held, in *National Institute of Family and Life Advocates v. Becerra*, that the speech of professionals is not entitled to less First Amendment protections, specifically noting that the government may not impose "content-based restrictions" on professional speech. 138 S. Ct. 2361, 2372 (2018).

Given that *Becerra* precludes content-based punishment of professionals, Defendants have no pedagogical interest in enforcing a professionalism policy that would be unconstitutional as applied to a working pharmacist. As noted above, the *Nixon* court already determined that the off-campus, personal speech of a sixth grader was protected under the *Tinker, Fraser,* and *Hazelwood* line of cases. Under the Defendants' position, the First Amendment would protect

students' off-campus, online speech until the point at which a university could claim to be

teaching "professionalism," even if the basis for their decision is based upon the student's

viewpoint—a result that would clearly violate the First Amendment if applied to professional

pharmacists under *Becerra*.

Because Defendants' position would allow universities to "reasonably construe all types

of [speech] as a sign of the student's lack-of-professionalism and thus avoid providing the

student with the" protections of the First Amendment, this Court should reject Defendants'

position and deny their motions to dismiss. *Endres,* 938 F.3d at 299.

### D.  Diei Has Sufficiently Alleged Personal Involvement by Boyd.

Under Section 1983, a supervisor may be individually liable based upon some "'active

[un]constitutional behavior' on the part of the supervisor.'" *Colson v. City of Alcoa*, No. 3:16-

CV-377, 2017 U.S. Dist. LEXIS 66339, at *16 (E.D. Tenn. May 2, 2017) (citation omitted). A

plaintiff can show "active unconstitutional behavior" if the supervisor "(1) 'encouraged the

specific incident of misconduct or in some other way directly participated in it' or (2) 'implicitly

authorized, approved, or knowingly acquiesced in the unconstitutional conduct.'" *Id.* (citation

omitted). Courts from California to Mississippi have found that university officials can be liable

under Section 1983 for approving and implementing a policy that caused a constitutional

deprivation. *See OSU Student All. v. Ray*, 699 F.3d 1053, 1076 (9th Cir. 2012) ("[a]dvancing a

policy that requires subordinates to commit constitutional violations is always enough for § 1983

liability . . . so long as the policy proximately causes the harm — that is, so long as the plaintiff's

constitutional injury in fact occurs pursuant to the policy."); *see also Brown v. Jones Cty. Junior

Coll.*, 463 F. Supp. 3d 742, 757 (S.D. Miss. 2020) ("there is an alternative basis for supervisory

liability when a plaintiff alleges that the supervisor implemented 'a policy so deficient that the

policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'") (citation omitted).

Boyd was personally responsible for the approval and implementation of the "professionalism" policy that caused Diei's constitutional deprivation. Diei has alleged that "President Boyd is responsible for the promulgation, implementation, and enforcement of the College of Pharmacy's policies, procedures, and practices, including those that were applied to deprive Diei of her constitutional rights." (Compl., ¶¶ 10, 137.) Diei has also alleged that "President Boyd knew or reasonably should have known that the College of Pharmacy's policies, procedures, and practices would lead to this deprivation," and that he "knew that individuals under his supervision implemented the College of Pharmacy's policies, procedures, and practices that deprived Diei of her constitutional rights, and President Boyd, with deliberate indifference, failed to act with regard to the constitutional rights of Diei and all the College of Pharmacy students." (*Id.*, ¶ 10.) In short, Diei has alleged that Boyd "implemented 'a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" *Brown*, 463 F. Supp. 3d at 757 (citation omitted).

Because Diei has alleged that Boyd implemented an unconstitutional policy to deprive her of her First Amendment rights and Defendants must accept these factual allegations at this stage, this Court should deny Defendants' motions to dismiss on the grounds that Boyd was not personally involved in Diei's constitutional deprivation.

### III.   Diei's Fifth Cause of Action Sufficiently States Claims Against Chairperson George in Her Individual Capacity for First Amendment Retaliation.

To sustain a First Amendment retaliation claim, Diei must establish three elements: "'(1) [she] engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against [her] that would deter a person of ordinary firmness from continuing to engage in

that conduct; [and] (3) . . . the adverse action was motivated at least in part by [her] protected

conduct.'" *Anders*, 984 F.3d at 1175 (citation omitted). As argued below, Diei has sufficiently

alleged claims for First Amendment retaliation.[3]

### A.  Diei's Social Media Posts Are Clearly Protected Expression.

Diei engaged in protected expression when she posted on her personal social media

accounts. As a general matter, speech is protected if it does not fall into one of the "historic and

traditional categories" of unprotected speech, such as incitement, fighting words, obscenity, or

defamation. *See United States v. Stevens*, 559 U.S. 460, 468 (2010); *see also Becerra*, 138 S. Ct.

at 2373 (citing *Stevens* in discussion of regulations on professional conduct that burden speech).

Diei's social media posts do not fall into any of these well-established categories of unprotected

speech, and are therefore presumptively protected under the First Amendment.

Moreover, the First Amendment certainly protects expression "'that may be 'fairly

characterized as constituting speech on a matter of public concern.'" *Anders*, 984 F.3d at 1175

(citation omitted). "In order to conclude that speech addresses a matter of public concern, this

court must be able to fairly characterize the expression as relating to any matter of political,

social, or other concern to the community." *Id.* at 1176 (citations omitted).

Diei used profanity and sexual commentary to express her viewpoints on issues regarding

permissible conduct by women in popular culture. When the song "WAP" was released, Diei

found that many individuals were criticizing the song's explicit, sexual lyrics. (Compl., ¶¶ 59–

62.) Diei disagreed with the criticism of the song, which she perceived to be largely coming from

men condemning a woman for speaking brashly about her sexual desires. Diei engaged in this

conversation by defending the lyrics of WAP and suggesting lyrics to a remix to support women

---

[3] Defendants have not moved to dismiss the official capacity claim for First Amendment
retaliation.

expressing their sexuality though lyrical raps. (*Id.*) Given that Defendants themselves do not argue that Diei's 2020 social media posts are not protected speech on a matter of public concern, this Court should find that Diei has alleged that she spoke on a matter of public concern.

### B. Defendants' Punishment of Diei Would Deter a Student of Ordinary Firmness from Continuing to Engage in Protected Expression.

"Whether a retaliatory action is sufficiently severe to deter a person of ordinary firmness from exercising his or her rights *is a question of fact.*" *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002) (emphasis added). The Sixth Circuit "has described an adverse action as 'one that is 'capable of deterring a person of ordinary firmness' from exercising the constitutional right in question. [The Sixth Circuit has] also held that nothing justifies 'harassing people for exercising their constitutional rights,' so the deterrent effect on speech 'need not be great' to be actionable." *Anders*, 984 F.3d at 1176 (citations omitted).

A defendant instituting disciplinary proceedings against a student in retaliation for protected speech is sufficient to deter a student of ordinary firmness from engaging in protected speech. In *Thompson v. Ohio State University*, a student filed a First Amendment retaliation claim against a professor who filed a complaint alleging that the plaintiff violated the student code of conduct. 990 F. Supp. 2d 801, 809 (S.D. Ohio 2014). The professor moved to dismiss the First Amendment retaliation claim under Fed. R. Civ. Pro. 12(b)(6), arguing that the filing of charges itself is not sufficient to deter a student from continuing to engage in protected speech. *Id.*

The court disagreed, explaining that "[t]o the extent [the defendant] alleges that the filing of charges is not enough of an adverse action to chill a person of ordinary firmness, the Court is unpersuaded." *Id.* Moreover, the professor further argued that he was entitled to qualified immunity because "there was no 'clearly established law' that would have put [the professor] on

notice that the 'mere filing of a conduct charge' would be an adverse action for First Amendment retaliation purposes." *Id.* at 812 (citation omitted). The court, again, rejected the professor's argument noting that the plaintiff specifically alleged that the professor made the report *because of* protected speech, which is significant because "[i]n the context of a retaliation claim, the focus of the qualified immunity analysis is on the retaliatory intent of the defendant." *Id.* The Sixth Circuit recently reaffirmed, in *Speech First, Inc. v. Schlissel*, that "the threat of punishment from a public official who *appears* to have punitive authority can be enough to produce an objective chill." 939 F.3d 756, 764 (6th Cir. 2019) (emphasis in original) (finding that plaintiff had established the "injury" element of standing because the threat of punishment is sufficient).

Like the plaintiff in *Thompson* who alleged that the professor "initiated student misconduct charges against the plaintiff in retaliation for plaintiff's allegations of race discrimination," 990 F. Supp. 2d at 812, Diei has alleged that "Chairperson George's investigation and vote to dismiss Diei from the College of Pharmacy in September 2020 were also retaliatory actions against Diei because of her First Amendment protected speech . . . ." (Compl. ¶ 158.) Importantly, Diei does not know who filed the charges against her, and Diei will seek discovery to find out who made the complaint. It is plausible that Chairperson George herself made the complaints. Moreover, Diei has alleged that Chairperson George's conduct did, in fact, chill and continues to chill Diei's exercise of her right to engage in expressive First Amendment activity. (*Id.*, ¶¶ 96–98, 160.) Finally, Diei believed that she was going to be expelled from September 4, 2020, to September 25, 2020, a nearly three-week period during which Diei suffered emotional distress from what she believed was the death-knell of her career in pharmacy. (*Id.*, ¶ 100.) Considering that most graduate students in this country need their degree to enter their chosen profession and have accumulated hundreds of thousands of dollars in

student loan debt, it is simply unbelievable that having a committee vote to expel a student for protected speech would not deter a student of ordinary firmness from engaging in protected speech. *See Schlissel*, 939 F.3d at 765 (finding that the mere threat of an investigation and "implicit threat of consequence[s]" objectively chills speech).

Defendants failed to provide the court with a complete First Amendment retaliation analysis, as noted above, but contend that Diei's retaliation claim fails because the university did not take any "adverse action" against her. To support its argument, Defendants rely upon *Benison v. Ross*, a case involving a professor's claim for First Amendment retaliation against a university, for the proposition that a professor may only challenge the "final decision" of a university when asserting a claim for First Amendment retaliation. 765 F.3d 649 (6th Cir. 2014). However, the *Benison* court based its reasoning on another case in the employment context, *Dobbs-Weinstein v. Vanderbilt University*, 185 F.3d 542, 545 (6th Cir. 1999).

"In *Dobbs-Weinstein*, we held that a dean's decision to deny tenure to a professor was not an adverse action because it was not an 'ultimate employment decision.'" *Benison*, 765 F.3d at 545. Critically, the Sixth Circuit has explained that the term "'adverse action'" is different in the employment context than in the context of First Amendment retaliation claims by non-employees. *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012). "Moreover, although the Sixth Circuit has not expressly overruled *Dobbs-Weinstein*, subsequent decisions have retreated from the 'ultimate employment decision' standard." *Barron v. Univ. of Notre Dame du Lac*, 93 F. Supp. 3d 906, 913 (N.D. Ind. 2015) (citing *Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 433 (6th Cir. 2014)). In the context of First Amendment retaliation claims by students, Defendants have not identified any cases in this Circuit that support their "final decision" theory. And outside the retaliation context, the Sixth Circuit has affirmed that

even the initiation of a purportedly "voluntary" referral process "is chilling even if it does not result in a finding of responsibility or criminality." *See Schlissel*, 939 F.3d at 765. As illustrated by *Thompson*, and as implied by the court's reasoning in *Schlissel*, courts in this Circuit have held that it is clearly established that it is unconstitutional to retaliate against a student for their protected speech, and that retaliation need not be a "final decision" as in the employment context.

### C. As Alleged in Diei's Complaint, Defendants Voted to Expel Diei Because of Her Protected Speech.

"To establish causation, [plaintiff] must demonstrate that its protected speech was 'a substantial or motivating factor' of the adverse action." *Anders*, 984 F.3d at 1177 (citation omitted.) "A defendant's motivation for taking action against the plaintiff is usually a matter best suited for the jury." *Paige v. Coyner*, 614 F.3d 273, 282 (6th Cir. 2010). Here, Diei has alleged that Defendants specifically identified her protected speech as the cause for her punishment. (Compl., ¶¶ 80–82, 158.) As such, Diei has sufficiently alleged this prong of her claim.

### IV. Defendants Are Not Entitled to Qualified Immunity on Diei's Fourth and Fifth Causes of Action Because They Violated Clearly Established Law.

"To defeat a claim of qualified immunity, the plaintiff must show that the official's conduct (1) violated a constitutional right that (2) was clearly established." *Anders*, 984 F.3d at 1175. A right is clearly established when officials have "fair warning" that their conduct violates established law. *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 898 (6th Cir. 2019) (citation omitted). The Sixth Circuit has advised that "'an official can be on notice that his conduct violates established law even in novel factual situations." *Id.* (citation omitted). In evaluating whether a right is clearly established, this Court "must look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within our circuit, and finally to decisions of other circuits." *Id.* (citation omitted). Looking to these decisions, "'an action's

unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs.'" *Id.* (citation omitted). "As [the Sixth Circuit has] repeatedly cautioned, it is generally "'inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity. Although an officer's 'entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point,' that point is usually summary judgment and not dismissal under Rule 12.''" *Anders*, 984 F.3d at 1175 (citation omitted). "Although qualified immunity does protect the defendant from all burdens of litigation, including 'the burdens of discovery,' . . . the fact-intensive nature of a qualified immunity defense makes it 'difficult for a defendant to claim qualified immunity on the pleadings *before discovery* . . . .'" *Jenkins v. Jefferson Cty. Bd. of Educ.*, No. 3:19-CV-315-RGJ, 2020 U.S. Dist. LEXIS 57145, at *7–8 (W.D. Ky. Apr. 1, 2020) (citations omitted) (denying motion to dismiss on the basis of qualified immunity because of the fact intensive nature of the claims).

### A. Defendants Violated Clearly Established Law by Disciplining Diei Because of Her Viewpoint.

Defendants are not entitled to qualified immunity because it is well-settled that schools may not engage in viewpoint discrimination, which is precisely what Diei has alleged in the Complaint. As explained in Section III(A), Diei has alleged that Defendants invoked the "various professionalism policies" as pretext for punishing her because of her viewpoint—a fact that Defendants cannot dispute at this stage. Defendants had "fair warning" that they were not permitted to invoke a policy as pretext for viewpoint discrimination because the Sixth Circuit's 2012 decision in *Ward* unmistakably held that school administrators may not "invoke curriculum as a pretext for punishing" a student because of her viewpoint. *Ward*, 667 F.3d at 731 (citation omitted). Moreover, for decades, "[i]t [has been] firmly settled that under our Constitution the

public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street*, 394 U.S. at 592.

Defendants attempt to avoid liability for their unconstitutional conduct by arguing that "[t]he truth is that '[a]t the intersection of university speech and social media, First Amendment doctrine is unsettled.' *Yeasin v. Durham*, 719 F. App'x 844, 852 (10th Cir. 2018)." (Defs.' Ind. Mot., 27 of 29.) However, as discussed above, the *Nixon* case illustrates that the law in this circuit is not as "unsettled" as the Defendants would have this Court believe. Instead, the *Nixon* court provided a clear application of the *Tinker, Fraser,* and *Hazelwood* line of cases in relation to student social media use and held that school administrators may not punish such speech unless it falls within one of the permissible exceptions to the First Amendment. Moreover, three months before Defendants' vote to expel Diei for her social media use, the Third Circuit engaged in an extensive analysis of *Tinker, Fraser,* and *Hazelwood* to protect students' First Amendment rights in *B.L. v. Mahanoy Area School District*, 964 F.3d 170, 177–78 (3d Cir. 2020), *cert. granted*, 141 S. Ct. 976 (2021). In that case, the Third Circuit found that school administrators violated the First Amendment rights of a high school student for dismissing her from the cheerleading team because of a social media post in which the student wrote "'Fuck school fuck softball fuck cheer fuck everything.'" *Id.* at 175. Based upon *Nixon* and *Mahanoy*, Defendants had "fair warning" that punishing Diei for her off-campus, online speech would violate the First Amendment principles established in *Tinker, Fraser,* and *Hazelwood*.

Because clear precedent prohibits administrators from invoking a policy as pretext for viewpoint discrimination, and because *Nixon* gave Defendants "fair warning" that punishing Diei for her off-campus, online speech would violate the First Amendment, this Court should find that

the Individual Defendants are not entitled to qualified immunity on Diei's Fourth Cause of Action.

### B. Defendants Violated Clearly Established Law by Retaliating Against Diei for Her Protected Speech.

Chairperson George is not entitled to qualified immunity because the law is well-established that state officials cannot retaliate against public university students for their protected expression. *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999); *see also Kesterson v. Kent State Univ.*, 967 F.3d 519, 525 (6th Cir. 2020) (citing *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 585–86 (6th Cir. 2008)).

As a less specific proposition, it is a clearly established principle that even the *threat* of an official action by the government in retaliation for protected speech could deter a person of ordinary firmness from engaging in protected speech. *See Schlissel*, 939 F.3d at 764–5 (finding that the threat of discipline and the attendant implicit threat of consequences has an objective chilling effect on speech); *see also See Hill v. Lapin*, 630 F.3d 468, 472–73 (6th Cir. 2010) (quoting *Thaddeus-X*, 175 F.3d at 398); *see also Izen v. Catalina*, 398 F.3d 363, 367 n.5 (5th Cir. 2005) ("'Any form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom.'"(citation omitted)). Even more specifically and as explained in Section IV(B) above, the *Thompson* court recognized that university officials are not exempt from the rule barring government officials from initiating an investigatory and disciplinary process in bad faith and in retaliation for an individual's protected speech. 990 F. Supp. 2d at 812 (rejecting a university-defendant's argument he was entitled to qualified immunity because "there was no 'clearly established law' that would have put [the professor] on notice that the

'mere filing of a conduct charge' would be an adverse action for First Amendment retaliation purposes.").

Because clear precedent prohibits public college and university administrators, like Chairperson George, from taking adverse action against students in response to their protected speech, this Court should find that Chairperson George is not entitled to qualified immunity on Diei's Fifth Cause of Action.

## V. Defendants' "Various Professionalism Policies" Are Unconstitutionally Overbroad and Vague.

As an initial matter, Diei's well-pled allegations state a claim that Defendants' "various professionalism policies" are overbroad and vague, and this Court should ignore Defendants' extra-pleading submissions. Defendants contradict Diei's allegations, asserting that it is undisputed that a policy entitled "Standards of the Health Professions" is applicable to College of Pharmacy students and submitting to this Court an excerpt of the *CenterScope* Student Handbook that contains that policy (Defs.' Ind. Mot., 10–11 of 29.) Even if this Court considers the Student Handbook or the policies contained within it, Defendants' policies are still facially overbroad and vague. As discussed in Part B of this section, the policies contained in the Student Handbook do not pass constitutional muster under the Sixth Circuit's overbreadth jurisprudence, and, as discussed in Part C of this section, those policies are void for vagueness. Lastly, Part D addresses Defendants' argument that their policies should enjoy a presumption of constitutionality.

### A. Diei's First and Second Causes of Action Sufficiently State Facial Claims for Overbreadth and Vagueness.

The Official Capacity Defendants' Motion to Dismiss the First, Second, and Third Causes of Action fails to take the allegations in Diei's Complaint as true. To determine whether Diei's facial challenges to Defendants' "various professionalism policies" state a claim, this

Court should ignore Defendants' extra-pleading submissions and take Diei's allegations in the Complaint as true. *See Casas*, 2018 U.S. Dist. LEXIS 222089, at *20–21.

In her Complaint, Diei sufficiently pleads that Defendants' policies are unconstitutionally overbroad. As discussed further below, a regulation is overbroad if it is (1) related to the suppression of expression, (2) does not "further an important or substantial government interest," and (3) "burden[s] substantially more speech than necessary to further [the] interest." *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 391 (6th Cir. 2005) (citations omitted). As such, restrictions on expression must further the College of Pharmacy's pedagogical interest in training future pharmacists. Diei alleges that Defendants' "various professionalism policies" directly regulate expression, going so far as to allow for punishment of social media content that administrators deem to be "unprofessional." (Compl., ¶ 105.) Diei also unambiguously alleges that Defendants' policies punish a broad range of protected expression — including students' off-campus, personal expression — for no legitimate pedagogical reason. (*Id.*, ¶¶ 103–104.) These allegations state a claim that Defendants maintain policies that restrict more expression than is necessary to serve their interests, and are therefore overly broad.

In her Complaint, Diei sufficiently pleads that Defendants' policies are unconstitutionally vague. As discussed further below, a regulation is void for vagueness if they fail to provide "fair warning" of prohibited conduct and fail to provide explicit standards to guide enforcement. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). Diei's allegations demonstrate that Defendants' policies fail to provide this "fair warning" to students, and do not provide the Committee with objective standards to enforce those policies. First, Diei alleges that she has never seen Defendants' "various professionalism policies." (*Id.*, ¶¶ 36–40.) In fact, she alleges that the link to Defendants' policy titled "Standards of Student Professionalism Conduct" does

not function, and that she was not even provided with a copy of the "policy/guidelines" the Committee applied during its investigation. (*Id.*, ¶¶ 39, 66–69). Defendants' failure to provide students with notice of the policies applicable to them is a clear example of a policy that threatens to "trap the innocent by not providing fair warning." *Grayned*, 408 U.S. at 108. Further, Diei alleges that Defendants' "various professionalism policies" allow for discrimination based on viewpoint. (Compl., ¶¶ 104–105, 118.) This type of subjective discretion by its nature lacks objective, explicit standards of enforcement. As such, Diei's allegations state a claim that Defendants maintain policies that provide no notice of proscribed activity or objective standard of enforcement and allow unbridled discretion to administrators, and are therefore void for vagueness.

Diei has alleged that Defendants did not provide her with the policy she allegedly violated and that Defendants' website that allegedly housed these policies did not work. (*Id.*, ¶ 36–40.)  In short, by arguing that the "Standards of the Health Professions" contained in the *CenterScope* Student Handbook is the applicable policy, Defendants do not accept Diei's allegations as true. However, even if this Court finds that the Student Handbook is fairly incorporated into Diei's Complaint and therefore considers Defendants' extra-pleading submission of the policies contained therein, their policies are both overbroad and vague.

### B. Defendants' "Standards of the Health Professions" Are Unconstitutionally Overbroad.

The policies in the Student Handbook that Defendants argue are applicable to Diei and College of Pharmacy students fail each prong of the Sixth Circuit's overbreadth test. First, they are related to the suppression of expression, not merely non-expressive conduct. Second, they do not serve a legitimate pedagogical interest. And third, they burden substantially more expression than is necessary to further the University of Tennessee's interest in educating competent future

pharmacists or the State of Tennessee's interest in "regulation and control" of the "practice of pharmacy." Tenn. Code Ann. § 63-10-202.

A law or regulation that "punishes a 'substantial' amount of protected free speech, 'judged in relation to [its] plainly legitimate sweep'" is overbroad. *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (citation omitted). As explained above in Part A, under the Sixth Circuit's test for assessing the facial validity of an allegedly overbroad restriction on expressive conduct, the regulation fails if it is (1) related to the suppression of expression, (2) does not "further an important or substantial government interest," and (3) "burden[s] substantially more speech than necessary to further [the] interest." *Blau*, 401 F.3d at 391 (citations omitted); s*ee also Yoder*, 526 F. App'x at 547.

Diei disputes that she was ever provided with the text of Defendants' "various professionalism policies." Defendants present the "Standards of the Health Professions" as the policy applicable to its College of Pharmacy students. (Defs.' Off. Mot., 14 of 21.) That policy, in pertinent part, states that University of Tennessee Health Science Center students can be subject to discipline for "misconduct" that "would bring disrepute or disgrace upon both the student and profession" and "would tend to substantially reduce or eliminate the student's ability to effectively practice the profession in which discipline he or she is enrolled." *Id.*

**1.  Defendants' "Standards of the Health Professions" Restrict Protected Speech and Expressive Conduct.**

The First Amendment's protections extend not only to speech but also to expressive conduct. *See Blau*, 401 F.3d at 388 (conduct is expressive when it "'conveys a particularized message' and 'the likelihood [is] great that the message will be understood by those who view[] it'") (alteration in original) (citations omitted)); *Texas v. Johnson*, 491 U.S. 397, 404 (1989) ("[The First Amendment's] protection does not end at the spoken or written word."); *R.A.V. v.*

36

*City of St. Paul*, 505 U.S. 377, 382 (1992) (including expressive conduct within the ambit of the First Amendment's protections).

Defendants frame their professionalism policies as being aimed at restricting only conduct. (Defs.' Off. Mot., 15 of 21.) But the plain text of the policy also demonstrates that it has more than an "incidental" effect on speech. *See Becerra*, 138 S. Ct. at 2372. It applies to expression that would bring "disrepute or disgrace" upon the student or the practice of pharmacy. (Defs.' Off. Mot., 14 of 21.) As the Committee's investigation of Diei demonstrates, Defendants consider protected expression on social media — not merely conduct — to fall with the ambit of these policies. Because Defendants' policies restrict expression, not merely conduct, this Court should find that Diei has sufficiently pled the first prong of her overbreadth claim.

### 2. Defendants Have no Pedagogical Interest in Punishing Students' Personal Expression or Expressive Conduct on Social Media.

To survive an overbreadth challenge, a restriction on expressive conduct must "further[] an important or substantial government interest." *Blau*, 401 F.3d at 391 (citation omitted). Defendants have identified their interest in the "larger context of state regulation of pharmacists, accreditation standards" and what they characterize as "the long-time standard practice of American colleges of pharmacy to teach and require adherence to professional standards," as the State of Tennessee does in its regulation of the profession. (Defs.' Off. Mot., 9–10 of 21.) As a general matter, this is undoubtedly an "important or substantial government interest." *Id*. But Defendants' policies extend much further than what is necessary to protect "integrity and dignity in the profession of pharmacy." Tenn. Code. Ann. § 63-10-304(c).

Regulation of students' protected expression on social media, particularly when that expression has no bearing on the student's ability to perform the duties attendant with their studies or the profession itself, is outside the scope of this general interest in protecting the

"integrity and dignity" of the profession as a whole. *Id.* Defendants have no legitimate

pedagogical reason for the regulation of the off-campus, personal expression of students that is

unrelated to the school's curriculum or activities. (Compl., ¶ 104, 130). And the Sixth Circuit has

held that to comply with the First Amendment professionalism policies must further such a

pedagogical interest. *See Ward*, 667 F.3d at 734. As discussed below, because Defendants have

not identified an "important and substantial" interest that warrants such a broad restriction on

expression, this Court should find that Diei has sufficiently pled the second prong of her

overbreadth claim.

> ### 3.   Defendants' Professionalism Policies Burden More Speech Than Necessary to Further Their Interests.

Defendants' policies burden substantially more protected expression than is necessary to

further their interest in preparing students to enter the profession as pharmacists. As discussed

above, Defendants highlight that the state of Tennessee has an interest in regulating the

profession of pharmacy as a matter of health, safety, and welfare (Defs.' Off. Mot., 12 of 21), but

do not identify any legitimate pedagogical interest in regulating student expression on the

personal social media accounts of students studying to become a pharmacist.

In *Yoder*, a nursing student published a blog post detailing a labor and delivery she

witnessed during her clinical program in the University of Louisville's School of Nursing.

Administrators alleged that Yoder's blog post violated the School of Nursing Honor Code, the

"standards of the profession," and a Confidentiality Agreement Yoder signed when she began

her clinical experience, and dismissed her from the program. *Yoder*, 526 F. App'x at 541. Yoder

challenged the Honor Code, Confidentiality Agreement, and Consent Form she also signed

before her clinical experience as unconstitutionally overbroad. Without analyzing the full sweep

of the Honor Code itself, the court disagreed and held that the policies at issue furthered the

School of Nursing's effort to "restrict the dissemination of patient information for purposes of teaching students about their confidentiality responsibilities" as well as ensuring that confidential patient information was not disseminated. *Id.* at 548.

This case, the text of Defendants' policies, and their practice of applying those policies to off-campus student expression, are distinguishable from *Yoder* in two ways. First, the expression at issue in *Yoder* concerned a clinical experience that was part of an educational program, not the expression of personal viewpoints off-campus and wholly divorced from Yoder's status as a student. Second, Yoder's post implicated the privacy rights of others, which was the dispositive factor for the court in analyzing whether the university's policies were overbroad. *Id.* at 548. These two factors distinguish the College of Pharmacy's policies —which sweep within their ambit a broad swath of student expression unrelated to the practice of pharmacy — from the policies at issue in *Yoder* as characterized by the court.

Defendants' policies also fail to satisfy the "government interest" prong of the overbreadth test when measured against the Sixth Circuit's reasoning in *Blau*. 401 F.3d 381 (citation omitted). Blau, a middle school student, challenged her school's dress code as overbroad because she wanted to wear clothes she "fe[lt] good in." *Id.* at 386. The school identified its interest in promulgating the dress code as purpose as "to 'create unity, strengthen school spirit and pride, and focus[] attention upon learning and away from distractions,' . . . which is consistent with the Council's statutory mandate to implement policies that 'provide an environment to enhance the students' achievement and help the school meet [its] goals.'" *Id.* at 391 (citation omitted). And the only evidence *Blau* presented that the dress code was viewpoint-discriminatory and targeted towards expression was that the principal once said that although the

school was high-achieving, that didn't mean the administration was foreclosed from "let[ting]

the students know what we feel is appropriate." *Id.*

Defendants' policies extend to student expression that is completely removed from the

practice of pharmacy or education of pharmacists, and instead encompass *anything* that

administrators subjectively deem to bring "disrepute or disgrace" to the profession generally.

And as the Committee has made clear, it interprets these regulations to include what its members

subjectively deem to be "vulgar," "crude," and "sexual" expression. This, unlike the principal's

statement concerning "appropriate" dress for school in *Blau*, demonstrates a hostility towards

certain viewpoints that the Committee subjectively determines are "unprofessional," even if

expression of those viewpoints occurs on social media and is completely removed from the

practice of pharmacy and does not serve any pedagogical interest. 401 F.3d at 391. Finally, as

demonstrated by Defendants' improper reliance on Diei's 2019 social media posts, Defendants

also believe that their policies extend to regulating the speech of their students on social media,

even if that speech occurred before the student began their studies at the university.

Even expression that some find offensive or in poor taste remains protected by the First

Amendment. *See Barr*, 538 F.3d at 568 ("If there is a bedrock principle underlying the First

Amendment, it is that the government may not prohibit the expression of an idea simply because

society finds the idea itself offensive or disagreeable.") (quoting *Johnson*, 491 U.S. at 414). And,

as noted above, the Supreme Court has recently affirmed that "[g]iving offense is a viewpoint."

*Matal*, 137 S. Ct. at 1763. Defendants' interest in regulating the profession of pharmacy and

education of future pharmacists simply does not allow for the viewpoint-based regulation of

expression which their policies permit.

Defendants point out that the Standards of the Health Professions policy requires the Committee to determine that the student's behavior "would tend to substantially reduce or eliminate the student's ability to effectively practice the profession [of pharmacy]" in order to warrant discipline. (Defs.' Off. Mot., 17–18 of 21.) However, Defendants' actions with respect to their 2019 and 2020 investigation into Diei's personal social media demonstrate that in practice the policy is not so limited — the Committee did not indicate how Diei's personal social media (some of which were made before Diei began her studies) impacted her ability to practice pharmacy, and instead simply concluded that her posts were "a serious breach of the norms and expectations of the profession . . . ." (Compl., ¶ 82.)

Because Defendants' policies restrict students' personal, online expression that has no relation to the practice of pharmacy or their education, they restrict more expression than is necessary to further their interest in protecting the "integrity" of the profession of pharmacy and this Court should deny Defendants' motion to dismiss Diei's First Cause of Action.

## C. Defendants' Standards of the Health Professions Are Unconstitutionally Vague.

Defendants' "Standards of the Health Professions" do not satisfy the vagueness standard for two primary reasons. First, they do not define what type of conduct is so unprofessional as to bring "disrepute or disgrace" to the student or the profession. Second, they leave administrators with unbridled discretion to subjectively determine of what kind of expression rises to these ambiguous standards of professionalism.

The Sixth Circuit has "recognized that the vagueness doctrine has two primary goals: (1) to ensure fair notice to the citizenry and (2) to provide standards for enforcement . . . ." *McGlone v. Cheek*, 534 F. App'x 293, 297 (6th Cir. 2013) (quoting *Ass'n of Cleveland Fire Fighters v. Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007)); *see also Papachristou v. City of*

*Jacksonville*, 405 U.S. 156, 162 (1972). A regulation violates the Due Process Clause of the

Fourteenth Amendment and is void for vagueness if a person of ordinary intelligence cannot

distinguish between permissible and prohibited conduct. *Grayned*, 408 U.S. at 108. Unclear,

vague rules and regulations like Defendants' "various professionalism policies" — including the

Standards for the Health Professions, which Defendants identify as the applicable policy — are

incompatible with students' due-process rights.

        1.   **Defendants Failed to Provide Their Students with Proper Notice of
Proscribed Activities.**

Defendants wrongly contend that the "Standards of the Health Professions" policy

applies to Diei and all College of Pharmacy students. (Defs.' Ind. Mot., 10–11 of 29.) However,

Diei alleges that she was never provided with a copy of the professionalism policies Defendants

applied to discipline her and has never seen the "Standards of the Health Professions." (Compl.,

¶¶ 115–116.) She alleges that she was informed that the College of Pharmacy maintains a policy

called "Standards of Student Professionalism Conduct," but that the link to that policy was not

functioning, and that she was not provided with a copy of the "policy/guidelines" the Committee

was applying during its investigation despite requests to Chairperson George. (Compl. ¶¶ 39, 66–

69). At this stage, Defendants must accept Diei's allegations as true and construe them in the

light most favorable to her, which Defendants simply do not do by arguing that Diei had notice

of the "Standards of the Health Professions." *Casas*, 2018 U.S. Dist. LEXIS 222089, at *21.

Even if, as Defendants allege, the Committee applied the "Standards of the Health

Professions" to investigate and discipline Diei, that policy is void for vagueness because it does

not provide students with "'fair warning' of proscribed conduct . . . ." *Miller v. City of
Cincinnati*, 622 F.3d 524, 539 (6th Cir. 2010). As explained above, the policy allows the

Committee to discipline students when their expression "would bring disrepute and disgrace

upon both student and profession and which would tend to substantially reduce or eliminate the student's ability to effectively practice the profession in which discipline he or she is enrolled." (Defs.' Off. Mot., 13 of 21.) The policy does not define "disrepute" or "disgrace."

The Sixth Circuit has recognized that, in light of the Supreme Court's decision in *Minnesota Voters Alliance v. Mansky*, when a state actor restricts expression that restriction must be "capable of reasoned application." *Am. Freedom Def. Initiative v. Suburban Mobile Auth.*, 978 F.3d 481, 494 (6th Cir. 2020) (quoting *Mansky*, 138 S. Ct. 1876, 1892 (2018)). In *Mansky*, the Supreme Court found that Minnesota's ban on "political" apparel in polling places was unreasonable because the state presented no workable definition of what was political, "[a]nd the word can be expansive." *Mansky*, 138 S. Ct. at 1888. Even though the Court found that Minnesota had an interest in regulating the messages conveyed inside polling locations "in light of the special purpose of the polling place itself," the ordinance did not pass constitutional muster. *Id.* And in *American Freedom Defense Initiative*, the Sixth Circuit similarly found that the regulation at issue failed constitutional muster because it did not define the word "political," and the defendant could not point to guidance that provided a "workable standard[]" by which to apply the regulation. 978 F.3d at 494–95. As with the term "political" in *Mansky* and *Am. Freedom Def. Initiative*, Defendants' use of the terms "disrepute" or "disgrace" in the "Standards of the Health Professions" policy fails to provide students with any workable definition that would allow them to determine what conduct is prohibited.

Because Defendants' policies fail to define or provide students with any guidance as to the type of expression considered disgraceful or causing disrepute, this Court should deny Defendants' motion to dismiss Plaintiff's Second Cause of Action.

43

### 2. Defendants' Policies Provide College of Pharmacy Administrators Unbridled Discretion to Punish Speech They Dislike.

The College of Pharmacy's various professionalism policies are also void for vagueness because they provide unbridled discretion for enforcement to the Committee. The void for vagueness doctrine "protects citizens against the impermissible delegation of basic policy matters 'for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.'" *Miller*, 622 F.3d at 539 (citation omitted).

Even if, as Defendants suggest, the Committee applied the Standards of the Health Professions to discipline Diei, the delegation of enforcement of this professionalism policy to the Committee, which appears to act in concert with the judgment of Chairperson George, violates the vagueness doctrine. The Committee's interpretation of the Standards for the Health Professions prohibition on expression that is unprofessional in that it would bring "disrepute and disgrace" to the student and the profession allows it unbridled discretion to determine what is too "sexual" in nature for an adult to post on their personal social media account. In Diei's case, the Committee voted unanimously that her expression was "crude," vulgar," and "sexual" — apparently based on their interpretation of the Standards for Health Professions.

That the Committee's decision was reviewable by Dean Chisholm-Burns does not save the policies from vagueness. While Dean Chisholm-Burns was right to overturn the Committee's decision, she unquestionably exercised unbridled discretion in making her determination. A public institution's policies cannot survive a vagueness challenge merely because one administrator — in this case, the individual currently serving as Dean — may exercise unbridled discretion to either defend or punish protected speech. And a policy under which a single supervisory individual, at their sole prerogative, can overturn the decision of another individual or group without any clear standards is still too vague to pass constitutional muster. *See Univ. of*

44

*Cincinnati Chapter of Young Am. for Liberty v. Williams*, No. 1:12-cv-155, 2012 U.S. Dist. LEXIS 80967, at *25–28 (S.D. Ohio June 12, 2020) (finding that students' vagueness challenge to a university policy that "provided university officials with unbridled discretion to determine what constitutes a 'demonstration, picket, or rally'" was likely to succeed on the merits).

Because Defendants' policies give administrators unbridled discretion to punish students' by invoking "various professionalism policies" to punish viewpoints they do not like, this Court should find that Diei has pled that they are void for vagueness and deny Defendants' motion to dismiss the Second Cause of Action.

### D.  Defendants' Policies Are Not Immune from Judicial Review.

Defendants assert that their policies are entitled to deference because their policies track the State Board of Pharmacy Standards, and are otherwise "limited" by the Tennessee Campus Free Speech Act. (Defs.' Off. Mot., 15 of 21.) This is inconsistent with both Sixth Circuit and Supreme Court precedent.

Regulations implicating fundamental rights, such as First Amendment rights, do not enjoy any presumption of constitutionality. *See Lac Vieux Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.*, 172 F.3d 397, 410 (6th Cir. 1999) (finding that because the challenged ordinance implicated a fundamental right under the First Amendment it was subject to strict scrutiny rather than afforded the generous "presumption of validity" under rational basis review (quoting *Heller v. Doe*, 509 U.S. 312, 319-20 (1993)); *see also United States v. Playboy Entm't Grp.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.") And when it comes to students' First Amendment rights, "[the] Court is the final arbiter of the question whether a public university has exceeded constitutional constraints, and we owe no deference to universities when we consider that question." *Christian Legal Soc'y of the Univ. of*

*Cal. v. Martinez*, 561 U.S. 661, 686 (2010). This is true even in cases where there is a dispute as to whether a state actor is entitled to qualified immunity. *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 441–42 (6th Cir. 2016) ("The enforcement of a presumptively valid law . . . does not automatically entitle officials to qualified immunity.").

In defense of their policies, Defendants note that they have been in place for many years and cite *Ward v. Rock Against Racism*, 491 U.S. 781 (1989) for the proposition that the "interpretation and implementation" of the policy since it went into place in 2001 demonstrates that it is not facially overbroad. (Defs.' Off. Mot., 16–17 of 21). Defendants also fault Diei for being unable to identify other instances in which the university's various professionalism policies have been used to censor student expression and purport that it is evidence that, as in *Rock Against Racism*, they have narrowed the policy. But in *Rock Against Racism* it was the defendant who offered evidence of its own narrowing of the allegedly overbroad noise ordinance. 491 U.S. at 796; *see also Mansky*, 138 S. Ct. at 1883 (finding that a century-old ban on political apparel violated the First Amendment). Defendants have not presented such a limiting principle. Instead, their discipline of Diei demonstrates that the professionalism policies they maintain can stretch to cover social media activity or speech that, by the Committee's definition, is "vulgar," "crude," and "sexual."

Because the presumption of constitutionality afforded to state legislation does not apply to regulations implicating fundamental rights, Defendants' policies are reviewable by this court. under the First and Fourteenth Amendments (Compl., ¶¶ 102, 114, 127–28), this Court should apply strict scrutiny to Defendants' professionalism policies rather than presume that those policies are constitutional because they are long-standing and track the language of a statute.

## CONCLUSION

For the foregoing reasons, Official Capacity Defendants' Motion to Dismiss Plaintiff's First, Second, and Third Causes of Action and Individual Capacity Defendants' Motion to Dismiss Plaintiff's Fourth and Fifth Causes of Action under Federal Rules of Civil Procedure 12(b)(6) should be denied in their entirety.

*/s/ Greg H. Greubel*
GREG HAROLD GREUBEL
PA Bar No. 321130; NJ Bar No. 171622015
(admitted *pro hac vice*)
KATLYN A. PATTON
PA Bar No. 328353; OH Bar No. 097911
(*pro hac vice* forthcoming)
FOUNDATION FOR INDIVIDUAL RIGHTS IN
EDUCATION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (215) 717-3440
greg.greubel@thefire.org

*/s/ Edd Peyton*
EDD PEYTON
TN Bar No. 25635
SPICER RUDSTROM, PLLC
119 South Main, Suite 700
Memphis, Tennessee 38103
Tel: (901) 522-2318
Fax: (901) 526-0213
epeyton@spicerfirm.com