**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**AT MEMPHIS**

| | | |
|---|---|---|
| **KIMBERLY DIEI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:21-cv-02071-JTF-cgc** |
| | ) | |
| **RANDY BOYD, ET AL.** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

**CONSOLIDATED REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTIONS TO DISMISS**

---

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................. ii

INTRODUCTION AND SUMMARY ................................................ 1

ARGUMENT ................................................................................ 1

    I.   THE COURT SHOULD DISMISS THE AS-APPLIED CLAIMS
        (THE THIRD, FOURTH, AND FIFTH CAUSES OF ACTION). ................. 1

        A.  Ms. Diei Has Withdrawn Her Claims Related to the 2019 Event. ........... 1

        B.  The Court Should Dismiss All the As-Applied Claims Because
            There Has Been No Adverse Action Taken against Ms. Diei. ................. 2

        C.  As a Matter of Law, the College of Pharmacy May Impose the
            Profession's Professional Conduct Regulations Upon Its Students. ........ 8

        D.  The Court Should Dismiss All the As-Applied Damages Claims
            on Qualified Immunity Grounds. ........................................... 11

        E.  The Court Should Dismiss the Damages Claim against University
            System President Randy Boyd. .............................................. 15

        F.  The Court Should Dismiss the Official Capacity Claim against
            Dr. George in the Fifth Cause of Action. ................................. 15

        G.  The Defendants Properly Included Attachments to their Motions
            and Properly Applied the Rule 12(b)(6) Standard................................. 16

    II.  THE COURT SHOULD DISMISS THE FACIAL CHALLENGE
        CLAIMS (THE FIRST AND SECOND CAUSES OF ACTION)................ 17

CONCLUSION........................................................................... 20

## TABLE OF AUTHORITES

**Cases**

*Abbott v. Pastides*, 900 F.3d 160 (4th Cir. 2018) ...........................................................7

*Al-Dabagh v. Case Western Reserve University*, 777 F.3d 355 (6th Cir. 2015) ...................... 9-10

*Arreola v. Godinez*, 546 F.3d 788 (7th Cir. 2008)...........................................................7

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009))......................................................................17

*Benison v. Ross*, 765 F.3d 649 (6th Cir. 2014) ................................................ 2-4, 8, 17

*Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986) ....................................10

*Blau v. Ft. Thomas Pub. Sch. Dist.*, 401 F.3d 381 (6th Cir. 2005).................................19

*District of Columbia v. Wesby*, 138 S. Ct. 577 (2018)............................................. 11-12

*Endres v. Northeast Ohio Medical University*, 938 F.3d 281 (6th Cir. 2019)............. 3-4, 8, 15, 17

*Fieger v. Michigan Supreme Court*, 553 F.3d 955 (6th Cir. 2009) ...............................10

*Harris v. Blake*, 798 F.2d 419 (10th Cir. 1986)...........................................................3

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988)...........................................10

*Hunt v. Board of Regents of the University of New Mexico*,
792 Fed. Appx. 595 (10th Cir. 2019), *cert. denied*, 141 S. Ct. 885 (2020) ...................... 9, 12-13

*Keefe v. Adams*, 840 F.3d 523 (8th Cir. 2016)..........................................................9, 19

*Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2011)..........................................5, 9

*Ku v. Tenn.*, 322 F.3d 431 (6th Cir. 2003) .................................................................9

*Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*,
172 F.3d 397 (6th Cir. 1999) ....................................................................................20

*Maciariello v. Sumner*, 973 F.2d 295 (4th Cir. 1992)........................................... 14-15

*B.L. v. Mahanoy Area School District*, 964 F.3d 170 (3d. Cir. 2020),
*cert. granted*, 141 S. Ct. 976 (2021) ................................................................... 13-14

*Morrison v. Bd. of Educ. of Boyd City*, 521 F.3d 602 (6th Cir. 2008)..........................10

*Morse v. Frederick*, 551 U.S. 393 (2007) ...................................................................................10

*Moses v. Oldham*, No. 2-17-cv-02692, 2017 WL 6209704 (W.D. Tenn. Dec. 8, 2017)...............16

*National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018).......10, 11, 19

*New York v. United States.* 505 U.S. 144 (1992)........................................................................19

*Nixon v. Hardin County Bd. of Educ.* 988 F. Supp. 826 (W.D. Tenn. 2013) ................... 10-11, 13

*Novak v. City of Parma*, 932 F.3d 421 (6th Cir. 2019)...........................................................14, 15

*Oyama v. University of Hawaii*, 813 F.3d 850 (9th Cir. 2015).......................................................9

*Peloe v. University of Cincinnati*, No. 1-14-cv-404,
2015 WL 728309 (S.D. Ohio Feb. 19, 2015)...............................................................................4, 8

*Phillips v. Blair*, 786 Fed. Appx. 519 (6th Cir. 2019))..............................................................13

*Renteria-Villegas v. Metropolitan Government of Nashville and Davidson Co.*,
796 F. Supp. 2d 900 (M.D. Tenn. 2011)........................................................................................7

*Richmond v. Fowlkes*, 228 F.3d 854 (8th Cir. 2000) ....................................................................9

*Rudlaff v. Gillispie*, 791 F.3d 638 (6th Cir. 2015) .....................................................................14

*Saucier v. Katz*, 533 U.S. 194 (2001) .......................................................................................13

*Savage v. Gee*, 665 F.3d 732 (6th Cir. 2012)...............................................................................7

*Sensabaugh v. Halliburton*, 937 F.3d 621 (6th Cir. 2019) ...........................................................7

*Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019) ...............................................6-7, 12

*Sumpter v. Wayne County*, 868 F.3d 473 (6th Cir. 2017)...........................................................15

*Texas vs. Johnson*, 491 U.S. 397 (1989)................................................................................18-19

*Thompson v. Ohio State University*,
990 F. Supp. 2d 801 (S.D. Ohio 2014) (*Thompson I*)............................................................5-6, 13

*Thompson v. Ohio State University*,
92 F. Supp. 3d 719 (S.D. Ohio 2015) ("*Thompson II*"),
*aff'd*, 639 Fed. Appx. 333 (6th Cir. 2016) ...........................................................................5-6, 13

*Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969) ................10

*Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012) ................................................................... 4-5, 12, 15

*Wurzelbacher v. Jones-Kelley*, 675 F.3d 580 (6th Cir. 2012)...................................................... 2-3

*Yoder v. University of Louisville*, 526 Fed. Appx. 537 (6th Cir. 2013)....................... 10, 11, 12, 13

## **Statutes**

Tenn. Code Ann. § 49-9-209(D)(1)(P) ........................................................................................... 15

## **Administrative Procedure Act Rules**

Tenn. Comp. R. & Regs., Rule 1140-02-.01 ................................................................................ 16

Tenn. Comp. R. & Regs., Rule 1720-3-5-.01 ......................................................................... 16, 18

## INTRODUCTION AND SUMMARY

The system worked.  Although a College of Pharmacy committee voted to expel Ms. Diei, it is undisputed that the Dean sided with Ms. Diei, reversed that decision, and Ms. Diei never missed a single minute of school.  The Defendants' argument is simple:  Under dispositive Circuit precedent, the Dean's reversal of the committee means that Ms. Diei's as-applied First Amendment claims must be dismissed.  No expulsion means no lawsuit.  Additionally, she did not cite a case "clearly establishing" the rights she is asserting here, meaning the damages claims should be dismissed on qualified immunity grounds as well as on the merits.  On her separate claims seeking to invalidate State laws on their face, she cannot meet her heavy burden of establishing facial invalidity, and indeed her arguments are built on the incorrect premise that UTHSC's Professionalism Rule says something it does not.  The Defendants request the Court to dismiss this entire lawsuit.[1]

## ARGUMENT

**I.    THE COURT SHOULD DISMISS THE AS-APPLIED CLAIMS (THE THIRD, FOURTH, AND FIFTH CAUSES OF ACTION).**

**A.    Ms. Diei Has Withdrawn Her Claims Related to the 2019 Event.**

The exchange of briefing has simplified this case.  In Paragraphs 34-51 of her Complaint, Ms. Diei made allegations about a 2019 event (when the Professionalism Committee addressed her social media postings that included College of Pharmacy logos and Ms. Diei's exposing her breast), which she described as "punish[ment]" and something she "felt . . . violated her free

---

[1] The citation methodology for the briefing is as follows: "**Dft. Mem. 24-1**" is the Memorandum in Support of the Individual Capacity Defendants' Motion to Dismiss, ECF Document No. 24-1. "**Dft. Mem. 25-1**" is the Memorandum in Support of the Official Capacity Defendants' Motion to Dismiss, ECF Document No. 25-1. "**Pl. Mem.**" is the Plaintiff's Consolidated Opposition to Defendants' Motions to Dismiss the Complaint, ECF Document No. 32.

speech rights" (Compl., ¶ 49), and incorporated those allegations into each cause of action (*id.*, ¶¶ 101, 113, 126, 141, 156).  In response to the arguments that exposing her breast was not speech, the claim is time-barred, and the University lawfully prescribed an educational outcome, Ms. Diei has withdrawn the claim, stating: "Diei has not based her claims on that [September 2019] investigation."  (Pl. Mem. at 3).

### B.    The Court Should Dismiss All the As-Applied Claims Because There Has Been No Adverse Action Taken against Ms. Diei.

The key point of the Defendants' argument – the reason all the as-applied claims should be dismissed on their merits – is that the Court does not need to reach the question of whether it would have been lawful for the College of Pharmacy to have expelled Ms. Diei from school due to her social media postings, because the College did not expel her.  While there are many other legal issues that would need to be addressed if the as-applied claims go forward, the point is that there is one dispositive fatal defect in Ms. Diei's claims that renders her case due to be dismissed right now without the need for a decision on any other issue: She was not expelled.

The Defendants rely on Circuit precedent, *Benison v. Ross*, 765 F.3d 649 (6th Cir. 2014). In that case, a faculty member's First Amendment claim was dismissed on the ground of what the Sixth Circuit called "not adverse actions" (*id.* at 659) because she failed to appeal the allegedly retaliatory recommendations against her request for a promotional pay increase.  What *Benison* necessarily means is that if Dr. Benison had appealed and had won her appeal (as Ms. Diei did here), she would have had no First Amendment claim – if that were not the case, then what would have been the point of insisting that she go through with the appeal?

In response to *Benison*, Ms. Diei argues that an employment case should not be applied in a student setting, citing *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580 (6th Cir. 2012) (Pl. Mem. 28).  The actual holding in *Wurzelbacher*, which involved "Joe the Plumber's" claim that

2

improper database searches seeking to dig up information about him were conducted by state employees to retaliate against him after his highly publicized interaction with then-Presidential candidate Barack Obama, was to affirm judgment on the pleadings dismissing his case because he failed to show an adverse action.  The case does not say anything that would preclude the *Benison* standard from being applied to a student's situation.  While there may be differences between the employment context and other contexts that are material in some cases, this case is not one of them.  As explained in the Defendants' opening briefs (Dft. Mem. 24-1 at 14-15), the rationale of *Benison* shows why it applies in the student setting of this case, and the Defendants also cited a case involving a student (*Harris v. Blake*, 798 F.2d 419 (10th Cir. 1986)) to which Ms. Diei made no response at all.  As the *Benison* court explained, a "university should have the opportunity to correct errors through its complete internal appeals process that precedes its final decision" 765 F.3d at 659 (internal quotation marks omitted).  Ms. Diei has identified no principled basis why such an opportunity should be afforded in a case involving a faculty member but not in a case involving a student.

Indeed, another Sixth Circuit decision, *Endres v. Northeast Ohio Medical University*, 938 F.3d 281 (6th Cir. 2019), cited by Ms. Diei for another point (Pl. Mem. at 20-21),[2] buttresses *Benison* and further supports applying it to a student situation.  In *Endres*, a student was expelled for cheating.  A Committee on Academic and Professional Progress ("CAPP") made a decision to dismiss him from school, subject to his appealing within four days.  *Id*. at 289.  He did appeal to the Executive Review Committee, which granted him a rehearing before the CAPP.  *Id*. at

---

[2] *Endres* limits a university's ability to use the "academic"/"disciplinary" distinction to shortchange a student on process.  But Ms. Diei does not claim she was shortchanged on process here – she received due process and it resulted in her winning her appeal.

290. The CAPP again voted to dismiss him. *Id*. at 291. One question in the case was: When did his cause of action accrue for statute of limitations purposes? The Sixth Circuit ruled that it accrued only after the second CAPP decision, when he received "a final, non-appealable decision recommending his dismissal" (*id*. at 296), not after the first one. That is, the appeal and reversal of the first committee dismissal decision kept his cause of action from accruing until later; likewise, in this case, because of her appeal right, no cause of action accrued for Ms. Diei when the Professionalism Committee issued its expulsion decision, and then no cause of action later accrued after the appeal because the appeal decision was to not expel her. In arguing that she suffered an adverse action by the Professionalism Committee's vote that was later reversed, ***Ms. Diei is arguing for a cognizable legal claim at a time when, under Circuit precedent, no claim had even accrued yet***. Thus, *Endres* is a student case (not an employment case) that, like *Benison*, recognizes the need to let universities complete their internal appeals process and make a final decision – before that happens, no cause of action accrues. *See also Peloe v. University of Cincinnati*, No. 1-14-cv-404, 2015 WL 728309 (S.D. Ohio Feb. 19, 2015) (student's claim that his procedural due process rights were violated at Code of Conduct hearing dismissed as unripe because he had not yet completed internal appeal).

Ms. Diei extensively discusses and relies on *Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012) (Pl. Mem. at 12-16), a case where the claim of a professional student who was expelled survived dismissal. *Ward* does not support denial of the motion to dismiss. In *Ward*, the plaintiff was actually expelled – here, Ms. Diei was "not expelled" (Compl., ¶ 100). She provides no reason

4

to conclude that *Ward* would have allowed the claim to go forward if that student's expulsion had been reversed by the university's appeals process.[3]

Ms. Diei also relies on *Thompson v. Ohio State University*, 990 F. Supp. 2d 801 (S.D. Ohio 2014) (*Thompson I*) (Pl. Mem. 26-27).   In that case, the plaintiff alleged that a faculty member named Dr. Salimbene "brought student misconduct charges against Plaintiff in retaliation for Plaintiff's complaints [of alleged race discrimination] . . . even though she knew [the charges] were bogus," *id*. at 809, and those charges resulted in the plaintiff's suspension and

_____

[3] While none of this need be addressed because the *Ward* plaintiff was not expelled, it is a complicated case that is distinguishable for other reasons as well.  It squarely upheld the exact same kind of professionalism policy the College of Pharmacy has, one that incorporates external professional standards for practicing members of the profession.  The Court held that "[o]n its face, the [American Counseling Association's] code of ethics sets forth neutral and generally applicable policies." 667 F.3d at 738.  What *Ward* turned on was the specific facts of that case about the university's inconsistent actions in the application of the professional standard.  The university was guilty of "selective enforcement" (*id*. at 733) because it refused to allow the plaintiff, a student in a counseling degree program who had a faith-based objection to counseling a gay client, to refer a gay client to another counselor.  The problem for the university was that the applicable professional code "expressly permits values-based referrals" (*id*. at 735), and there was evidence that the university did not in fact have a no-referral policy either on paper (the student manual actually allowed referrals, *id*. at 736) or in practice (there was an example of another student being allowed to refer a client, *id*. at 737).  Accordingly, the court allowed the claim to go to the jury on the issue of whether the university's cited reason for action, an apparently non-existent no-referral policy, was a pretext for dismissing the student due to her "faith-based speech."  *Id*. at 738.  Indeed, the gravamen of *Ward* – with its endorsement of the facial validity of the professional standards, its citation with approval of the Eleventh Circuit's *Keeton* decision which upheld a remediation plan for a student in a similar situation, and its extensive analysis of specific facts – indicates that the university's actions would have been upheld if it really did have a no-referral policy based on professional standards; otherwise, the numerous pages analyzing the facts about whether or not there really was such a policy would have been unnecessary.  That reality is the likely reason why Ms. Diei, while relying on *Ward*, at the same time declares it to be "incorrect[ ]" (Pl. Mem. at 12 and n.2).  Ms. Diei does not allege any selective enforcement of the College of Pharmacy's policies in a way contrary to the way they are written and applied to others, and her view of what *Ward* held – an "attempt to cloak impermissible viewpoint discrimination by reference to an impermissibly broad and vague catch-all 'professionalism' policy" (Pl. Mem. at 14) – is wrong.  *Ward* held that the policy was facially valid, and the problem was that it said the opposite of what the university said it said.

delayed graduation. *Id*. at 807. The case is distinguishable from this one in two ways: (1) Dr. George is not alleged to have filed any charges against Ms. Diei, but rather simply to have done her job in chairing the committee that evaluated complaints made by others, (Compl. ¶ 55 (the process began with a "complaint" "received" by Dr. George)); and (2) the result of the process was that no discipline was imposed on Ms. Diei compared to the suspension the *Thompson* plaintiff received. And a later opinion in *Thompson* both highlights the first of those distinctions and casts doubt on its original ruling. In *Thompson v. Ohio State University*, 92 F. Supp. 3d 719 (S.D. Ohio 2015) ("*Thompson II*"), *aff'd*, 639 Fed. Appx. 333 (6th Cir. 2016), the court dismissed the lawsuit by summary judgment. In *Thompson II*, the court ruled that Dr. Salimbene's "attendance at and participation in the [Office of Student Conduct] panel hearing [that found Plaintiff guilty] did not cause a legally cognizable injury to Plaintiff." *Id*. at 733-34. And the court backed away from its earlier ruling about the initiation of the disciplinary process:

> It is entirely unclear whether the fact that Plaintiff had an entity investigate her – independent from the charges and suspension that resulted – is more than a *de minimis* injury. But the court need not address that issue. Because Dr. Salimbene concedes that her referral constitutes an adverse action, the Court will **assume without deciding** that Plaintiff meets the second prong of the First Amendment retaliation test [the requirement of an adverse action].

92 F. Supp. 3d at 734 (emphasis added). Then the court **granted qualified immunity**, ruling that **any "right to be free from a retaliatory investigation" is not clearly established**. *Id*. at 734-35.

Ms. Diei cites *Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019) for the proposition that a student facing a threat of potential punishment can be "chilled" in their speech. (Pl. Mem. at 27-29). But the *Speech First* majority criticized a process where a university's bias response team could refer complaints to another body, such as the police; it did not hold that a body to whom a complaint was directly reported (such as the Professionalism Committee here) may not investigate the complaint. And *Speech First* dealt only with the question of whether a

6

plaintiff has suffered a sufficient injury to have **standing** to make a **facial** challenge to a policy; it contains no holding at all about what does and does not violate the First Amendment on the **merits**, and it specifically disclaimed applicability to **as-applied** claims.[4] The "injury" component of the standing inquiry is a "very generous" one that requires only a "minimal" injury. *Renteria-Villegas v. Metropolitan Gov't of Nashville and Davidson Co.*, 796 F. Supp. 2d 900, 910 (M.D. Tenn. 2011) (internal quotation marks omitted). A plaintiff can have standing and not have a valid claim on the merits, because "standing and entitlement to relief are not the same thing. Standing is a prerequisite to **filing suit**, while the underlying merits of the claim (and the laws governing its resolution) determine whether the plaintiff is **entitled to relief**." *Arreola v. Godinez*, 546 F.3d 788, 794-95 (7th Cir. 2008) (emphases in original).

In short, the type of alleged "injury" that can give rise to standing for a facial challenge – all that was at issue in *Speech First* – does not equate to what is necessary to establish liability on an as-applied claim, and *Speech First* does not hold that a fear of punishment from the potential outcome of a university's investigation is an adverse action that can give rise to liability. A person facing termination from a job would experience similar fear, but suspension with pay pending an investigation into suspected wrongdoing is not an adverse employment action. *Sensabaugh v. Halliburton*, 937 F.3d 621, 629 (6th Cir. 2019). And a case that does address the merits liability issue held that a university did not violate students' First Amendment rights by calling them to a meeting to discuss complaints that had been made about their speech. *Abbott v. Pastides*, 900 F.3d 160 (4th Cir. 2018). *Cf. Savage v. Gee*, 665 F.3d 732, 741 (6th Cir. 2012) (investigation of complaints about librarian's speech insufficient to confer standing).

---

[4] The *Speech First* majority distinguished *Morrison v. Bd. of Educ. of Boyd City*, 521 F.3d 602 (6th Cir. 2008), over a dissent, because it involved an as-applied claim. 939 F.3d at 766.

Finally, Ms. Diei complains that she does not know why Dean Chisholm-Burns reversed the expulsion (Pl. Mem. at 4). That is irrelevant. The point is: the Dean *did* reverse the expulsion, Ms. Diei was *not* expelled, and thus she did not suffer an adverse action giving rise to a lawsuit.

Applying the cases relied upon by the Defendants and summarizing the argument:

- If Ms. Diei had not appealed at all and sued – her suit would be dismissed under *Benison*.

- If she had appealed and sued before awaiting the appeal result, her suit would have been dismissed as unripe, as in *Peloe v. University of Cincinnati, supra*.

- If she had appealed, lost her appeal and been expelled, and sued on September 15, 2021 – over a year after the committee decision, but within a year of the ultimate decision – and the Defendants asserted the one-year statute of limitations, she would have cited *Endres* and argued (and won) that she had no cause of action yet until after the appeals decision.

- A ruling that she can sue claiming the committee decision violated her First Amendment rights when the committee decision was reversed by the Dean and she was not expelled cannot be squared with any of these precedents.

- Finally, she has not cited a single case from anywhere in the country where a student was permitted to pursue a claim about an action that was reversed in a university's internal appeal process and resulted in a favorable end result for the student. If the Court so holds in this case, it thus appears that the Court would be the first court in the nation to do so – and such a ruling would conflict with Circuit precedent.

**C.    As a Matter of Law, the College of Pharmacy May Impose the Profession's Professional Conduct Regulations Upon Its Students.**

Rather than countering the Defendants' simple point that no expulsion means no lawsuit, Ms. Diei spends considerable pages attacking the very idea that professional students may be held to professional standards. Substantial case law, thoroughly canvassed in the Defendants'

opening briefs (*see* Dft. Mem. 24-1 at 5-12), establishes that (1) institutions of higher education may require their professional students to adhere to the professional standards of the profession they are preparing to enter; (2) those professional standards may regulate conduct that involves speech; and (3) the speech that may be permissibly regulated includes off-campus, on-line speech such as social media posts. *Hunt v. Board of Regents of the University of New Mexico*, 792 Fed. Appx. 595 (10th Cir. 2019), *cert. denied*, 141 S. Ct. 885 (2020); *Keefe v. Adams*, 840 F.3d 523 (8th Cir. 2016); *Oyama v. University of Hawaii*, 813 F.3d 850 (9th Cir. 2015); *Al-Dabagh v. Case Western Reserve University*, 777 F.3d 355 (6th Cir. 2015); *Yoder v. University of Louisville*, 526 Fed. Appx. 537 (6th Cir. 2013); *Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2011); *Ku v. Tennessee*, 322 F.3d 431 (6th Cir. 2003); *Richmond v. Fowlkes*, 228 F.3d 854 (8th Cir. 2000).  Among the specific rulings made by these cases are the following:

- A professional program's teaching and requiring adherence to professional standards serves a "legitimate pedagogical concern in teaching its students to comply with" their field's code of ethics. *Keeton v. Anderson-Wiley*, 664 F.3d 865, 876 (11th Cir. 2011).

- The Eighth Circuit rejected the "extreme position" that "a college student may not be punished for off-campus speech . . . unless it is speech that is unprotected by the First Amendment, such as obscenity." *Keefe v. Adams*, 840 F.3d 523, 529 (8th Cir. 2016).

Ms. Diei ignores almost all of this – her brief does not cite or address *Hunt*, *Keefe*, *Oyama*, *Keeton*, *Ku*, or *Richmond* in any way.  She does address *Al-Dabagh (*Pl. Mem. at 20-23), but appears to misunderstand the point of it.  Not every case cited by the Defendants covers every issue in the case, and the point of *Al-Dabagh* is simply that it establishes that institutions of higher education may impose professionalism requirements on their professional students as an academic matter – and the case unequivocally does so.  And while *Al-Dabagh* also involves the

9

issue of judicial deference to academic decisions, the Defendants' request for dismissal here does not require the Court to defer to any academic decision – it merely asks the Court to follow Circuit precedent and rule that no expulsion means no lawsuit.

Ms. Diei quotes *National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (Compl. ¶ 127; Pl. Mem. at 22): "[T]his Court has not recognized 'professional speech' as a separate category of speech." The Defendants are not asking the Court to treat professional speech as unprotected speech like obscenity or fighting words. What they are arguing for is what *Becerra* squarely allows: "States may regulate professional conduct, even though that conduct incidentally involves speech." 138 S. Ct. 2361 at 2372. *See, e.g., Fieger v. Michigan Supreme Court*, 553 F.3d 955, 964-65 (6th Cir. 2009) (attorney sanctioned for vulgar criticism of judge). That is all the College of Pharmacy is claiming to be able to do here.[5]

Ms. Diei also argues (Pl. Mem. at 16-19) that the only legal standards that can apply to professional schools are from the Supreme Court's K-12 *Tinker*, *Fraser*, *Hazelwood*, and *Morse* cases; and relies on *Nixon v. Hardin County Bd. of Educ.* 988 F. Supp. 826 (W.D. Tenn. 2013), a case that applied those standards to deny summary judgment on a claim that a school violated the First Amendment by sending a sixth grader to an alternative school after she tweeted threatening comments about another student. *Nixon* did not address the professional student context, nor did it cite any cases involving professional higher education other than a brief reference to *Yoder*.

---

[5] Notably, in *Becerra*, the Supreme Court expressly stated that "[w]e do not foreclose the possibility" of "treating professional speech as a unique category that is exempt from ordinary First Amendment principles," 138 S. Ct. at 2375, but declined to do so in that case. The case said nothing that cast any doubt on the eight higher education professionalism cases cited above and relied upon by the Defendants here. And it is inapposite to this lawsuit– it ruled that the State of California could not require pro-life organizations to provide information about obtaining an abortion, and the pending lawsuit raises no issues about compelled speech.

And *Yoder* itself said, in reference to the Supreme Court cases that govern K-12 student speech standards, that "none of [them] considers the unique circumstances posed here.  Yoder has not identified any case – nor are we aware of any – that undermines a university's ability to take action against a nursing (or medical) student for making comments off campus that implicate patient privacy concerns."  526 Fed. Appx. at 545.  Thus, in *Yoder* the Sixth Circuit recognized that the Supreme Court's K-12 First Amendment decisions do not exhaust the legal landscape in dealing with higher education professional students, and *Nixon* – which, involving a sixth grader, is factually inapposite – does not provide any basis to treat this case differently from the way courts around the country have addressed cases in the professional higher education context.

Finally, something Ms. Diei says while discussing *Becerra* brings focus to the issue in dispute.  She accuses the College of Pharmacy of "enforcing a professionalism policy that would be unconstitutional as applied to a working pharmacist" (Pl. Mem. at 22).  This is ***NOT*** what the College is doing.  On the contrary, the College's Professionalism Rule merely seeks to hold its students accountable for complying with the very same Tennessee Board of Pharmacy professionalism rules that ***are*** constitutionally applied to working pharmacists.

### D.   The Court Should Dismiss All the As-Applied Damages Claims on Qualified Immunity Grounds.

As explained in Section I.B, the as-applied claims should be entirely dismissed on the merits.  In addition, a separate and independent reason for dismissal of the damages claims is qualified immunity, which here requires dismissal of the damages claims even if they survive dismissal on their merits.  The standard that Ms. Diei must meet in order to carry her burden to overcome qualified immunity was recently summarized by the Supreme Court:

> [O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was ***clearly established at the time***.  Clearly established means that, at

the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful.  In other words, existing law must have placed the constitutionality of the officer's conduct **beyond debate**.  This **demanding standard** protects all but the plainly incompetent or those who knowingly violate the law.  To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent.  The rule must be **settled law**, which means it is dictated by **controlling authority** or **a robust consensus of cases of persuasive authority**.  It is not enough that the rule is suggested by then-existing precedent.  **The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply**.  Otherwise, the rule is not one that every reasonable official would know.

*District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018) (internal citations and quotation marks omitted, emphases added).  In the opening briefs, the Defendants cited approximately ten cases granting qualified immunity (Dft. Mem. 24-1 at 19-20 and n.3), and Ms. Diei responded to almost none of them.  Her argument on this issue (Pl. Mem. at 29-33) fails to carry her burden.

First, there is no controlling authority – a Supreme Court or Sixth Circuit case – clearly establishing any constitutional violation alleged here.  Ms. Diei relies on *Speech First v. Schlisssel* to argue that the mere threat of punishment violates a clearly established right, but as explained above that case establishes no law regarding First Amendment liability, and a case that does is to the contrary (see pages 6-7 above).  She also relies on *Ward v. Polite*, but as also explained above (pages 4-5), it does not clearly establish any liability based on her allegations.  The relevant Sixth Circuit decision here is *Yoder*, where, in granting qualified immunity in the higher education professional student social media context, the Sixth Circuit said that "neither the Supreme Court nor a panel of our circuit has considered whether schools can regulate off-campus, online speech by students."  *Yoder v. University of Louisville*, 526 Fed. Appx. 537, 545 (6th Cir. 2013).  That remains true today.

A recent case reaching the same conclusion is *Hunt v. Board of Regents of the University of New Mexico*, 792 Fed. Appx. 595 (10th Cir. 2019), *cert. denied*, 141 S. Ct. 885 (2020), a case

that Ms. Diei does not address.  There, a university required a medical student, based on his social media post about the 2012 Presidential election, to engage in ethics and professionalism activities such as assigned readings, supervised reflective writings, and meetings with a faculty mentor.  *Id*. at 598-99.  He did so – but also sued, claiming a First Amendment violation. Notably, his speech was core political speech expressing his viewpoint.  But noting that "[o]ff-campus, online speech by university students, particularly those engaged in professional schools, involves ***an emerging area of constitutional law***," *id*. at 601 (emphasis added), the court affirmed the dismissal of claims against individual university administrators because there was no violation of a clearly established right.

Ms. Diei cites no Supreme Court or Sixth Circuit case contrary to the Sixth Circuit's statement in *Yoder* about the lack of clear guidance, which, as just noted, has been reinforced by a recent decision from another Circuit.  That should end the qualified immunity inquiry.  *Phillips v. Blair*, 786 Fed. Appx. 519, 529 (6th Cir. 2019) (where controlling authority expressly states that a right is not clearly established, and no later controlling authority has clearly established it in the interim, a defendant is entitled to qualified immunity).  Nevertheless, turning from controlling authority to potentially persuasive authority, Ms. Diei relies on *Thompson* (see pages 5-6 above), *Nixon* (see pages 10-11 above), and *B.L. v. Mahanoy Area School District*, 964 F.3d 170 (3d. Cir. 2020), *cert. granted*, 141 S. Ct. 976 (2021).  *Thompson*, of course, is devastating to Ms. Diei's position because, in a persuasive opinion, it granted the very qualified immunity she seeks to have withheld here.  92 F. Supp. 3d at 734-35.  *Nixon* and *Mahanoy* are not in "the specific context of [this] case," *Saucier v. Katz*, 533 U.S. 194, 201 (2001), as they involved a sixth grader and a high school student, respectively.  Neither case even attempts to address the higher education professional student issues that the Sixth Circuit's *Yoder* decision identified as

13

distinguishing the context from the K-12 line of cases, nor does either of them analyze the cases relied upon by the Defendants here.  *Mahanoy* itself cannot be classified as placing any issue "beyond debate," because the case itself is still being debated, now in the Supreme Court.  The decisions cited by Ms. Diei do not represent a "consensus" of any kind, and certainly not a "robust consensus," on how the First Amendment should be applied in the context of professional higher education.

In fact, just the opposite of a consensus exists here – "[c]ourts have ***not reached consensus*** on how First Amendment protections apply to comments on social media platforms," for "when it comes to online speech, the law lags behind the times.  And rightly so."  *Novak v. City of Parma*, 932 F.3d 421, 434 (6th Cir. 2019) (emphasis added).  Ms. Diei appears to agree. In comments to the media through her attorney, she said: "It's so hard to fit old First Amendment principles into the social media era," and for that reason "[t]his is one of those areas of law that ***needs to evolve***."[6]  And:  "We're not saying in the lawsuit that everything that a student does on social media is perfectly fine and there are no bounds to what schools can discipline students for in social media speech[.]  ***If there are these bounds*** to the First Amendment's protections on social media***, we want to get some guidance on what those are***."[7]  Cases that result in evolution of the law and provide new guidance on previously unknown legal boundaries are the kind of cases for which the qualified immunity doctrine was made, because "'[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.'"  *Rudlaff v. Gillispie*, 791

---

[6] "Students Punished for 'Vulgar' Social Media Posts Are Fighting Back," *New York Times*, Feb. 5, 2021 (available at  https://www.nytimes.com/2021/02/05/us/colleges-social-media-discipline.html) (emphasis added).

[7] "U of Tennessee Pharmacy Student Suing over 'Vague' Professionalism Codes," *Inside Higher Ed*, Feb. 15, 2021  (https://www.insidehighered.com/print/news/2021/02/15/u-tennessee-pharmacy-student-suing-over-vague-professionalism-codes) (emphases added).

F.3d 638, 644 (6th Cir. 2015) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).  *See also Sumpter v. Wayne County*, 868 F.3d 473, 488 (6th Cir. 2017) ("Qualified immunity exists to give public officials breathing room to make close calls when the issue is not black-and-white.").

Finally, Ms. Diei objects to qualified immunity being decided at the pleadings stage, but the disputed issue revealed by the parties' briefing is the legal issue of whether the relevant court decisions clearly establish any right allegedly violated here, not an issue that turns on the application of an established rule to the particular facts of this case (as was the case in *Ward v. Polite*). *See Novak, supra*, 932 F.3d at 433-35 (granting qualified immunity at 12(b)(6) stage for two First Amendment claims); *Endres*, *supra*, 938 F.3d 281, *affirming* 2018 WL 4002613 at *9 (the Sixth Circuit affirmed 12(b)(6) dismissal of claim on qualified immunity grounds).

### E.   The Court Should Dismiss the Damages Claim against University System President Randy Boyd.

Ms. Diei's response (Pl. Mem. at 23-24), which does not address any of the cases cited in the opening brief (Dft. Mem. 24-1 at 17), confirms that she has sued President Boyd simply for being the person in charge of the University.  He is the person in charge (Tenn. Code Ann. § 49-9-209(d)(1)(P)), but that is not a basis for a Section 1983 lawsuit, and the damages claim against him cannot be squared with *Ward v. Polite*, 667 F.3d 727, 742 (6th Cir. 2012).

### F.   The Court Should Dismiss the Official Capacity Claim against Dr. George in the Fifth Cause of Action.

Ms. Diei argues that the Defendants did not move to dismiss the official capacity claim against Ms. George in the Fifth Cause of Action.  (Pl. Mem. at 6 and 25 n.3).  Undersigned counsel acknowledges that the motions are less than clear on that point, but the motions and briefs do state the Defendants are seeking dismissal of the entire lawsuit.  If the Court determines

15

that the individual capacity damages claim in the Fifth Cause of Action is due to be dismissed on its merits, then the official capacity claim for declaratory and injunctive relief will also be due to be dismissed on its merits for exactly the same reason, and the Court is requested to dismiss it as well, sua sponte if necessary.  *See, e.g., Moses v. Oldham*, No. 2-17-cv-02692, 2017 WL 6209704 (W.D. Tenn. Dec. 8, 2017) (Fowlkes, J.) (dismissing certain claims sua sponte).

### G.   The Defendants Properly Included Attachments to their Motions and Properly Applied the Rule 12(b)(6) Standard.

Ms. Diei objects to at least some of the items attached to the Defendants' motion to dismiss (*see* Pl. Mem. at 6-8).  Those attachments were copies of state laws, copies of judicially noticeable documents, copies of documents referred to in the Complaint, and an authentication declaration simply authenticating some of the documents.  They are all properly before the Court based on the citations provided (Dft. Mem. 24-1 at PageID195), and Ms. Diei did not respond to any of those citations.   (Note: No citation was provided for the propriety of providing convenience copies of state laws because none was thought necessary).

Ms. Diei also contends that the Defendants failed to properly follow the Rule 12(b)(6) standard, but that is incorrect.  No detailed explanation of the standard apart from one small point (Dft. Mem. 25-1 at 13-14) was provided, because the Court is well aware of the Rule 12(b)(6) standard.  But the Defendants' arguments do not rest on the Court rejecting any properly pleaded material, and the claims are due to be dismissed crediting all properly pleaded factual allegations.

For example, Ms. Diei argues that she could not have been aware of any relevant policies because an internet link was broken.  (Pl. Mem. at 7).  However, her allegation is merely that one particular link was broken on one particular day, January 28, 2021.  (Compl., ¶ 39).  There is no allegation that this link was broken in August and September of 2020, when the events at issue took place.  There is no allegation that any then-current academic year's version of UTHSC's

16

Student Handbook, *CenterScope*, has ever been unavailable on the internet.  As explained in the Defendants' opening briefs (Dft. Mem. 24-1 at 3), the Professionalism Rule can be found from the front page of *CenterScope* with two mouse-clicks.  There is no allegation that the relevant state regulations, TENN. COMP. R. & REGS., Rules 1140-02-.01 and 1720-3-5-.01, were ever unavailable on the Secretary of State's website.  Accordingly, while the Court can credit her assertion that she ***did not*** see the Professionalism Rule (Compl. ¶ 40), the Court need not accept as a fact, for purposes of ruling on this motion, that she ***could not*** have seen it or that it was somehow ***impossible*** for her to be aware of publicly-available policy documents, because she has alleged no facts that, properly credited, would establish that point.

Ms. Diei also insists that she was "punished," but her use of that word does not make it so.  Allegations that "are no more than conclusions … are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009).  If the Court, applying *Benison* and *Endres*, rules as a legal matter that a reversed expulsion decision that never took effect does not create a cause of action, then her choice to describe it as "punishment" is either irrelevant or is the assertion of an incorrect legal conclusion, not an allegation of fact – but in neither case do the pleading standards require her choice to describe it as "punishment" to control the legal outcome.

## II.   THE COURT SHOULD DISMISS THE FACIAL CHALLENGE CLAIMS (THE FIRST AND SECOND CAUSES OF ACTION).

In Section V.A (Pl. Mem. 33-35), Ms. Diei treats an as-applied challenge as a facial challenge.  Rather than addressing the actual written policy, she complains of the way it was applied to her by alleging that the policy was not adequately identified to her when she asked.  She puts the point well herself earlier in her brief by complaining that "it took Diei filing a lawsuit against Defendants to finally receive a response to her question about what policy was

being used." (Pl. Mem. 11). Whether that criticism is fair or not,[8] the point is that the Professionalism Rule is now clearly out on the table, and complaining about the way she was informed of it in 2020 is an as-applied challenge, not a facial challenge to the actual rule.

In Sections V.B-D (Pl. Mem. 35-46), Ms. Diei turns to the College of Pharmacy's actual Professionalism Rule, but fails to make out a case for facial invalidity. As the Defendants explained in opening briefing (Dft. Brf. 25-1 at 4-14), the Professionalism Rule is facially valid.

To begin with, Ms. Diei fails to acknowledge what a heavy lift it is to establish the facial invalidity of a state law. It is "strong medicine," "disfavored," and a "last resort," as the cases cited in Defendants' opening brief explain (Dft. Brf. 25-1 at 6). In addition to ignoring how high her burden is, Ms. Diei succumbs to the straw man fallacy. Throughout her argument she treats the Professionalism Rule as if it regulates speech on its face – but it does not. It says:

> (1) A student enrolled at The University of Tennessee Health Science Center is subject to disciplinary action up to and including suspension and dismissal for engaging in the following acts of ***misconduct***, regardless of whether such ***misconduct*** is engaged in on or off University-owned or -controlled property:
>
> \*   \*   \*
>
> (d) . . . [U]nprofessional and unethical ***conduct*** which would bring disrepute and disgrace upon both student and profession and which would tend to substantially reduce or eliminate the student's ability to effectively practice the profession in which discipline he or she is enrolled.

TENN. COMP. R. & REGS., Rule 1720-3-5-.01(1)(d) (emphases added). Nowhere does this rule, on its face, specifically regulate speech. While it is true that conduct – such as burning a flag,

---

[8] As shown by an August 28, 2020 e-mail from Dr. George to Ms. Diei, which is part of the pleadings because it is attached to a letter from Ms. Dei's counsel to College of Pharmacy Dean Chisholm-Burns that is specifically referred to in Paragraph 90 of the Complaint, Dr. George directed her, among other things, to the *CenterScope* student handbook and to the professionalism standard of the State Board of Pharmacy (Ct. Doc. 24-7, PageID 232), the very same items the Defendants have directed the Court to in their motions.

*Texas vs. Johnson*, 491 U.S. 397 (1989) – can sometimes be treated as speech, that provides no justification for erasing the word "conduct" from the Professionalism Rule and replacing it with "speech" in evaluating its facial validity.  Further, as a matter of law, the fact that in regulating "conduct," the rule may in some applications regulate speech, does not make it unlawful.  As the Supreme Court said in *Becerra* (discussed above, page 10), "States may regulate professional conduct, even though that conduct incidentally involves speech." 138 S. Ct. at 2372.  And *Blau v. Ft. Thomas Pub. Sch. Dist*., 401 F.3d 381 (6th Cir. 2005) (Pl. Mem. 34-40) is no bar to dismissing this case – *Blau **upheld*** a school's dress code against a facial challenge.

"[H]aving carefully built [her] straw man, [Ms. Diei] proceeds impressively to knock him down."  *New York v. United States*, 505 U.S. 144, 195 (1992) (White, J., concurring in part and dissenting in part).  Her arguments are premised on the idea that the Professionalism Rule is ***facially*** invalid because it regulates ***speech on its face*** – which it does not do.  The Defendants' response to these arguments is that they fail due to their faulty premise, and to refer the Court back to Defendants' own argument which addresses the Professionalism Rule as it is actually written (Dft. Brf. 25-1 at 4-14).  A few specific points to note are:

- Ms. Diei ignores the case cited by the Defendants (Dft. Brf. 25-1 at 6-7) that says "viewpoint-neutral professional codes of ethics are ***a legitimate part of a professional school's curriculum*** that do not, ***at least on their face***, run afoul of the First Amendment." *Keefe v. Adams*, 840 F. 3d 523, 530 (8th Cir. 2016) (emphases added).

- In arguing against any legitimate interest in addressing off-campus behavior, Ms. Diei ignores the case cited by the Defendants (Dft. Brf. 24-1 at 8-9) that says:  "A student may demonstrate an unacceptable risk of professionalism off campus, as well as in the classroom, and by speech as well as conduct."  *Keefe*, 840 F. 3d at 531.

19

- Ms. Diei incorrectly says that "Defendants' policies . . . encompass *anything* that administrators subjectively deem to bring 'disrespect or disgrace' [sic – it says 'and'] to the profession generally" (Pl. Mem. at 40, emphasis in original).  She ignores the fact that the rule on its face has a second requirement, "***and*** which would tend to substantially reduce or eliminate the student's ability to effectively practice the profession in which discipline he or she is enrolled" – except to claim that this "and" requirement is not applied "in practice" (Pl. Mem. at 41), which is an as-applied challenge rather than a facial challenge to the Professionalism Rule as it is actually written.

- While applying the presumption of constitutionality in this case is not necessary to uphold the Professionalism Rule, the cases Ms. Diei cites do not say the presumption is inapplicable here.  *See, e.g., Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 172 F.3d 397, 410 (6th Cir. 1999) (applying strict scrutiny to an ordinance ***not*** "because the challenged ordinance implicated a fundamental right under the First Amendment" (Pl. Mem. at 45) as Ms. Diei asserts, but rather because it was "content based," which the Professionalism Rule is not).

## <u>CONCLUSION</u>

The Defendants request the Court to dismiss this entire lawsuit with prejudice.

Respectfully submitted this 21st day of April, 2021.

*/s/ Frank H. Lancaster*

Frank H. Lancaster, BPR # 030650
Associate General Counsel, University of Tennessee
719 Andy Holt Tower
Knoxville, TN 37996-0170
(865) 974-3245
flancast@tennessee.edu

Attorney for Defendants

20

**CERTIFICATE OF SERVICE**

I hereby certify that on April 21, 2021, a copy of the foregoing memorandum was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt, and parties may access this filing through the Court's electronic filing system.

*/s/ Frank H. Lancaster*