**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | 100 EAST FIFTH STREET, ROOM 540 | |
|---|---|---|
| Kelly L. Stephens | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: September 17, 2024

Ms. Caitlyn Luedtke Elam
The University of Tennessee
Office of the General Counsel
505 Summer Place, Suite 1115
Knoxville, TN 37902

Mr. Greg Harold Greubel
Mr. Raul A. Ruiz
Foundation for Individual Rights and Expression Litigation
510 Walnut Street, Suite 900
Philadelphia, PA 19106

Mr. Jt Morris
Foundation for Individual Rights in Education
General Counsel
700 Pennsylvania Avenue, S.E., Suite 340
Washington, DC 20003

Ms. Jennifer Safstrom
Vanderbilt Law School
131 21st Avenue, S.
Nashville, TN 37203-0000

Re: Case No. 23-5771, *Diei v. Boyd, et al.*
Originating Case No. : 2:21-cv-02071

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Kelly L. Stephens, Clerk

Laurie A Weitendorf
Deputy Clerk

cc: Ms. Wendy R. Oliver
Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0219p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

KIMBERLY DIEI,

        *Plaintiff-Appellant*,

     *v.*

RANDY BOYD, et al.,

        *Defendants-Appellees*.

No. 23-5771

Appeal from the United States District Court for the Western District of Tennessee at Memphis.
No. 2:21-cv-02071—John Thomas Fowlkes, Jr., District Judge.

Argued: May 2, 2024

Decided and Filed: September 17, 2024

Before: LARSEN, READLER, and DAVIS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Greg H. Greubel, FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, Philadelphia, Pennsylvania, for Appellant. Caitlyn Luedtke Elam, UNIVERSITY OF TENNESSEE, Knoxville, Tennessee, for Appellees. **ON BRIEF:** Greg H. Greubel, Katlyn A. Patton, JT Morris, Paul A. Ruiz, FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, Philadelphia, Pennsylvania, for Appellant. Caitlyn Luedtke Elam, UNIVERSITY OF TENNESSEE, Knoxville, Tennessee, for Appellees. Jennifer Safstrom, VANDERBILT LAW SCHOOL, Nashville, Tennessee, for Amicus Curiae.

_____

## OPINION

_____

CHAD A. READLER, Circuit Judge. While enrolled in pharmacy school, Kimberly Diei was the subject of professionalism complaints regarding her social media posts. Following an

investigation, a committee at the school voted to expel Diei. She responded by filing suit under 42 U.S.C. § 1983, primarily asserting violations of the First Amendment. The district court dismissed Diei's complaint. Because she plausibly alleged a free speech violation, we reverse in part and remand.

## I.

Kimberly Diei enrolled at the University of Tennessee Health Science Center College of Pharmacy to pursue a doctorate in pharmacy. At the time, Diei maintained social media accounts under the pseudonym "KimmyKasi," where she posted about song lyrics, fashion, and sexuality. According to Diei, her social media posts neither identified her "as a College of Pharmacy student" nor "indicated any affiliation with the University of Tennessee." Those accounts would nevertheless put Diei at the center of a school investigation.

Just a month into her studies, Diei was informed by Christa George, Chair of the College's Professional Conduct Committee, that the Committee had received an anonymous complaint regarding Diei's social media activity. George explained that the Committee would review the posts to decide whether they violated the "Standards for Student Professionalism Conduct," requirements Diei asserts she was never provided. Following an investigation, the Committee unanimously held that Diei's postings were "sexual," "crude," and "vulgar" in nature, and thereby violated the College's professionalism standards. The Committee, however, did not vote to expel Diei.

The following school year, George notified Diei that the Committee had received a second complaint similar to the first. After a hearing, the Committee informed Diei that the content of the newly complained-of posts also violated the College's professionalism standards. The Committee deemed Diei's social media activity "a serious breach of the norms and expectations of the profession[]," and concluded that Diei did not "meet the threshold of professional behavior or the requirements of the Technical Standards for students." Accordingly, the Committee voted unanimously to dismiss Diei from the College. Diei appealed that decision to the school's Dean. Roughly three weeks later, the Dean reversed the Committee's decision.

Yet that was not the end. Diei filed suit in federal court against University President Randy Boyd, members of the University Board of Trustees, and George. Her complaint asserted five causes of action. In the first three—overbreadth, vagueness, and as-applied challenges to the professionalism policies—she requested a declaratory judgment and an injunction blocking the continued application of the policies. In the final two—an as-applied challenge to the policies and a claim of First Amendment retaliation—she requested declaratory and injunctive relief as well as damages for emotional distress caused by defendants' "unconstitutional interference" with her speech rights.

Defendants moved to dismiss Diei's complaint under Federal Rule of Civil Procedure 12(b)(6). Attached to those motions were eight exhibits. Before the motions were resolved, Diei graduated from the College, prompting defendants to move to dismiss Diei's first three causes of action as moot.

Taking up both sets of motions, the district court agreed that Diei's claims for injunctive and declaratory relief became moot when she graduated. As to her remaining claims, the district court, relying on documents attached to defendants' motions, held that Diei failed to state a claim for relief. To the district court's eye, the professionalism policies were neither overbroad nor vague, Diei's social media posts were not "protected First Amendment speech," and Diei suffered no adverse action because her expulsion was reversed. Alternatively, the court held, defendants were entitled to qualified immunity. This timely appeal followed.

## II.

A. Before addressing the merits of Diei's appeal, we must determine how much of her case or controversy remains live following her graduation. *See* U.S. CONST. art. III, § 2, cl. 1. To that end, all parties agree that Diei's graduation mooted her requests for injunctive relief. The parties likewise agree that her damages requests survive her graduation, assuming her legal theory underlying those claims is viable.

For jurisdictional purposes, then, that leaves Diei's request for, in her words, "retrospective declaratory relief." Specifically, Diei requests a declaratory judgment stating that defendants unconstitutionally applied the professionalism policies against her, and that George

unconstitutionally retaliated against her. According to Diei, those requests for relief remain justiciable as a "predicate to her damages awards."

Turn to the familiar standing requirements. A plaintiff "must show that she has suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) (cleaned up). Standing, it bears adding, may not be established "in gross." *Davis v. Colerain Township*, 51 F.4th 164, 171 (6th Cir. 2022) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006)). Rather, a plaintiff "must prove standing's elements for each claim and remedy." *Id.*

Diei's request for retrospective declaratory relief is unusual. She seems to seek a declaratory judgment regarding events that already occurred. If so, she lacks standing. Although "past exposure to illegal conduct can serve as evidence of threatened future injury," it "does not in itself show a present case or controversy regarding injunctive relief." *Murthy*, 144 S. Ct. at 1987 (cleaned up) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)); *see also Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 406 (6th Cir. 2019) ("Past harm allows a plaintiff to seek damages, but it does not entitle a plaintiff to seek injunctive or declaratory relief." (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983))).

Not so, says Diei. To her mind, a plaintiff can seek a declaratory judgment as a predicate to a damages award. The cases she relies on, however, do not hold as much. *See Crue v. Aiken*, 370 F.3d 668 (7th Cir. 2004); *PeTA v. Rasmussen*, 298 F.3d 1198 (10th Cir. 2002). Diei emphasizes a lone statement in *Crue* that a declaratory judgment can survive as a "predicate to a damages award." 370 F.3d at 677. Yet that language appears to be little more than an inartful description of the fact that a liability determination must accompany any damages award, not that such a declaration is available as a separate remedy. Confirming as much, the request for "declaratory relief" in *Crue* was merely a liability finding as a predicate to damages. *Id.* at 677–78. *PeTA*, for its part, dismissed claims for injunctive and declaratory relief while allowing damages claims to proceed. 298 F.3d at 1202–03. So too here. Diei has standing to pursue only her claims for damages (causes of action four and five). We turn to those claims now.

B. To resolve Diei's remaining claims, we must first consider which materials are properly before us. As a general matter, a Rule 12(b)(6) motion should be decided solely on the complaint. *See Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020); *Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 155 (6th Cir. 1983). That is unlike a Rule 12(c) motion, which incorporates the materials in a defendant's answer. *See United Food & Com. Workers, Loc. 1995 v. Kroger Co.*, 51 F.4th 197, 202 (6th Cir. 2022). Nevertheless, a court considering a Rule 12(b)(6) motion may review exhibits attached to the complaint as well as "items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). We may also consider "public records[] or [materials that] are otherwise appropriate for the taking of judicial notice." *Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 560 (6th Cir. 2005). Otherwise, before a court may consider supplemental information, the motion typically "must be treated as one for summary judgment under Rule 56," and the parties must be given an opportunity to present evidence. Fed. R. Civ. P. 12(d).

In ruling on defendants' motions to dismiss, the district court, over Diei's objection, relied on documents attached to defendants' motions. So we must determine whether defendants' exhibits were either judicially noticeable or both "referred to in the Complaint and . . . central to the claims." *Bassett*, 528 F.3d at 430.

Begin with the attached excerpts from the Rules of the Tennessee Board of Pharmacy and the College of Pharmacy Student Handbook. These documents might normally reflect "matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). They are currently publicly available, and their content "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," and thus "not subject to reasonable dispute." Fed. R. Evid. 201(b); *cf., e.g.*, *Weiser v. Benson*, 48 F.4th 617, 620 n.3 (6th Cir. 2022) (taking judicial notice of a publicly available document from a state agency). But in this case there is more to consider, especially with regard to the Student Handbook. Diei alleges that this document either did not form the basis for her discipline, or was not publicly available at the time of the relevant events. Thus, even if the Handbook was a

No. 23-5771                           *Diei v. Boyd, et al.*                           Page 6

document that might normally reflect a matter appropriate for judicial notice, at this stage, we must accept Diei's plausible allegations as true. Nor was the Handbook "referred to in the Complaint" and "central" to its claims, because Diei specifically alleges that she never received those policies nor was told which specific violations formed the basis for her discipline. While a court may rely upon "documents integral to the complaint . . . it must also be clear that there exist no material disputed issues of fact regarding the relevance of the documents." *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 797 (6th Cir. 2012); s*ee also Moyer v. Gov't Emp. Ins. Co.*, No. 23-4015, 2024 WL 3934566, at *3 (6th Cir. Aug. 26, 2024) ("A district court should not rely on documents at the motion-to-dismiss stage if their authenticity is disputed."). Taking Diei's plausible allegations as true—which we must do in a Rule 12(b)(6) setting—we cannot, as did the district court, incorporate the Handbook's policies by reference into Diei's complaint, as she was unfamiliar with them at the time of filing.

Other exhibits also fell outside the narrow exceptions to Rule 12(d). Start with a pair of pledges Diei purportedly signed stating that she reviewed and would follow the professionalism policies. Diei likewise questions the relevance of these documents. To her mind, the document she purportedly signed did not reference the policy the College later claimed formed the basis for her discipline. And here again, Diei never referred to the pledges in her complaint. We thus see no basis to consider the pledges in ruling on a Rule 12(b)(6) motion. The same is true for screenshots of Diei's social media posts from the 2019 investigation. Diei alleged that she never received or reviewed them, and, regardless, the 2019 investigation is not the subject of Diei's lawsuit. Thus, at a minimum, their content was not "central to [her] claims."

The remaining documents, such as screenshots of posts from the 2020 investigation, admittedly fell closer to the line. But even assuming those were properly considered, we believe that, on balance, the district court erred by reviewing and relying on the other exhibits. And due to this error, Diei was not allowed to conduct discovery, meaning she did not have an opportunity to counter those items with other evidence. *See Bates*, 958 F.3d at 484; *Max Arnold & Sons, LLC v. W.L. Hailey & Co.*, 452 F.3d 494, 504 (6th Cir. 2006).

How, then, should we proceed? We could remand to allow the district court to reconsider defendants' motions without reference to the just-discussed exhibits. *See Hurd v. District of*

*Columbia*, 864 F.3d 671, 686–87 (D.C. Cir. 2017). At the same time, because we review a Rule 12(b)(6) ruling de novo, *BNA Assocs. LLC v. Goldman Sachs Specialty Lending Grp., L.P.*, 63 F.4th 1061, 1064 (6th Cir. 2023), we could review the merits of Diei's remaining claims, disregarding the inappropriate attachments. *Cf. Bates*, 958 F.3d at 484 (noting that an appellate court may review a complaint "without reference to any extraneous matters" (quoting 5C Charles A. Wright et al., *Federal Practice and Procedure* § 1364, at 63 (3d ed. Supp. 2019))). Seeing no prejudice to the parties in that latter approach, we turn to the merits of Diei's claims.

   C. They take two forms. The first is an as-applied First Amendment challenge, the second a First Amendment retaliation claim. The two have considerable overlap. But differences remain. Chief among them, the retaliation claim concerns subjective motives, whereas the as-applied challenge "focuse[s] on the objective nature of the challenged restriction." *Greenwich Citizens Comm., Inc. v. Cntys. of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 31–32 (2d Cir. 1996) (citing *Cameron v. Johnson*, 390 U.S. 611, 615–19 (1968)); *cf. O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016) (noting that a constitutionally permissible punishment could nevertheless be First Amendment retaliation).

   For today's purposes, however, that distinction is immaterial. No one has disputed that defendants' actions were motivated by Diei's speech, and the retaliation she alleges is itself the unconstitutional application of the policy against her. Thus, at this stage, both claims rise and fall on the resolution of the same three disputed legal questions: (1) was Diei's speech constitutionally protected? (2) did defendants take adverse actions against Diei that caused her to suffer an injury that would likely chill a person of ordinary firmness from continuing that speech? and (3) if so, were her rights clearly established? *See McElhaney v. Williams*, 81 F.4th 550, 556 (6th Cir. 2023).

   Because we consider only whether Diei's complaint failed to state a claim under Rule 12(b)(6), we need not answer these questions definitively. Rather, "[t]o survive a motion to dismiss under Rule 12(b)(6), [Diei] must allege facts that, if accepted as true, are sufficient 'to raise a right to relief above the speculative level,' and to state a 'claim to relief that is plausible on its face.'" *Kovalchuk v. City of Decherd*, 95 F.4th 1035, 1037 (6th Cir. 2024) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). In so doing, we "must construe the

complaint in the light most favorable to [Diei] and accept all allegations as true," but we need not "accept as true unwarranted factual inferences." *Elec. Merch. Sys. LLC v. Gaal*, 58 F.4th 877, 882 (6th Cir. 2023) (citations omitted) (cleaned up).

*Protected Speech.* The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits the government from "abridging the freedom of speech." *See Ward v. Polite*, 667 F.3d 727, 732 (6th Cir. 2012). To that end, "[t]he free-speech clause generally prohibits suppressing speech 'because of its message.'" *Id.* (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995)). This prohibition applies in the public-school setting—including public universities—as those entities are arms of the government. *Id.* (citation omitted). Yet First Amendment freedoms are somewhat constrained in the educational context. *See Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*, 594 U.S. 180, 187 (2021). Generally speaking, "students do not 'shed their constitutional rights to freedom of speech or expression,' even 'at the schoolhouse gate.'" *Id.* (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). At the same time, public high schools and universities have considerable authority to control student speech in light of the pedagogical roles of those institutions. *See id.* at 187–88 (summarizing the categories of student speech restrictions); *see also Ward*, 667 F.3d at 732 (collecting cases). That is not to say the First Amendment necessarily affords the same protection to speech by a high school freshman as it does to a graduate student. Rather, the First Amendment permits teachers, administrators, and courts to consider the "'level of maturity' of the student." *Ward*, 667 F.3d at 734; *see also Mahanoy*, 594 U.S. at 194 n.2 (2021) (Alito, J., concurring).

The Supreme Court has directed us in weighing these competing interests. "[S]chools," we understand, "have a special interest in regulating speech that materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Mahanoy*, 594 U.S. at 188 (cleaned up). But "the leeway the First Amendment grants to schools in light of their special characteristics is diminished" when the speech at issue occurs off campus. *Id.* at 190. "[T]he less the speech has to do with the curriculum and school-sponsored activities, the less likely any suppression will further a 'legitimate pedagogical concern[],' which is why the First Amendment permits suppression under those circumstances only if the speech causes 'substantial disruption

of or material interference with school activities.'" *Ward*, 667 F.3d at 734 (quoting *Tinker*, 393 U.S. at 514); *see also Mahanoy*, 594 U.S. at 189–91. Critical to this inquiry, then, is the context and content of the speech, as well as whether the school has a proper pedagogical reason for regulating it.

As alleged, Diei's social media posts were unrelated to the College of Pharmacy and caused no disruption. She posted about sexuality, fashion, and song lyrics—topics that have little bearing on pharmacy studies. Her posts made no reference to her scholarship or her classmates. And she used a pseudonym to make the posts, further distancing her speech from the College; indeed, Diei alleged that her posts "never identified" her "as a College of Pharmacy student" nor "indicated any affiliation with the University of Tennessee." This is a far cry from a case like *Yoder v. University of Louisville*, where a nursing student was expelled for inappropriate blog posts. 526 F. App'x 537, 541–42 (6th Cir. 2013). In that case, after all, the plaintiff both identified herself as a student and violated the confidentiality of her patients. *Id.* Based on the allegations in the complaint, which we accept as true, Diei's speech did not identify her with the College, had no connection to her studies, and did not lead to disruption. So unless the College had a genuine educational purpose for regulating Diei's speech, her communications fell safely within the confines of First Amendment protection. *See Ward*, 667 F.3d at 734.

Defendants counter that they did have a legitimate pedagogical purpose: training their students to comport with the norms of the pharmacy profession. For support, they cite *Al-Dabagh v. Case Western Reserve University*, 777 F.3d 355 (6th Cir. 2015). There, a medical student was denied a degree due to his asserted lack of professionalism, both inside and outside the classroom. *Id.* at 358. But the basis for the student's punishment was his conduct—arriving late, sexual harassment, poor academic performance, and driving while intoxicated—not his speech. *Id.*

Nor do defendants' citations to two out-of-circuit cases—*Hunt v. Board of Regents of the University of New Mexico*, 792 F. App'x 595 (10th Cir. 2019), and *Keefe v. Adams*, 840 F.3d 523 (8th Cir. 2016)—alter this conclusion. In *Hunt*, a medical student was punished for online speech. 792 F. App'x at 598–99. But unlike here, the speech there disparaged and "harass[ed] others," including other students, albeit not by name. *Id.* at 598. *Keefe* is similarly

distinguishable. In that case, a student was removed from a nursing program after the school received complaints about his online posts. 840 F.3d at 525. Yet those posts, it bears noting, were about the school, were directed at other students in the program, and caused material disruption to the "educational experience." *Id.* at 526–32.

Finally, recall that Diei has alleged that she was never provided with the professionalism policies that formed the basis for her discipline, even when she asked. So those policies are not properly before us. It is thus difficult, at this stage of the litigation, for us to credit the College's claim of a pedagogical purpose. For instance, the College asserts an interest in teaching students to comply with the "professional standards that practicing Tennessee pharmacists live and work under 365 days a year." Perhaps so. But because we have no record at this point whether the College ever imparted such standards, we cannot make that judgment. And even were we to agree that an interest in teaching professionalism may sometimes legitimately curtail a student's speech, the interest evaporates entirely if the College's professionalism regulations bear little resemblance to those of the profession. Again, assessing that relationship would require not only access to the policies, but also a sense of how they are enforced. Neither inquiry is one we can perform on the basis of the complaint alone. At bottom, Diei has adequately alleged that defendants lacked a "legitimate pedagogical concern[]" justifying regulation of her off-campus, online, pseudonymous speech about topics unrelated to the College of Pharmacy that caused no disruption. *Ward*, 667 F.3d at 734 (quoting *Tinker*, 393 U.S. at 514); *see also Mahanoy*, 594 U.S. at 190.

*Adverse Action*. Next, we consider whether the complaint alleges that defendants took an adverse action against Diei that caused her to "suffer an injury that would likely chill a person of ordinary firmness from continuing that activity." *McElhaney*, 81 F.4th at 556. To satisfy this element, "the deterrent effect on speech 'need not be great.'" *Anders v. Cuevas*, 984 F.3d 1166, 1176 (6th Cir. 2021) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999) (en banc)). And here, Diei plausibly alleged that defendants' actions were sufficiently chilling. After the Committee twice investigated her and once voted to expel her, she says, she feared that her continued speech could compromise her professional studies.

Case 2:21-cv-02071-JTF-cgc   Document 74   Filed 09/17/24   Page 12 of 18   (12 of 18)
PageID 661

No. 23-5771                              *Diei v. Boyd, et al.*                              Page 11

Those allegations compare favorably to *Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019). There, we found the student plaintiffs, despite never being punished by the university, had standing to pursue First Amendment claims because "the threat of punishment from a public official who *appears* to have punitive authority can be enough to produce an objective chill." *Id.* at 764 (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963)). Although *Speech First* addressed standing, the same logic applies here. With greater force, in fact. Remember, defendants did not merely threaten punishment—they voted to expel Diei, effective immediately. Taking these allegations as true, a reasonable factfinder could conclude that defendants' actions would likely chill a person of ordinary firmness. *See Anders*, 984 F.3d at 1176.

Defendants disagree, primarily on the basis that, because Diei successfully appealed her expulsion, she did not suffer an adverse action. Defendants cite four cases for support. The first, *Benison v. Ross*, 765 F.3d 649 (6th Cir. 2014), is factually distinguishable. There, the defendants declined to recommend a professor for promotional pay. *Id.* at 653. But because the plaintiff voluntarily resigned before a final decision on her pay was reached, we found no adverse action. *Id.* at 660. The conduct here was more serious: a vote to expel Diei immediately. Indeed, *Benison*, when considering a different action by the defendants, held that the mere threat of putting a hold on a transcript was sufficiently adverse. *Id.* If threatening a transcript's release is an adverse action, then so is initiating an expulsion.

Next is *J. Endres v. Northeast Ohio Medical University*, 938 F.3d 281 (6th Cir. 2019). Endres sued his medical school after he was expelled for cheating. *Id.* at 285. We held that the statute of limitations did not start to run until the final, non-appealable expulsion decision had been made. *Id.* at 296. As such, our analysis addressed accrual for the purpose of a statute of limitations, not whether an action was sufficiently chilling. No more instructive is *Sensabaugh v. Halliburton*, 937 F.3d 621 (6th Cir. 2019). That case arose in the employment context, where "the term 'adverse action' has traditionally referred to actions such as discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote." *Id.* at 628 (cleaned up). No more availing is *Harris v. Blake*, 798 F.2d 419 (10th Cir. 1986). It is both non-binding

and, in the end, inapposite, as it involved a due process (not First Amendment) claim about the adequacy of a graduate school's disciplinary process. *See id.* at 423–24.

All told, at this early stage, we accept Diei's plausible allegations that the investigations and expulsion were sufficient to chill a person of ordinary firmness.

*Clearly Established.* Finally, defendants argue that, even if the complaint fairly alleges unconstitutional conduct on their part, they are entitled to qualified immunity because Diei's rights were not "'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted). On this front, it bears noting the present procedural posture—a Rule 12(b)(6) motion to dismiss. That fact can be decisive. For "[a]lthough an officer's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment," given the record development that typically occurs during discovery. *Anders*, 984 F.3d at 1175 (internal quotation marks and citation omitted).

Either way, clearly established law "should not be defined at a high level of generality." *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (internal quotation marks and citation omitted). An "existing precedent" must place the contours of the right "beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quoting *Ashcroft*, 563 U.S. at 741). Here, the right at issue is Diei's ability to post online, under a pseudonym, about topics unrelated to her studies in a way that did not materially interfere with the pedagogical interests of the College. Against that backdrop, we ask whether a reasonable public official would have understood that Diei's speech was protected. *See Crawford-El v. Britton*, 523 U.S. 574, 590 (1998).

Diei points to three cases to demonstrate that her rights were clearly established. The first, *Reno v. ACLU*, 521 U.S. 844 (1997), says Diei, established that the First Amendment protects online and offline speech equally. *See id.* at 868–70 ("[O]ur cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to [the internet]."). That may be true. But that holding, standing alone, strikes us as one at a high level of generality.

From there, Diei drills down. She turns next to *Papish v. Board of Curators of the University of Missouri*, 410 U.S. 667 (1973) (per curiam). In *Papish*, a graduate student was

No. 23-5771                     *Diei v. Boyd, et al.*                    Page 13

expelled for distributing a newspaper on campus "containing forms of indecent speech." *Id.* at 667. When the student sued, the district court dismissed the case. *Id.* at 669. The court of appeals affirmed, reasoning that "freedom of expression" on a university campus may be "subordinated to other interests such as . . . conventions of decency." *Id.* (citation omitted).

The Supreme Court reversed. *Id.* at 671. Precedent, it said, "ma[de] it clear" that universities cannot rely on "conventions of decency" alone to stifle protected speech. *Id.* at 670; *see, e.g.*, *Healy v. James*, 408 U.S. 169, 187–88 (1972) ("[A public university] may not restrict speech . . . simply because it finds the views expressed . . . to be abhorrent."). "[I]n the absence of any disruption of campus order or interference with the rights of others," the Supreme Court explained, a university cannot "proscribe" speech based on its content—"no matter how offensive to good taste" the speech may be. *Id.* at 670 & n.6. The First Amendment, the Supreme Court observed, "leaves no room for the operation of a dual standard in the academic community with respect to the content of speech." *Id.* at 671.

In *Ward*, we reiterated *Papish*'s admonition against content-based discrimination by universities and, in so doing, identified when a university oversteps its authority to discipline student speech. 667 F.3d at 742. There, a graduate student studying counseling was expelled for requesting that a client seeking counseling about a same-sex relationship be reassigned. *Id.* at 731–32. The student alleged that her expulsion "violated her free-speech and free-exercise rights"; the defendants countered that the student's conduct violated the code of ethics. *Id.* at 730–32. The district court agreed with the defendants and awarded them summary judgment. *Id.* We reversed on both claims. *Id.* at 742.

Relevant for present purposes was *Ward*'s description of the extent to which the First Amendment protects student speech. We acknowledged in *Ward* that the First Amendment does not completely deprive educators of their discretion over course curriculum and class-related speech. *Id.* at 734. At the same time, we stated that if student speech is unrelated to "the curriculum and school-sponsored activities," and suppression of the speech does not "further a 'legitimate pedagogical concern[],'" then the First Amendment only "permits suppression" of the speech when it "causes 'substantial disruption of or material interference with school activities.'" *Id.* (quoting *Tinker*, 393 U.S. at 514). Concluding that a reasonable jury could find that

"hostility" to the plaintiff's religious speech, not a legitimate pedagogical purpose, was the cause of the plaintiff's expulsion, we reversed. *Id.* at 735–38, 742.

Read together, these cases provided fair warning to defendants that Diei's speech (as characterized in her complaint)—off-campus, online, pseudonymous social media posts, unrelated to her field of study, that caused no disruptive effect—was protected by the First Amendment.

Defendants disagree. To their eye, *Ward* does not articulate a clearly established rule because it did not deem the policies there facially unconstitutional. Fair enough. But *Ward* is instructive here not for what it says about the content of school policies, but rather what it says about such policies' function. Put simply, a university cannot use a policy to punish student speech if the university has no legitimate educational reason for doing so.

This is not to say that a professionalism policy may never serve a pedagogical purpose. A university may use a policy of that ilk to inculcate graduate students with the norms and expectations of their professions, preparing them for their future endeavors. *See, e.g.*, *Keefe*, 840 F.3d at 531; *Hunt*, 792 F. App'x at 605. In some cases, in other words, instructional purposes may give universities "space" to discipline "speech by students in professional schools that appears to be at odds with customary professional standards." *Hunt*, 792 F. App'x at 605.

But even when a professional school adopts a policy regulating student conduct for pedagogical reasons, the policy must genuinely reflect the professional norms and provide students with sufficient notice of what activity could subject them to discipline. *See, e.g.*, *Keefe*, 840 F.3d at 544 (Kelly, J., concurring in part and dissenting in part) (questioning whether a university "provide[s] sufficient notice of what . . . [is] prohibited" when it applies a "generalized Code of Conduct to speech after the fact"). Without sufficient notice, the university policy risks becoming a tool for chilling student speech rather than fostering student development. *See id.* (warning that generic phrases in university policies could "easily be used to restrict protected speech"). This concern becomes a reality when, as alleged here, a university fails to provide students with the policy in the first place. It is exceedingly difficult to see how any

professionalism policy could serve a pedagogical purpose if students are unaware of its existence.

Based on Diei's complaint, the College's treatment of her speech clearly transgressed the school's authority. Diei alleges that her speech did not concern her courses, classmates, or school, nor did it have any disruptive effect on school activities. Further, Diei alleges that she never received the professionalism policies that gave rise to her punishment. In Diei's case, then, the professionalism policies served no pedagogical purpose. *Ward* clearly established that Diei's speech, as alleged, was beyond the purview of her educators' control. At this stage, we need not decide whether the policies actually tracked the norms of the profession or were too vague to provide Diei with sufficient notice of prohibited conduct.

As for *Papish* and *Reno*, defendants argue that the rights described in those cases are defined at a high level of generality. Standing alone, this may well be true. But *Papish* held that universities cannot punish a student solely based on the content of her speech. 410 U.S. at 670. And by establishing that the First Amendment does not differentiate between online and offline speech, *Reno* extended *Papish*'s protections to online student speech. 521 U.S. at 868–70. In conjunction with *Ward*, these cases put it "beyond debate" that the speech, as alleged, was protected. *Mullenix*, 577 U.S. at 12 (citation omitted).

Nor does *Yoder* compel a different outcome. Recall that there, a nursing student was expelled for a blog post about her experience with patients. 526 F. App'x at 539–42. We affirmed a grant of qualified immunity because the boundaries for the regulation of off-campus speech related to school activities were not clearly established. *Id.* at 545. That outcome, however, was tied to the specific setting. At issue was "a university's ability to take action against a nursing (or medical) student for making comments off campus that implicate patient privacy concerns." *Id.* Exactly true, *Yoder* was decided at the summary judgment stage, where there was no dispute that the nursing student had been informed of and had committed to the professionalism and confidentiality policies at issue. *Id.* at 538–39. Diei's alleged speech, on the other hand, was unrelated to her studies, had no privacy implications, caused no disruption to the College, and did not violate any policy of which she was aware. Remember, Diei alleges that "[t]o this day, [she] does not know what policy she allegedly violated."

That we sit at the Rule 12(b)(6) stage bears repeating. Oftentimes, we need a fuller factual picture to define the contours of the right at issue to determine if it was clearly established, *see Anders*, 984 F.3d at 1175, especially so in the First Amendment context, *Evans-Marshall v. Board of Education of Tipp City Exempted Village School District*, 428 F.3d 223, 234–35 (6th Cir. 2005) (Sutton, J., concurring). At this point, we accept Diei's well-pleaded allegations as true. Those allegations disclaim receipt or knowledge of the professionalism policy under which Diei was purportedly disciplined. So we cannot, at this stage, credit the College's claimed pedagogical purposes when it is plausibly alleged they were unknown to Diei. As the record develops, it may reveal that Diei's speech was not clearly protected. *See id.* For example, her speech may have disrupted the College in ways not apparent from the complaint. Such evidence would affect the qualified immunity analysis. Today, we merely hold that Diei's speech, as alleged, was clearly protected by the First Amendment. At this preliminary stage, then, defendants do not deserve dismissal based on qualified immunity.

*   *   *   *   *

We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 23-5771

KIMBERLY DIEI,

    Plaintiff - Appellant,

v.

RANDY BOYD, et al.,

    Defendants - Appellees.

**FILED**
Sep 17, 2024
KELLY L. STEPHENS, Clerk

Before: LARSEN, READLER, and DAVIS, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Tennessee at Memphis.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED IN PART, REVERSED IN PART, and REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

Kelly L. Stephens, Clerk